UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket No.: 1:04-cv-10775-DPW

EVANGELIA BAKIS and PETER BAKIS,
       Plaintiffs,


       V.


PATRONS MUTUAL INSURANCE COMPANY OF
CONNECTICUT,
       Defendant.


## **List of Exhibits**

Exhibit 1 (Kelly Complaint)

Exhibit 2 (Patrons policies)

Exhibit 3 (Depo. of Peter Bakis)

Exhibit 4 (Depo. of Evangelia Bakis)

Exhibit 5 (Police report of investigation)

*342652_1.doc*

# EXHIBIT 1



# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 02-4725E

SUZANNE KELLY,      )
     )
         Plaintiff,      )
     )
     )
vs.      )
     )
NICHOLAS BAKIS, a Minor,      )
EVANGELINA BAKIS,      )
ALSO KNOWN AS EVI BAKIS      )
AND EVANGELINA      )
SIMEONIDOU, Individually and as )
Trustee OF THE 296      )
BELGRADE AVENUE TRUST,      )
D AND S REALTY TRUST,      )
TABLETOP TRUST AND      )
MACEDONIA REALY TRUST      )
And PETER BAKIS, ALSO      )
KNOWN AS PANAGIOTIS      )
BAKIS, Individually, and, as      )
Parents and Next Friends of      )
NICHOLAS BAKIS, a Minor,      )
     )
         Defendants      )
     )

## FIRST AMENDED VERIFIED COMPLAINT
## AND JURY TRIAL CLAIM

### PARTIES

1.    Plaintiff, Suzanne Kelly, is a natural person who at all times relevant to this Complaint was a resident of Broadlawn Park, West Roxbury, County of Suffolk, Commonwealth of Massachusetts.

2.    Defendant, Nicholas Bakis, a minor, is a natural person who at all times relevant to this Complaint was a resident of the City of Boston, County of Suffolk, Commonwealth of Massachusetts.

3.    Defendant, Evangelina Bakis, also known as Evi Bakis and/or Evangelina Simeonidou, and as Trustee of the 296 Belgrade Avenue Trust, D and S Realty

Trust, Table Top Trust and Macedonia Realty Trust (hereinafter referred to as Evangelina Bakis), is a natural person who at all times relevant to this Complaint was a resident of the City of Boston, County of Suffolk, Commonwealth of Massachusetts.

4.  Defendant, Peter Bakis, also known as Panagiotis Bakis, (hereinafter referred to as Peter Bakis) is a natural person who at all times relevant to this Complaint was a resident of the City of Boston, County of Suffolk, Commonwealth of Massachusetts.

5.  Defendants, Evangelina Bakis and Peter Bakis, are the parents and next friends of Defendant, Nicholas Bakis, who was a minor at the time of the incident alleged in this Complaint.

## FACTS

6.  On or about February 3, 2002, Defendant, Nicholas Bakis and/or Defendant, Evangelina Bakis, or both Defendants, failed to exercise due care in the operation of a motor vehicle when the vehicle he or she was operating, in a reckless and/or a negligent manner, struck Plaintiff, Suzanne Kelly, a pedestrian, on the West Roxbury Parkway, West Roxbury, County of Suffolk, Commonwealth of Massachusetts.

7.  At the time of the incident described in this Complaint, the motor vehicle being operated by either Defendant, Nicholas Bakis, and/or Defendant, Evangelina Bakis, was owned by Defendant, Evangelina Bakis.

8.  Upon information and belief, at the time of the incident described in this Complaint, pursuant to M.G.L. c. 90, § 8, Defendant, Nicholas Bakis, a minor, had a restricted junior operator's license prohibiting him from operating a motor vehicle between the hours of 12:00 a.m. and 5:00 p.m.

9.  Upon information and belief, Defendant, Nicholas Bakis, a minor, struck Plaintiff, Suzanne Kelly, at a time when he was prohibited from operating a motor vehicle in violation of M.G.L. c. 90, § 8.

10. Upon information and belief, after striking Plaintiff, Suzanne Kelly, Defendant, Nicholas Bakis, a minor, and Defendant, Evangelina Bakis, in violation of M.G.L. c. 90, § 24(2)(a), left the scene leaving Plaintiff, Suzanne Kelly, who was severely injured, along the side of the road.

11. Upon information and belief, after striking Plaintiff, Suzanne Kelly, one or more of the Defendants, Nicholas Bakis, a minor, and/or Defendant, Evangelina Bakis, and/or Defendant, Peter Bakis, acting either alone or together, failed to notify the proper authorities about this incident in which Plaintiff, Suzanne Kelly, had been severely injured, failed to notify the proper authorities that the driver of the

vehicle owned by Defendant, Evangelina Bakis, had struck her and/or concealed the location of the vehicle for the purpose of evading prosecution by law enforcement authorities.

## COUNT I – NEGLIGENCE
### (Suzanne Kelly v. Nicholas Bakis)

12.    Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven of this Complaint as if expressly rewritten and set forth herein.

13.    As a direct and proximate result of the negligent operation of a motor vehicle by Defendant, Nicholas Bakis, a minor, Plaintiff, Suzanne Kelly, has suffered continues and will continue to suffer severe physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and outpatient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; has suffered continues and will continue to suffer great pain of body and mind; has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE,** Plaintiff, Suzanne Kelly, demands judgment against Defendant, Nicholas Bakis, a minor, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT II – NEGLIGENCE
### (Suzanne Kelly v. Evangelina Bakis)

14.    Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven of this Complaint as if expressly rewritten and set forth herein.

15.    As a direct and proximate result of the negligent operation of a motor vehicle by Defendant, Evangelina Bakis, Plaintiff, Suzanne Kelly, has suffered, continues and will continue to suffer severe physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and outpatient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined has suffered, continues and will continue to suffer great pain of body and mind; has been, continues and will

continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE,** Plaintiff, Suzanne Kelly, demands judgment against Defendant, Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT III – NEGLIGENT ENTRUSTMENT
### (Suzanne Kelly vs. Evangelina Bakis)

16. Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven and Paragraphs twelve and thirteen of Count I of this Complaint as if expressly rewritten and set forth herein.

17. Upon information and belief, at all times relevant herein, Defendant, Evangelina Bakis, was the owner of the vehicle being operated by her son, Defendant, Nicholas Bakis, a minor, when it stuck and severely injured Plaintiff, Suzanne Kelly.

18. As a direct and proximate result of the negligent entrustment of her motor vehicle to her son, Defendant, Nicholas Bakis, a minor, Defendant Evangelina Bakis caused Plaintiff, Suzanne Kelly, to suffer severe physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and outpatient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; to suffer great pain of body and anguish of mind; to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE,** Plaintiff, Suzanne Kelly, demands judgment against Defendant, Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT IV – NEGLIGENT SUPERVISION
### (Suzanne Kelly vs. Evangelina Bakis)

19. Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I and Paragraphs sixteen through eighteen of Count III of this Complaint as if expressly rewritten and set forth herein.

20. At all times relevant herein, Defendant, Nicholas Bakis, a minor, was and is the son of Defendant, Evangelina Bakis.

21. As a direct and proximate result of the negligent supervision of her son, Defendant, Nicholas Bakis, a minor, Defendant Evagelina Bakis caused Plaintiff, Suzanne Kelly to suffer severe physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and outpatient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; to suffer great pain of body and mind; to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

WHEREFORE, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT V – NEGLIGENT SUPERVISION
### (Suzanne Kelly vs. Peter Bakis)

22. Plaintiff, Suzanne Kelly repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I and Paragraphs sixteen through eighteen of Count III of this Complaint as if expressly rewritten and set forth herein.

23. At all times relevant herein, Defendant, Nicholas Bakis, a minor, was and is the son of Defendant, Peter Bakis.

24. As a direct and proximate result of the negligent supervision of his son, Defendant, Nicholas Bakis, a minor, Defendant Peter Bakis caused Plaintiff, Suzanne Kelly, to suffer severe physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and outpatient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages as well as substantial continuing future medical expenses and lost earnings in an amount as yet to be determined; to suffer great pain of body and anguish of mind; to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

WHEREFORE, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Peter Bakis, for the damages and losses she has sustained, continues and will continue to

PATRONS' CLAIMS

suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT VI – CIVIL CONSPIRACY
### (Suzannne Kelly vs. Nicholas Bakis,
### Evangelina Bakis and/or Peter Bakis)

25.    Plaintiff, Suzanne Kelly, repeats and reavers, all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I, Paragraphs fourteen and fifteen of Count II, Paragraphs sixteen through eighteen of Count III, Paragraphs nineteen through twenty-one of Count IV and Paragraphs twenty-two through twenty-four of Count V of this Complaint as if expressly rewritten and set forth herein.

26.    Defendants, Nicholas Bakis, a minor, Defendant, Evangelina Bakis and Peter Bakis, individually and as next friends Nicholas Bakis, a minor, acted together to avoid criminal and civil responsibility for striking and injuring Plaintiff, Suzanne Kelly, including, but not limited to, leaving the scene of the accident, failing to alert the proper authorities so that immediate assistance and essential emergency medical care and treatment could be provided to the critically injured plaintiff, failing to provide proper information about the events of the accident and concealing the vehicle that struck the plaintiff.

27.    As a direct and proximate result of the Defendants' actions and/or inactions, the Plaintiff, Suzanne Kelly, was caused, continues and will continue to suffer severe personal injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient and admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be undetermined; has suffered, continues and will continue to suffer great pain of body and anguish of mind; has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

WHEREFORE, Plaintiff, Suzanne Kelly, demands judgment against Defendants, Nicholas Bakis, a minor by and through his parents and next friends, Evangelina Bakis and Peter Bakis, and Peter Bakis and Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT VII – INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS
### (Suzanne Kelly vs. Nicholas Bakis)

28.    Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I and Paragraphs twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

29.    Defendant, Nicholas Bakis, knew or should have known that his conduct would cause Plaintiff, Suzanne Kelly, to suffer emotional distress, that further his conduct was beyond all possible bounds of decency, was intolerable in a civilized community and was extreme and outrageous.

30.    As a direct and proximate result of the actions and/or inactions of Defendant, Nicholas Bakis, Plaintiff Suzanne Kelly, has been caused, continues and will continue to suffer severe emotional and physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing future medical expenses and lost earnings in an amount as yet to be determined; has suffered, continues and will continue to suffer great pain of body and anguish of mind; has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

WHEREFORE, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Nicholas Bakis a minor by his parents and next friends, Peter Bakis and/or Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer including, but not limited to, consequential damages, together with interest and costs.

## COUNT VIII – NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS)
### (Suzanne Kelly vs. Nicholas Bakis)

31.    Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I and paragraphs twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

32.    Defendant, Nicholas Bakis, knew or should have known that his conduct would cause the Plaintiff, Suzanne Kelly, to suffer emotional distress.

33.    As a direct and proximate result of the actions and/or inactions of Defendant, Nicholas Bakis, Plaintiff Suzanne Kelly, has been caused, continues and will

continue to suffer severe emotional and physical injuries including, but not limited to, numerous fractures including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; has suffered, continues and will continue to suffer great pain of body and anguish of mind; has been continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently affected.

**WHEREFORE**, Plaintiff, Suzanne Kelly, demands judgment against Defendant Nicholas Bakis, a minor  by and through his parents and next friends, Peter Bakis and/or Evangelina Bakis, for damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT IX -- INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS
### (Suzanne Kelly vs. Evangelina Bakis)

34.     Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I, Paragraphs fourteen and fifteen of Count II, Paragraphs sixteen through eighteen of Count III, Paragraphs nineteen through twenty-one of Count IV and Paragraphs twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

35.     Defendant, Evangelina Bakis, knew or should have known that her conduct would cause the Plaintiff, Suzanne Kelly, to suffer emotional distress, that further her conduct was beyond all possible bounds of decency, was intolerable in a civilized community and was extreme and outrageous.

36.     As a direct and proximate result of the actions and/or inactions of Defendant Evangelina Bakis, Plaintiff Suzanne Kelly, has been caused, continues and will continue to suffer severe emotional and physical injuries including, but not limited to, numerous fractures including but not limited to her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admissions of a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; has suffered, continues and will continue to suffer great pain of body and anguish of mind; has been continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE**, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer including, but not limited to, consequential damages, together with interest and costs.

## COUNT X – NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS
## (Suzanne Kelly vs. Evangelina Bakis)

37.    Plaintiff, Suzanne Kelly, repeats and reavers Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I, Paragraphs fourteen and fifteen of Count II, Paragraphs sixteen through eighteen of Count III, Paragraphs nineteen through twenty-one of Count IV and Paragraphs twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

38.    Defendant, Evangelina Bakis, knew or should have known that her conduct would cause the Plaintiff, Suzanne Kelly to suffer emotional distress.

39.    As a direct and proximate result of the actions and/or inactions of Defendant, Evangelina Bakis, Plaintiff, Suzanne Kelly, has been caused, continues and will continue to suffer severe emotional distress and physical injuries including but not limited to numerous fractures including but not limited to her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined, has suffered, continues and will continue to suffer great pain of body and anguish of mind, has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE**, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Evangelina Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT XI – INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS
## (Suzanne Kelly vs. Peter Bakis)

40.    Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I, Paragraphs twenty-two through twenty-four of Count V and Paragraph twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

41. Defendant, Peter Bakis, knew or should have known that his conduct would cause the Plaintiff, Suzanne Kelly, to suffer emotional distress, that further his conduct was beyond all possible bounds of decency, was intolerable in a civilized community and was extreme and outrageous.

42. As a direct and proximate result of the actions and/or inactions of Defendant, Peter Bakis, Plaintiff Suzanne Kelly, has been caused, continues and will continue to suffer severe emotional and physical injuries including, but not limited to, numerous fractures, including but not limited to her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; has suffered, continues and will continue to suffer great pain of body and anguish of mind; has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

WHEREFORE, Plaintiff, Suzanne Kelly, demands judgment against Defendant, Peter Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## COUNT XII – NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS
### (Suzanne Kelly vs. Peter Bakis)

43. Plaintiff, Suzanne Kelly, repeats and reavers all of the allegations contained in Paragraphs one through eleven, Paragraphs twelve and thirteen of Count I, Paragraphs twenty-two through twenty-four of Count V and Paragraphs twenty-five through twenty-seven of Count VI of this Complaint as if expressly rewritten and set forth herein.

44. Defendant, Peter Bakis, knew or should have known that his conduct would cause the Plaintiff, Suzanne Kelly, to suffer emotional distress.

44. As a direct and proximate result of the actions and/or inactions of Defendant, Peter Bakis, the Plaintiff, Suzanne Kelly, has been caused, continues and will continue to suffer severe emotional and physical injuries including, but not limited to, numerous fractures, including, but not limited to, her pelvis, tibia and face, a ruptured bladder, multiple surgeries, an extended period of in-patient hospitalization, an extended period of in-patient and out-patient admission to a rehabilitation hospital resulting in substantial medical expenses and lost wages already incurred as well as substantial continuing and future medical expenses and lost earnings in an amount as yet to be determined; has suffered, continues

and will continue to suffer great pain of body and anguish of mind, has been, continues and will continue to be unable to pursue normal activities and her ability to enjoy life has been permanently adversely affected.

**WHEREFORE,** Plaintiff, Suzanne Kelly, demands judgment against Defendant, Peter Bakis, for the damages and losses she has sustained, continues and will continue to suffer in the future including, but not limited to, consequential damages, together with interest and costs.

## JURY CLAIM

Plaintiff, Suzanne Kelly, hereby demands trial by jury on all counts contained in this Complaint to the extent permitted by law.

Respectfully submitted,
Plaintiff Suzanne Kelly
By her attorneys,

Patricia Noyes-Corrigan
B.B.O. #374930
Richard A. Gargiulo
B.B.O. #185680
GARGIULO / RUDNICK, LLP
66 Long Wharf, 4th Floor
Boston, MA 02110
Telephone: (617) 742-3833

DATED: October 25, 2002

10/30/2003 09:46 FAX 8606333942          PATRONS CLAIMS                                    ☑016

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                                        October 25, 2002

Then personally appeared, Suzanne Kelly, Plaintiff in the above-entitled action, being duly sworn, deposes and says that she is the plaintiff in the within entitled action and she has made oath that she has read the First Amended Verified Complaint and Jury Trial Claim, and that she knows the contents thereof; and that the same is true of her own knowledge, except as to matters stated to be alleged on information and belief as to those matters she believes it to be true.

SUZANNE KELLY
Broadlawn Park
West Roxbury, Massachusetts

Sworn to before me this _25_ day of October 2002.

_Nancy A. Finn_
Notary Public

My commission expires: 7/29/2005

# EXHIBIT 2

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT

**BUSINESSOWNERS POLICY DECLARATIONS**          **LEGAL**

Policy Number: BOP9008357

Renewal Certificate #: New

**BILLING TYPE: Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 134 Belgrade Realty Trust<br>Evangelia Bakis<br>PO Box 203<br>West Roxbury, MA 02132 | Guard Insurance Agency<br>279 Mt. Auburn Street<br>Watertown, MA 02172<br><br>Agency Number: 6110 |

Policy Period:    from 11/12/01  to 11/12/02          12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## DESCRIBED PREMISES:

| Premise # | Building # | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 134 Belgrade Avenue, Roslindale, MA | The Cooperative Bank  ISAOA ATIMA<br>40 Belgrade Avenue<br>Roslindale, MA 02131 |

**BUSINESS DESCRIPTION:  6 UNIT APARTMENT BUILDING**

☐ Individual      ☐ Joint Venture      ☐ Partnership      ☐ Corporation      ☒ Other

## LIMITS OF INSURANCE FOR PROPERTY:

| BUILDINGS | Premise # 1        Building # 1 | Premise #        Building # |
|---|---|---|
| ☐ Actual Cash Value   ☒ Replacement Value<br>Automatic Increase                % | $            360,000 | $ |
| PERSONAL PROPERTY | $ | $ |

## OPTIONAL COVERAGES / applicable only if "x" is shown below:

**LIMITS OF INSURANCE**

☐ Outdoor Signs
☐ Exterior Grade Floor Glass
☐ Other (specify)       Specify:
☐ Money & Securities Limit     $
☐ Employee Dishonesty
☒ Mechanical Breakdown

Inside Premises    $

$                per occurrence
Included in Property Limit
Included in Property Limit
Outside Premises
$                per occurrence
Included in Property Limit

*CERTIFIED COPY OF POLICY*

DEC 1 2004

AUTHORIZED SIGNATURE: *Connie Dumond*

**DEDUCTIBLE: $ 1,000**

## LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| LIABILITY AND MEDICAL EXPENSES | $ | 1,000,000 | Per Occurrence | $ | 2,000,000 | Aggregate |
|---|---|---|---|---|---|---|
| MEDICAL EXPENSES | $ | 5,000 | Per Person | | | |
| FIRE LEGAL LIABILITY | $ | 50,000 | Any one fire or explosion | | | |
| | $ | | | | | |

**FORMS APPLICABLE:**
BP-200 Ed 1.0  BP-432 Ed 2.0  BP-0620 Ed 01 99
GL-895 Ed 2.0  BP 56 22 03 99
PM 72 01 07 99  BP 06 63 12 99  ML-106 Ed 1.0  ML-223 Ed 3.0  BP-309 Ed 1.0
Authorized Signature: _____

| ANNUAL PREMIUM | $  1,891 |
|---|---|

$350 Minimum Earned Premium Regardless of Term

Date: _____

bop 7/96

# BUSINESSOWNERS SPECIAL POLICY
## TABLE OF CONTENTS

Agreement .................................................................................................................... Page 1
Common Policy Conditions ............................................................................................... 2
Property Coverage Section ...............................................................................................
   Definitions .................................................................................................................... 3
   Property Covered ........................................................................................................ 4
      Coverage A -- Buildings ......................................................................................... 4
      Coverage B -- Business Personal Property ............................................................ 4
      Property Not Covered ............................................................................................. 4
      Additional Property Excluded and Limitations ....................................................... 5
      Additional Coverages ............................................................................................. 5
      Extensions of Coverage ......................................................................................... 6
   Coverage C -- Loss Of Income .................................................................................... 8
      Earnings ................................................................................................................. 9
      Extra Expenses ...................................................................................................... 9
      Exclusions And Limitations ..................................................................................... 9
      Supplemental Loss Of Income Coverages ............................................................. 10
   Perils Covered ............................................................................................................. 10
   Perils Excluded ............................................................................................................ 11
   Additional Exclusions ................................................................................................... 11
   What Must Be Done In Case Of Loss .......................................................................... 13
   Valuation Of Property Losses ...................................................................................... 15
   How Much We Pay ....................................................................................................... 16
   Loss Payment .............................................................................................................. 17
   Other Property Coverage Conditions ........................................................................... 18
   Optional Property Coverages ....................................................................................... 18
Commercial Liability Coverage Section ............................................................................ 20
   Definitions .................................................................................................................... 25
   Principal Coverages ..................................................................................................... 29
      Coverage L -- Bodily Injury Liability/Property Damage Liability .............................. 29
      Coverage M -- Medical Payments .......................................................................... 29
      Coverage N -- Products/Completed Work .............................................................. 29
      Coverage O -- Fire Legal Liability .......................................................................... 29
      Coverage P -- Personal Injury Liability/Advertising Injury Liability .......................... 30
   Supplemental Coverages ............................................................................................. 30
   Defense Coverage ....................................................................................................... 30
   Exclusions ................................................................................................................... 32
   Additional Exclusions That Apply To Personal Injury and/or Advertising Injury .......... 35
   Additional Exclusions That Apply To Property Damage Liability .................................. 36
   Additional Exclusions That Apply To Medical Payments .............................................. 37
   What Must Be Done In Case Of Loss .......................................................................... 37
   How Much We Pay ....................................................................................................... 38
   Conditions ................................................................................................................... 38
   Nuclear Energy Liability Exclusion .............................................................................. 39
   Nuclear Energy Liability Exclusion Definitions ............................................................ 42

Endorsements may also apply. They are identified on the "declarations" page. Refer to the Definitions for words that have special meanings. These words are shown in quotation marks or bold type.

## AGREEMENT

Subject to all the "terms" that apply, and in return for "your" payment of the required premium, "we" provide the coverages described in this policy during the policy period.



# COMMON POLICY CONDITIONS

This Common Policy Conditions Section contains additional "terms" that apply to all coverages provided by this policy.

1. **Assignment** -- This policy may not be assigned without our written consent.

2. **Cancellation** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" a written notice and stating at what future date coverage is to stop.

   "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

   If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days before the cancellation is effective. The notice will state the time that the cancellation is to take effect.

   "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification, or Waiver of Policy Terms** -- A change or waiver of "terms" of this policy must be issued by "us" in writing to be valid.

4. **Conformity With Statute** -- "Terms" of this policy, in conflict with the statutes of the state where the premises described are located, are amended to conform to such statutes.

5. **Cooperation** -- In case of loss, "you" must cooperate in performing all acts required by this policy.

6. **Examination of Books and Records** -- "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

7. **Inspections** -- "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

8. **Liberalization** -- If "we" adopt a revision of forms during a policy period which broadens this policy without additional premium, the broadened coverage will automatically apply to this policy. This also applies if "we" adopt the revision within 60 days before this policy is effective.

9. **Misrepresentation, Concealment, or Fraud** -- This coverage is void as to "you" and any other "insured" if, before or after a loss:

   a. "you" have or any other "insured" has willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof; or
      2) the "insured's" interest herein; or

   b. there has been fraud or false swearing by "you" or any other "insured" with regard to a matter that relates to this insurance or the subject thereof.

# PROPERTY COVERAGES

This Property Coverage Section contains the definitions, coverage descriptions, perils, exclusions, limitations, and conditions that apply to Businessowners Property Coverages.

## DEFINITIONS

1. "You" and "your" mean the persons or organizations named as the insured on the "declarations".

2. "We", "us", and "our" mean the company providing this coverage.

3. "Basic territory" means the United States of America, its territories and possessions, Canada, and Puerto Rico.

4. "Declarations" means all pages labeled declarations, supplemental declarations, or schedules, which pertain to this policy.

5. "Limit" means the amount of coverage that applies.

6. "Money" means currency, coins, bank notes in current use; and traveler's checks and money orders held for sale.

7. "Pollutant" means:

   a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be disposed of as well as recycled, reclaimed, or reconditioned.

   b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

8. "Restoration period" means the time it should reasonably take to resume "your" normal business activities at the described premises starting from the date of loss caused by a covered peril, and ending on the date the property should be rebuilt, repaired, or replaced. This is not limited by the expiration date of the policy.

   This does not include any increase in time due to the enforcement of any ordinance, law, or decree that regulates or requires:

   a. the construction, use, repair, or demolition of any property;

   b. the testing, evaluating, observing, or recording the existence, level, or effects of "pollutants"; or

   c. the clean up, removal, containment, treatment, detoxification, or neutralization of "pollutants".

9. "Securities" means negotiable and nonnegotiable instruments representing either "money" or other property. This includes tokens, tickets, revenue, or other stamps in current use, and evidences of debt used in connection with credit cards, but does not include "money".

10. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

11. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm, all except as excluded or limited.

Falling objects does not include loss to personal property in the open or to the interior of buildings or structures or personal property inside buildings or structures unless the exterior of the roof or walls are first damaged by a falling object.

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

12. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

13. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow. It does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PROPERTY COVERED

"We" cover direct physical loss to property covered under COVERAGE A and COVERAGE B caused by a covered peril.

### COVERAGE A -- BUILDINGS

This means buildings and structures for which a "limit" is shown on the "declarations". This includes:

1. completed additions;

2. fixtures, machinery, and equipment which are a permanent part of the described building or structure;

3. outdoor fixtures;

4. personal property owned by "you" and used to maintain or service the described premises, including air-conditioning equipment; fire extinguishing apparatus; outdoor furniture; floor coverings; and appliances for refrigerating, cooking, dish washing, and laundering;

5. if not covered by other insurance:

   a. additions under construction, alterations, and repairs to the building or structure; and

   b. materials, equipment, supplies, and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations, or repairs to the building or structure; and

6. "your" personal property in apartments or rooms furnished by "you" as landlord.

### COVERAGE B -- BUSINESS PERSONAL PROPERTY

This means "your" business personal property in the buildings and structures described on the "declarations" or in the open (or in vehicles) on or within 100 feet of the described premises and for which a "limit" is shown on the "declarations". This includes:

1. "your" interest in personal property of others in "your" care, custody, or control, to the extent of "your" legal liability, plus the cost of "your" labor, material, and services; and

2. "your" use interest as tenant in improvements to the described building or structure. Improvements are fixtures, alterations, installations, or additions:

   a. to a building or structure "you" occupy but do not own; and

   b. made or acquired at "your" expense and which cannot be legally removed by "you".

## PROPERTY NOT COVERED

The property described below is not covered under Coverage A -- Buildings or Coverage B -- Business Personal Property. Limited coverage for some of the property described below is included under Additional Coverages or Extensions of Coverage.

1. **Antennas, Fences, and Signs** -- Except as provided under Additional Coverages, "we" do not cover outdoor:

    a. radio, television, satellite, dish-type, or other antennas or their masts, towers, or lead-in wiring;

    b. fences; or

    c. signs.

2. **Bullion** -- "We" do not cover bullion.

3. **Contraband** -- "We" do not cover contraband or property in the course of illegal transportation or trade.

4. **Land, Water, Growing Crops, or Lawns --** "We" do not cover:

    a. land, including land on which the property is located;

    b. underground or surface water; or

    c. growing crops or lawns.

5. **Lottery Tickets** -- "We" do not cover lottery tickets not held for sale.

6. **Money and Securities** -- "We" do not cover lottery tickets not held for sale, "money", or "securities".

7. **Trees, Shrubs, and Plants** -- Except as provided under Extensions of Coverages, "we" do not cover trees, shrubs, plants, or grain, hay, straw, or other crops, when outdoors.

8. **Vehicles and Aircraft** -- "We" do not cover aircraft or vehicles or self-propelled machines required to be licensed for use on public roads.

9. **Watercraft** -- "We" do not cover watercraft (including their motors, equipment, or accessories) while afloat.

## ADDITIONAL PROPERTY EXCLUDED AND LIMITATIONS

The exclusions and limitations described below apply to Coverage A and Coverage B.

1. **Boilers** -- "We" do not cover loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment. "We" do cover loss to such equipment caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

    "We" do not cover loss to hot water boilers or water heaters caused by any condition or occurrence within such equipment other than explosion.

2. **Furs** -- "We" do not cover more than $2,500 total in any one occurrence for loss by theft of furs or fur garments.

3. **Glass Breakage** -- "We" do not cover building glass breakage (other than glass building blocks) for more than $100 for any plate, pane, multiple plate insulating unit, heating pane, jalousie, louver, or shutter, or more than $500 in any one occurrence. These "limits" do not apply to loss by a "specified peril" other than vandalism.

4. **Glassware/Fragile Articles** -- "We" do not cover breakage of fragile articles such as glassware, statuary, porcelains, and bric-a-brac, except as a result of a "specified peril". This does not apply to glass that is a part of a building or structure; bottles or other containers held for sale; or lenses of photographic or scientific instruments.

5. **Jewelry, Watches, Jewels, Pearls, Precious Stones, and Metals** -- "We" do not cover more than $2,500 total in any one occurrence for loss by theft of jewelry; watches; watch movements; pearls; precious, or semi-precious stones; gold, silver, or other precious metals; or items consisting primarily of precious metals. This limitation does not apply to jewelry or watches worth $100 or less per item.

6. **Missing Property** -- "We" do not cover missing property where the only proof of loss is unexplained or mysterious disappearance, shortage discovered on taking inventory, or other instance where there is no physical evidence to show what happened to the property.

7. **Patterns, Dies, Molds, Models, and Forms** -- "We" do not cover more than $2,500 total in any one occurrence for loss by theft of patterns, dies, molds, models, or forms.

8. **Personal Property in the Open** -- "We" do not cover loss to personal property in the open caused by rain, snow, ice, or sleet.

## ADDITIONAL COVERAGES

"We" provide the following additional property coverages.

Unless otherwise stated, each additional coverage is an additional amount of insurance.

1. **Collapse** -- "We" pay for loss caused by direct physical loss involving collapse of a building or structure or any part of a building or structure caused only by one or more of the following:

   a. a "specified peril"; all only as covered in the Property Coverages;

   b. hidden decay;

   c. hidden insect or vermin damage;

   d. weight of people or business personal property;

   e. weight of rain that collects on a roof; or

   f. the use of defective materials or methods in construction, remodeling, or renovation if the "collapse" occurs during the course of the construction, remodeling, or renovation.

If otherwise covered under the Property Coverages, "we" do not pay for loss to the following types of property under items b. through f. above, unless the loss is a direct result of the collapse of a building or structure:

   outdoor radio, television, satellite, dish-type, or other antennas including their masts, towers, or lead-in wiring; outdoor awnings or canopies or their supports; fences; gutters or downspouts; yard fixtures; outdoor swimming pools; piers, wharves, or docks; beach or diving platforms or appurtenances; retaining walls; foundations; or walks, roadways, or other paved surfaces.

Collapse does not include settling, cracking, shrinking, bulging, or expanding.

This does not increase the "limit" for the covered property.

2. **Debris Removal** -- "We" cover the cost to remove the debris of covered property that is caused by a covered peril. This coverage does not include costs to:

   a. extract "pollutants" from land or water; or

   b. remove, restore, or replace polluted land or water.

"We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" do not pay

more for loss to property and debris removal combined than the "limit" for the damaged property.

However, "we" pay an additional amount of debris removal expense up to $5,000 when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

"We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

3. **Fire Department Service Charges** -- "We" pay up to $1,000 to cover "your" liability required by local ordinance, or assumed by contract or agreement prior to the loss, for fire department service charges.

This coverage is limited to charges incurred when the fire department is called to save or protect covered property from a covered peril.

No deductible applies.

4. **Increased Costs -- Ordinance or Law** -- "We" pay up to $5,000 for each described premises to cover the increased costs of a covered loss, including debris removal expense, resulting from the enforcement of any ordinance, law, or decree that regulates or requires:

   a. the construction, use, or repair of any property; or

   b. the demolition of any property, in part or in whole, not damaged by a covered peril.

The ordinance, law, or decree must be in force at the time of loss.

Under Perils Excluded, Ordinance or Law does not apply to this Additional Coverage.

5. **Pollutant Clean Up and Removal** -- "We" pay "your" expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period.

"We" pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants" only when the expense of extracting the "pollutants" is covered by this Additional Coverage.

The most "we" pay for each described premises is $10,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12 month period of this policy. The expenses are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

6. **Removal** -- "We" cover loss to covered property while moved or being moved from the described premises for preservation from loss caused by a covered peril. "We" pay for any direct physical loss to that property. This coverage applies for up to ten days after the property is first moved.

This does not increase the "limit" for the covered property.

7. **Tearing Out and Replacing** -- When loss caused by:

   a. water;

   b. other liquids;

   c. powder; or

   d. molten material

is covered, "we" also pay the cost of tearing out and replacing any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

"We" do not pay for damage to the system or appliance from which the water or other substance escapes. However, "we" pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage results in discharge of any substance from an automatic fire protection system, or is directly caused by freezing.

This does not increase the "limit" for the covered property.

8.  **Antennas, Fences, and Signs** -- "We" pay up to $2,500 for loss to "your" outdoor:

    a.  radio, television, satellite, dish-type, or other antennas including their masts, towers, and lead-in wiring;

    b.  fences; or

    c.  signs,

    caused by a covered peril. However, loss to fences is covered only for the perils of aircraft, civil commotion, explosion, fire, lightning, or riot.

## EXTENSIONS OF COVERAGE

Unless otherwise stated, each extension of coverage is an additional amount of insurance which applies to losses at the described premises caused by a covered peril.

"We" provide the following extensions of Coverage A -- Buildings.

1.  **Building Property -- Off Premises** -- "We" pay up to $5,000 for loss to covered property while temporarily at locations that "you" do not own, control, rent, or lease.

    This coverage includes property while in transit. "We" only cover loss at such locations within the "basic territory". "We" do not cover theft loss from unattended vehicles unless the loss results from forced entry of a securely locked compartment. There must be visible evidence that the entry was forced.

2.  **Newly Acquired Buildings** -- "We" pay up to 25% of the "limit" shown on the "declarations" for Building Property, but not exceeding $250,000, for loss to each building or structure being built or that "you" acquire during the policy period. "We" only cover loss at such locations within the "basic territory".

    This coverage applies for 30 days after construction is started or for 30 days from the date "you" acquire the building or structure or until "you" report the newly acquired property to "us", whichever occurs first. This coverage does not extend beyond the end of the policy period.

    "You" must pay any additional premium due from the date construction is started or the date "you" acquire the property.

3.  **Trees, Shrubs, and Plants** -- "We" pay up to $1,000 for loss to "your" outdoor trees, shrubs, and plants. "We" only cover loss caused by aircraft, civil commotion, explosion, fire, lightning, or riot. This coverage is limited to $250 for any one tree, shrub, or plant, including debris removal.

"We" provide the following extensions of Coverage B -- Business Personal Property.

1.  **Personal Effects** -- "We" pay up to $500, at each described premises, for loss to personal effects owned by "you", "your" officers, "your" partners, or "your" employees. This coverage is limited to $100 for property owned by any one person.

2.  **Personal Property - Acquired Locations** -- "We" pay up to $20,000 for loss to Business Personal Property at each location "you" acquire. "We" only cover loss at such locations within the "basic territory".

    This coverage applies for 30 days from the date "you" acquire the location or until "you" report the acquired location to "us", whichever occurs first. This coverage does not extend beyond the end of the policy period.

"You" must pay any additional premium due from the date "you" acquire the location.

3. **Personal Property -- Off Premises -- "We"** pay up to $5,000 for loss to covered personal property while temporarily at locations that "you" do not own, control, rent, or lease. "We" only cover loss at such locations within the "basic territory". This coverage includes property while in transit. "We" do not cover theft loss from unattended vehicles unless the loss results from forced entry of a securely locked compartment. There must be visible evidence that the entry was forced.

4. **Personal Property of Others --** "We" pay up to $2,500, at each described premises, for loss to personal property of others in "your" care, custody, or control. This coverage is only for the benefit of the owners of the personal property.

5. **Valuable Papers and Records - Research Cost --** "We" pay up to $1,000, at each described premises, for the cost of research or other expenses necessary to reproduce, replace, or restore lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist.

# COVERAGE C – LOSS OF INCOME

"We" provide the coverages shown below during the "restoration period" when "your" normal business activities are necessarily interrupted by direct physical loss to real or personal property as a result of a covered peril during the policy period. This coverage applies only when the loss to real or personal property is at the described premises or in the open (or in vehicles) within 100 feet thereof.

"We" will pay only the loss of earnings and extra expenses incurred within 12 consecutive

months after the date of direct physical loss or damage to property. When a "limit" of insurance for Coverage C is shown on the "declarations", "we" will not pay more for earnings and extra expenses combined than the Coverage C "limit".

## EARNINGS

"We" cover "your" actual loss of net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses normally incurred and earned by "your" business.

"We" cover only the expenses that are necessary during the "restoration period". Consideration is given to continuation of payroll and other expenses to the extent necessary to resume "your" normal business activities with the same quality of service that existed before the loss.

"We" do not pay for any increase in loss due to "your" failure to use reasonable efforts to resume all or part of "your" normal business activities. This includes making use of other locations and property to reduce the loss.

If "your" normal business activities are not resumed as soon as possible, or if they are not resumed at all, the value of loss payment is based on the period of time it would have otherwise taken to resume "your" normal business activities as soon as possible.

In determining a loss, "we" consider the experience of "your" business before the loss and the probable experience had no loss occurred.

## EXTRA EXPENSE

"We" cover the necessary extra expenses that "you" incur to resume or continue "your" normal business activities as nearly as practicable.

"We" cover only the extra expenses that are necessary during the "restoration period".

"We" cover extra expenses to repair, replace, or restore any property, but only to the extent that they reduce the loss otherwise payable under this coverage.

"We" cover extra expenses to research, replace, or restore information on damaged valuable papers and records, but only to the extent that they reduce the loss otherwise payable under this coverage.

"We" do not pay for any increase in loss due to "your" failure to use reasonable efforts to resume all or part of "your" normal business activities. This includes making use of other locations and property to reduce the loss.

If "your" normal business activities are not resumed as soon as possible, or if they are not resumed at all, the value of loss payment is based on the period of time it would have otherwise taken to resume "your" normal business activities as soon as possible.

The salvage value of any property bought for temporary use shall be deducted from the amount of loss determined for extra expense.

## EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations are applicable to Coverage C -- Loss of Income.

1.  **Electronic Information** -- "We" do not cover loss of earnings caused by damage to or loss of electronic information beyond:

    a.  60 consecutive days from the date of loss; or

    b.  the time from the date of loss until the date "you" could reasonably rebuild, repair, or replace other damaged property at the described premises caused by the same occurrence,

    whichever is greater.

Electronic information is media, programs, or records for electronic data processing or electronically controlled equipment including films, tapes, discs, drums, or cells.

2.  **Fire Extinguishment** -- "We" do not cover expenses to put out a fire.

3.  **Leases, Licenses, Contracts, or Orders** -- "We" do not cover any increase in loss due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

    However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" normal business activities.

    "We" do not cover any extra expense caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders beyond the "restoration period".

4.  **Strikes, Protests, and Other Interference** -- "We" do not cover any increase in loss due to interference by strikers or other persons at the described premises. This applies to interference with rebuilding, repairing, or replacing the property or with resuming "your" normal business activities.

5.  **Unnecessary Expenses** -- "We" do not cover any expenses that are not necessary during the "restoration period".

## SUPPLEMENTAL LOSS OF INCOME COVERAGES

We provide the following extensions of Coverage C — Loss of Income.

1.  **Alterations and New Buildings** -- "We" extend "your" coverage to include loss caused by damage to:

    a.  additions or alterations;

b. new buildings or structures, completed or under construction; and

c. machinery, equipment, supplies, or building materials located on or within 100 feet of the described premises used in the construction, alterations, or additions; or incidental to the occupancy of new buildings or structures

at the described premises caused by a covered peril.

If such loss delays the start of "your" normal business activities, the "restoration period" starts from the time "your" normal business activities would have begun had no loss occurred.

This does not increase the "limit" for Coverage C -- Loss of Income.

2. **Interruption by Civil Authority** -- "We" extend "your" coverage to include loss while access to the described premises is specifically denied by an order of civil authority. This order must be a result of damage to property other than at the described premises and caused by a covered peril. This extension is limited to two consecutive weeks from the date of the order.

This does not increase the "limit" for Coverage C -- Loss of Income.

3. **Newly Acquired Locations** -- "We" extend "your" coverage for an amount up to $100,000 to include loss caused by damage to property at locations "you" acquire. "We" only cover loss at such locations within the "basic territory". The damage must be caused by a covered peril.

This coverage applies for 30 days after "you" acquire the location or until "you" report the newly acquired location to "us", whichever occurs first. This coverage does not go beyond the expiration of this policy.

This is an additional amount of insurance.

4. **Period of Loss Extension** -- "We" extend "your" coverage to cover loss from the date the property that incurred the loss is rebuilt, repaired, or replaced until:

a. the end of 30 consecutive days (unless otherwise shown on the "declarations"); or

b. the date "you" could reasonably resume "your" normal business to the conditions that would have existed had no loss occurred,

whichever is earlier.

This does not increase the "limit" for Coverage C -- Loss of Income.

## PERILS COVERED

The Perils Covered apply to Coverage A -- Buildings, Coverage B -- Business Personal Property, and Coverage C -- Loss of Income.

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

"We" do not pay for loss if one or more of the following exclusions apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

1. **Civil Authority** -- "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do pay for loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this policy.

2.  **Earth Movement or Volcanic Eruption --** "We" do not pay for loss caused by any earth movement (other than "sinkhole collapse") or caused by eruption, explosion, or effusion of a volcano. Earth movement includes, but is not limited to, earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, or shifting of earth.

    "We" do pay for direct physical loss by fire, explosion, or "volcanic action" resulting from either earth movement or eruption, explosion, or effusion of a volcano.

    All volcanic eruptions that occur within a 168 hour period will be considered a single loss.

3.  **Nuclear Hazard --** "We" do not pay for loss caused by a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by, contributed to, or aggravated by a covered peril; and whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct physical loss by fire resulting from the nuclear hazard is covered.

4.  **Ordinance or Law --** "We" do not pay for loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

5.  **Utility Failure --** "We" do not pay for loss caused by interruption of power or other utility services resulting from any cause if the interruption takes place away from the described premises. Interruption includes

reduced or increased voltage, low or high pressure, or other interruptions of normal services.

"We" do pay for the direct physical loss by a covered peril which occurs on the described premises as a result of any power interruption.

6.  **Water --** "We" do not pay for loss caused by water. This means:

    a.  flood, surface water, waves, tidal water, or the overflow of a body of water. This includes spray that results from these whether driven by wind or not;

    b.  water that backs up through a sewer or drain; and

    c.  water below the surface of the ground. This includes water that exerts pressure on; or flows, seeps, or leaks through or into:

        1)  basements whether paved or not;
        2)  doors, windows, or other openings;
        3)  foundations, floors, or paved surfaces; or
        4)  swimming pools, septic tanks, or other structures.

    If fire, explosion, or sprinkler leakage results, "we" do pay for the resulting loss.

7.  **War --** "We" do not pay for loss caused by war. This means:

    a.  declared war, undeclared war, civil war, insurrection, rebellion, or revolution;

    b.  a warlike act by a military force or by military personnel;

    c.  the destruction, seizure, or use of the property for a military purpose; or

    d.  the discharge of a nuclear weapon, even if it is accidental.

8. **Weather** -- "We" do not pay for loss caused by weather conditions if the weather conditions contribute in any way with a cause or event excluded in paragraphs 1. through 7. above.

"We" do pay for any resulting loss caused by a covered peril unless the resulting loss itself is excluded.

## ADDITIONAL EXCLUSIONS

"We" do not pay for loss if one or more of the following exclusions apply to the loss:

1. **Animals** -- "We" do not pay for loss caused by nesting or infestation, or discharge or release of waste products or secretions of animals, including birds, or insects. "We" pay for any resulting breakage of building glass or loss caused by a "specified peril".

2. **Collapse** -- "We" do not pay for loss caused by collapse, except as provided in the Additional Coverage for Collapse. If loss caused by a covered peril results at the described premises, "we" pay for that resulting loss.

3. **Contamination or Deterioration** -- "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in property that causes it to damage or destroy itself. "We" do pay for any resulting breakage of building glass or loss caused by a "specified peril".

4. **Criminal, Fraudulent, or Dishonest Acts** -- "We" do not pay for loss caused by criminal, fraudulent, dishonest, or illegal acts, alone or in collusion with another, by:

   a. "you";

   b. others who have an interest in the property;

   c. others to whom "you" entrust the property;

   d. "your" partners, officers, directors, trustees, joint venturers; or

   e. the employees or agents of a., b., c., or d. above, whether or not they are at work.

   This exclusion does not apply to acts of destruction of property by "your" employees, but theft by employees is not covered by this policy.

5. **Defects, Errors, and Omissions** -- "We" do not pay for loss which results from one or more of the following:

   a. an act, error, or omission (negligent or not) relating to:

      1) land use;
      2) the design, specification, construction, workmanship, installation, or maintenance of property;
      3) planning, zoning, development, siting, surveying, grading, or compaction; or
      4) maintenance of property (including land, structures, or improvements);

      whether on or off the described premises;

   b. a defect, a weakness, the inadequacy, a fault, or unsoundness in materials used in construction or repair, whether on or off the described premises;

   c. the cost to make good an error in design; or

   d. a data processing error or omission in programming or giving improper instructions.

In addition, "we" do not pay for loss to Business Personal Property caused by deficiency or defects in design, specifications, materials, or workmanship, or caused by latent or inherent defects.

"We" do pay for any resulting loss caused by a covered peril unless the resulting loss itself is excluded.

6. **Electrical Currents** -- "We" do not pay for loss caused by arcing or by electrical currents other than lightning. If a fire results, "we" pay for only the loss caused by fire.

7. **Explosion** -- "We" do not pay for loss caused by explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control. If a fire or combustion explosion results, "we" do pay for the resulting loss. "We" also pay for loss caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

8. **Freezing** -- "We" do not pay for loss caused by water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air-conditioning systems, or appliances (other than fire protective systems) as a result of freezing. This does not apply if "you" use reasonable care to maintain heat in the building or structure; or "you" drain the equipment and turn off the supply if the heat is not maintained.

9. **Mechanical Breakdown** -- "We" do not pay for loss caused by mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force. "We" do pay for any resulting breakage of building glass or loss caused by a "specified peril".

10. **Pollutants** -- "We" do not pay for loss caused by release, discharge, seepage, migration, dispersal, or escape of "pollutants" unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril". "We" do pay for any resulting loss caused by a "specified peril".

11. **Seepage** -- "We" do not pay for loss caused by, or resulting from, continuous or repeated seepage or leakage from within a plumbing, heating, or air-conditioning system, or domestic appliance.

12. **Settling, Cracking, Shrinking, Bulging, or Expanding** -- "We" do not pay for loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs. "We" do pay for any resulting breakage of building glass or loss caused by a "specified peril".

13. **Smog** -- "We" do not pay for loss caused by smog.

14. **Smoke, Vapor, or Gas** -- "We" do not pay for loss caused by smoke, vapor, or gas from agricultural smudging or industrial operations.

15. **Temperature/Humidity** -- "We" do not pay for loss to personal property caused by dampness, dryness, or changes in or extremes of temperature. "We" do pay for any resulting breakage of building glass or loss caused by a "specified peril".

16. **Voluntary Parting** -- "We" do not pay for loss caused by voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

17. **Wear and Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching. "We" do pay for any resulting breakage of building glass or loss caused by a "specified peril".

AAIS
BP-200  Ed 1.0
Page 15 of 43

# WHAT MUST BE DONE
# IN CASE OF LOSS

1.  Notice -- In case of a loss, "you" must:

    a.  give "us" or "our" agent prompt notice, including a description of the property involved ("we" may request written notice); and

    b.  give notice to the police when the act that causes the loss is a crime.

2.  **Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss. "We" pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a covered peril if a covered peril has already caused a loss to covered property. However, "we" do not pay for such repairs or emergency measures performed on property which has not been damaged by a covered peril. This does not increase "our" "limit".

3.  **Proof of Loss** -- "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

    a.  the time, place, and circumstances of the loss;

    b.  other policies of insurance that may cover the loss;

    c.  "your" interest and the interests of all others in the property involved, including all mortgages and liens;

    d.  changes in title or occupancy of the covered property during the policy period;

    e.  detailed estimates for repair or replacement of covered property;

    f.  available plans and specifications of buildings or structures;

    g.  detailed estimates of any covered income and expenses; and

    h.  an inventory of damaged and undamaged covered personal property showing in detail the quantity, description, cost, actual cash value, and amount of the loss. "You" must attach to the inventory copies of all bills, receipts, and related documents that substantiate the inventory. An inventory of undamaged personal property is not required if the total claim for a loss is less than $10,000 and less than 5% of the total "limit" that applies to the covered property.

4.  **Examination Under Oath** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of the others.

5.  **Records** -- "You" must produce records, including tax returns and bank microfilms of all cancelled checks, relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6.  **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7.  **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "We" do not have to accept any abandonment of property.

9. **Intent to Continue Business** — If "you" intend to continue "your" business, "you" must resume all or part of "your" business as soon as possible.

## VALUATION OF PROPERTY LOSSES

The valuation of property losses shall be based on the following provisions:

1. **Replacement Cost** -- The value of covered property is based on its replacement cost without a deduction for depreciation, unless Actual Cash Value Coverage is shown on the "declarations". However, these replacement cost "terms" do not apply to paragraphs 2. through 10. below.

   Replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment shall not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. "You" may make a claim for the actual cash value of the damaged property before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

2. **Property Not Eligible for Replacement Cost** -- The value of the following property is based on its actual cash value at the time of the loss:

   a. household contents, except personal property in apartments or rooms furnished by "you" as landlord;

   b. manuscripts;

   c. objects of art, rarity, or antiquity;

   d. personal property of others; and

   e. used or second-hand merchandise held for sale or in storage.

   Actual cash value includes a deduction for depreciation.

3. **Actual Cash Value Coverages A or B** -- Paragraph 1. Replacement Cost, does not apply to property for which Actual Cash Value Coverage is shown on the "declarations".

   When Actual Cash Value Coverage is shown for a Coverage A or Coverage B entry on the "declarations", the value of that property is based on its actual cash value at the time of the loss with a deduction for depreciation.

4. **Glass** — The value of glass is based on the cost of safety glazing material where required by code, ordinance, or law.

5. **Loss to Parts** — The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

6. **Money** — The value of "money" will be based on its face value.

7. **Pair or Set** — The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

8. **Securities** -- The value of "securities" will be based on their actual cash value at the close of business on the day the loss was discovered.

9. **Tenant's Improvements** -- Tenant's improvements losses will be based on replacement cost, without a deduction for depreciation, if repaired or replaced at "your" expense within a reasonable time. The value of tenant's improvements losses is based on a portion of "your" original cost if not repaired or replaced within a reasonable time. This portion is determined as follows:

   a. Divide the number of days from the date of the loss to the expiration date of the lease by the number of days from the date of installation to the expiration date of the lease; and

   b. Multiply the figure determined in 9.a. above by the original cost.

   If "your" lease contains a renewal option, the expiration of the lease in this procedure is replaced by the expiration of the renewal option period.

   Tenant's improvements losses are not covered if repaired or replaced at another's expense.

10. **Valuable Papers and Records** -- The value of valuable papers and records, including those which exist on electronic or magnetic media (other than prepackaged software programs) is based on the cost of blank materials, and the labor to transcribe or copy the records when there is a duplicate.

## HOW MUCH WE PAY

1. **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2. **Deductible** -- Except as provided under items a. and b. below, "we" will pay only that part of "your" loss over the deductible amount stated on the "declarations" in any one occurrence.

   a. The most "we" will deduct from "your" loss under all of the following optional coverages is $250 in any one occurrence:

      1) Employee Dishonesty;
      2) Exterior Glass;
      3) Interior Glass;
      4) "Money" and "Securities"; and
      5) Outdoor Signs.

      If an occurrence results in loss under any of the optional coverages listed above, as well as in loss under other coverages, the $250 deductible amount described in this provision will be subtracted from the deductible amount shown on the "declarations".

   b. No deductible applies to Fire Department Service Charge or Coverage C -- Loss of Income.

3. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 4., 5., 6., and 7. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation;

   b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

   c. the "limit" that applies to covered property.

4. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim or loss sustained.

5. **Insurance Under More Than One Policy** -- "You" may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do, "we" pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of that amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

6. **Automatic Increase** -- When a percentage increase is shown on the "declarations" for a Coverage A or Coverage B entry, the corresponding "limit" is increased annually by the percentage shown. The increase applies proportionally from the date of the most recent "limit". The increase applies only to the "limit" shown on the "declarations" for the corresponding Coverage A or Coverage B entry.

7. **Seasonal Increase** -- The Coverage B "limits" shown on the "declarations" will automatically increase by 25% to provide for seasonal increase. This increase applies only if "your" business personal Property "limit" is at least 100% of "your" average monthly values for the 12 months immediately preceding the date of the loss or damage.

If "you" have been in business less than 12 months, the "limit" of insurance must be 100% of "your" average monthly values for the time "you" have been in business.

## LOSS PAYMENT

1. **Our Options** -- "We" may:

   a. pay the value of the loss;

   b. pay the cost of repairing or replacing the loss;

   c. rebuild, repair, or replace with property of equivalent kind and quality, to the extent practicable; or

   d. take all or any part of the damaged property at the agreed or appraised value.

"We" must give "you" notice of "our" intent within 30 days after "we" have received a satisfactory proof of loss.

2. **Your Losses** -- "We" adjust all losses with "you". Payment is made to "you" unless another loss payee is named in the policy. A covered loss is payable 30 days after a satisfactory proof of loss is received, and:

   a. the amount of the loss has been agreed to in writing;

   b. an appraisal award has been filed with "us"; or

   c. a final judgment has been entered.

3. **Property of Others** -- Losses to property of others may be adjusted with and paid to:

   a. "you" on behalf of the owner; or

   b. the owner.

   If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits arising from the owners at "our" expense.

## OTHER PROPERTY COVERAGE CONDITIONS

1. **Appraisal** -- If "you" and "we" do not agree on the amount of the loss, either party may demand that the amount be determined by appraisal.

   If either makes a written demand for appraisal, each selects a competent, independent appraiser and notifies the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

The appraisers then determine and state separately the amount of each loss.

The appraisers also determine the actual cash value of covered property items at the time of the loss, if requested.

A written agreement is binding on all parties. If the appraisers fail to agree within a reasonable time, they submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three is binding on all parties.

Each appraiser is paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire is paid equally by "you" and "us".

If there is an appraisal, "we" retain "our" right to deny the claim.

2.  **Benefit to Others** -- Insurance under the Property Coverage shall not directly or indirectly benefit anyone having custody of "your" property.

3.  **Control of Property** -- The Property Coverage is not affected by any act or neglect beyond "your" control.

4.  **Death of an Individual Named Insured** -- If "you" die, "your" rights and duties under the Property Coverages pass to "your" legal representative or other person having proper temporary custody of "your" property.

5.  **Mortgage Provisions** -- If a mortgagee (mortgagee includes trustee) is named in this policy, loss to building property shall be paid to the mortgagee and "you" as their interest appears. If more than one mortgagee is named, they shall be paid in order of precedence.

The insurance for the mortgagee continues in effect even when "your" insurance may be void because of "your" acts, neglect, or failure to comply with the coverage "terms". The insurance for the mortgagee does not continue in effect if the mortgagee is aware of changes in ownership or substantial increase in risk and does not notify "us".

If "we" cancel this policy, "we" notify the mortgagee at least ten days before the effective date of cancellation if "we" cancel for "your" nonpayment of premium, or 30 days before the effective date of cancellation if "we" cancel for any other reason.

"We" may request payment of the premium from the mortgagee, if "you" fail to pay the premium.

If "we" pay the mortgagee for a loss where "your" insurance may be void, the mortgagee's right to collect that portion of the mortgage debt from "you" then belongs to "us". This does not affect the mortgagee's right to collect the remainder of the mortgage debt from "you". As an alternative, "we" may pay the mortgagee the remaining principal and accrued interest in return for a full assignment of the mortgagee's interest and any instruments given as security for the mortgage debt.

If "we" choose not to renew this policy, "we" give written notice to the mortgagee at least ten days before the expiration date of this policy.

6.  **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

a.  "You" must notify "us" promptly if "you" recover property or receive payment.

b.  "We" must notify "you" promptly if "we" recover property or receive payment.

c.  "We" will pay any recovery expenses incurred, and the expense to repair the recovered property, subject to the "limit" of insurance.

d.  "You" may keep the recovered property but "you" must refund to "us" the amount of the claim paid, or any lesser amount to which "we" agree.

e.  If the claim paid is less than the agreed loss due to a deductible or other limiting "term" of this policy any recovery is pro rated between "you" and "us" based on our respective interest in the loss.

7.  **Subrogation** -- If "we" pay for a loss under the Property Coverages "we" may require that "you" assign to "us" any right of recovery against others up to the amount "we" paid.

"You" may waive "your" right to recover, in writing, before the loss takes place without voiding coverage.

"We" are not liable for a loss if, after the loss, "you" impair "our" right to recover. But, "you" may waive "your" right to recover in writing after a loss only as to the following parties:

a.  someone insured under the Property Coverages;

b.  "your" tenant;

c.  a business firm owned or controlled by "you"; or

d.  a business firm which owns or controls "your" business.

8.  **Suit Against Us** -- No suit to recover any loss may be brought against "us" unless:

a.  the "terms" of the Property Coverages have been fully complied with; and

b.  the suit is commenced within two years after the loss.

If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by the law.

9.  **Vacancy -- Unoccupancy** -- "We" do not pay for loss caused by attempted theft, breakage of building glass, sprinkler leakage (unless "you" have protected the system against freezing), theft, vandalism, or water damage occurring while the building or structure has been:

a.  vacant for more than 60 consecutive days; or

b.  unoccupied for more than

    1)  60 consecutive days; or
    2)  the usual or incidental unoccupancy period for the described premises

    whichever is longer.

The amount "we" pay for any loss that is not otherwise excluded is reduced by 15%.

Unoccupied means that the customary activities or operations of the described occupancy are suspended, but business personal property has not been removed. The building or structure shall be considered vacant and not unoccupied when the occupants have moved, leaving the building or structure empty or containing only limited business personal property. Buildings or structures under construction are not considered vacant or unoccupied.

## OPTIONAL PROPERTY COVERAGES

If indicated as applicable on the "declarations", the following Optional Property Coverages also apply. All Optional Property Coverages are subject to all of the "terms" applying to the Common Policy Conditions and Property Coverages of this policy, except as provided below.

1.  **Employee Dishonesty**

a. "We" cover direct loss or damage to business personal property, including "money" and "securities", that "you" own, hold, or for which "you" are legally liable. "We" pay for only those losses resulting from dishonest acts:

1) committed by any of "your" employees, acting alone, or in collusion with other persons; and
2) that occur within the policy period.

Dishonest acts as used in this coverage means dishonest or fraudulent acts committed with the apparent intent to cause "you" to sustain loss or damage and to obtain financial benefit for any employee, person, or organization. The financial benefit does not include earned salaries, commissions, bonuses, fees, profit sharing, or other employee benefits.

b. The most "we" will pay in any one occurrence for Employee Dishonesty is the "limit" of insurance shown on the "declarations", even though the occurrence may extend over a number of policy periods.

All loss or damage caused by one or more persons, and involving a single act or series of related acts is considered one occurrence.

c. Perils Covered and Additional Exclusions do not apply to this Optional Property Coverage.

Under Perils Excluded only the following items apply to this Optional Property Coverage:

1) Civil Authority;
3) Nuclear Hazard; and
7) War.

d. In addition to the above exclusions "we" do not pay for loss or damage:

1) occurring after discovery of any dishonest act committed by the employee whether before or after being employed by "you". This includes discovery by "you" or by any of "your" partners, officers or directors not in collusion with the employee;
2) resulting from an act that "you" or any of "your" partners commit, whether acting alone, or in collusion with any employees, or other persons;
3) where the only proof of the loss or amount of the loss is dependent upon an inventory or a profit and loss computation;
4) that is not discovered within one year of the end of this policy period;
5) occurring outside the "basic territory", except as provided in the Supplemental Employee Dishonesty Coverage; or
6) legal expense or any indirect loss.

e. Supplemental Employee Dishonesty Coverage

1) "We" will cover loss caused by an employee who is temporarily out of the "basic territory" for not more than 90 days. This is not an additional amount of insurance.
2) "We" will cover loss that would have been covered by the prior insurance, except that the time to discover the loss had expired, and which would be covered by this policy had it been in effect when the acts or events causing the loss or damage occurred. This coverage is limited to the lesser of the "limits" applicable to the prior insurance or the "limit" of this coverage. This is not an additional amount of insurance.

This supplemental coverage applies only if this Employee Dishonesty Coverage replaces prior dishonesty coverage and became effective on the expiration or termination date of the prior coverage.

f.  "You" must keep records of property covered so that "we" can verify the amount of loss.

2.  **Exterior Glass**

a.  "We" cover breakage of glass and damage by chemicals to glass that is a part of the exterior of a covered building or structure described on the "declarations" if the glass is:

1)  on the basement or ground floor level of the building or structure, unless coverage for exterior glass on all floors is shown on the "declarations"; and
2)  owned by "you", or in "your" care, custody, or control.

b.  "We" also pay for the following:

1)  replacing or repairing the frames which hold the glass, if the frames have been damaged by the loss;
2)  boarding up openings or installing temporary glass if there is an unavoidable delay in replacement; or
3)  removing or replacing obstructions which prohibit replacement. This does not include window displays.

c.  Perils Covered and Additional Exclusions do not apply to this Optional Property Coverage.

Under Perils Excluded only the following items apply to this Optional Property Coverage:

1)  Civil Authority;
3)  Nuclear Hazard; and
7)  War.

d.  This optional coverage supersedes all limitations in this policy that apply to glass.

3.  **Interior Glass**

a.  "We" cover breakage of glass and damage by chemicals to glass that is a permanent part of the interior walls, floors, or ceilings of a covered building or structure described on the "declarations" if the glass is:

1)  on the basement or ground floor level of the building or structure, unless coverage for interior glass on all floors is shown on the "declarations"; and
2)  owned by "you", or in "your" care, custody, or control.

b.  "We" also pay for the following:

1)  replacing or repairing the frames which hold the glass, if the frames have been damaged by the loss;
2)  boarding up openings or installing temporary glass if there is an unavoidable delay in replacement; or
3)  removing or replacing obstructions which prohibit replacement. This does not include window displays.

c.  Perils Covered and Additional Exclusions do not apply to this Optional Property Coverage.

Under Perils Excluded only the following items apply to this Optional  Property Coverage:

1)  Civil Authority;
3)  Nuclear Hazard; and
7)  War.

d.  This optional coverage supersedes all limitations in this policy that apply to glass.

4.  **Money and Securities**

   a.  "We" cover "money" and "securities", bullion, and lottery tickets that "you" own, hold, or for which "you" are legally liable, for direct loss or damage resulting from:

      1) theft, meaning any act of stealing, including burglary and robbery;
      2) disappearance; or
      3) destruction.

   b.  Perils Covered do not apply to this Optional Property Coverage.

      Under Perils Excluded only the following items apply to this Optional Property Coverage:

      1) Civil Authority;
      2) Earth Movement or Volcanic Eruption;
      3) Nuclear Hazard; and
      7) War.

      Under Additional Exclusions only the following items apply to this Optional Property Coverage.

      4) Criminal, Fraudulent, or Dishonest Acts; or
      16) Voluntary Parting.

      In addition to the above exclusions "we" do not pay for loss or damage:

      1) resulting from accounting or arithmetical errors or omissions;
      2) from a "money" operated device unless the "money" deposited is recorded by a continuous recording instrument in the device;
      3) from an unattended vehicle, unless the loss results from forced entry of a securely locked compartment. There must be visible evidence that the entry was forced.

   c.  Under How Much We Pay, 6. Automatic Increase, and 7. Seasonal Increase do not apply to this coverage.

   d.  The most "we" will pay for any one occurrence is:

      1) the inside the premises "limit" shown on the "declarations" for loss occurring inside of the premises or within a bank or savings institution; or
      2) the outside the premises "limit" shown on the "declarations" for a loss at any other location.

      These "limits" apply to an act or a series of related acts involving one or more persons.

   e.  "You" must keep records of property covered so that "we" can verify the amount of loss.

5.  **Outdoor Signs**

   a.  "We" cover direct loss or damage to outdoor signs owned by "you" or in "your" care, custody, or control at the premises described on the "declarations".

   b.  Perils Covered do not apply to this Optional Property Coverage.

      Under Perils Excluded only the following items apply to this Optional Property Coverage.

      1) Civil Authority;
      3) Nuclear Hazard; and
      7) War.

      Under Additional Exclusions only the following items apply to this Optional Property Coverage:

      3) Contamination or Deterioration;
      6) Electrical Currents;
      9) Mechanical Breakdown; and
      17) Wear and Tear.

c.  The most "we" will pay for loss in any one occurrence is the "limit" shown on the "declarations" for Outdoor Signs.

d.  This optional coverage supersedes all limitations in this policy that apply to outdoor signs.

# COMMERCIAL LIABILITY COVERAGES

This Liability Coverage Section contains the definitions, coverage descriptions, exclusions, limitations, and conditions that apply to the Businessowners Liability Coverages.

## DEFINITIONS

1. The words "you" and "your" mean the person, persons, or organization named as the insured on the "declarations".

2. The words "we", "us", and "our" mean the company providing this coverage.

3. "Advertising injury" means injury (other than "bodily injury", "property damage", or "personal injury") arising out of one or more of the following offenses:

   a. oral or written publication of material:

      1) that slanders or libels a person or organization;
      2) that disparages a person's or organization's goods, products, or services; or
      3) that violates a person's right of privacy.

   b. misappropriation of advertising ideas or style of doing business.

   c. infringement of copyright, title, slogan, trademark, or trade name.

4. "Auto" means a land motor vehicle, a trailer, or a semi-trailer which is designed for use on public roads.

   "Auto" includes attached machinery and equipment.

5. "Basic territory" means the United States of America, its territories and possessions, Canada, and Puerto Rico.

6. "Bodily injury" means bodily harm, sickness, or disease sustained by a person and includes required care and loss of services. "Bodily injury" includes death that results from bodily harm, sickness, or disease. "Bodily injury" does not include mental or emotional injury, suffering, or distress that does not result from a physical injury.

7. "Coverage territory" means:

   a. the "basic territory";

   b. international waters or airspace, only if the "bodily injury", "property damage", "personal injury", or "advertising injury" occurs in the course of travel to or from the "basic territory";

   c. the world, if the injury or damage arises out of:

      1) "products" "you" have made or sold in the "basic territory"; or
      2) the activities of a person who normally resides in the "basic territory", but is away for a short time on "your" business; and

      provided that the "insured's" liability to pay "damages" has been determined in a suit on the merits in the "basic territory", or in a settlement that "we" have agreed to.

8. "Damages" means compensation in the form of "money" for a person who claims to have suffered an injury.

9. "Declarations" means all pages labeled "declarations", "supplemental declarations", or "schedules", which pertain to this policy.

10. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

11. "Impaired property" means tangible property (other than "products" or "your work"):

   a. whose value has been decreased:

      1) because it includes "products" or "your work" that is, or is believed to be, deficient or dangerous; or
      2) because "you" failed to carry out the terms of a contract; and

   b. whose value can be restored:

      1) by the repair, replacement, adjustment, or removal of "products" or "your work"; or
      2) by "your" fulfilling the terms of the contract.

12. "Insured" means:

   a. "you" and "your" spouse, but only with respect to the conduct of a business of which "you" are the sole owner, if shown on the "declarations" as an individual;

   b. "you" and all "your" partners or members and their spouses, but only with respect to the conduct of "your" business, if shown on the "declarations" as a partnership or a joint venture; or

   c. "you" and all of "your" executive officers and directors, but only while acting within the scope of their duties, if shown on the "declarations" as an organization (other than a partnership or a joint venture). It also includes "your" stockholders, but only for their liability as such.

   "Insured" also includes:

   a. any person or organization, except "your" "employees", while acting as "your" real estate manager;

   b. if "you" die during the policy period, "your" legal representative while acting within the scope of those duties as such, or a person who has custody of "your" property with respect to liability arising out of the maintenance or use of that property until "your" legal representative is appointed. "Your" legal representative has all "your" rights and duties under this coverage;

   c. with respect to the operation, with "your" permission, of mobile equipment:

      1) "your" "employee" in the course of employment. This does not apply to a fellow "employee" injured in the course of employment;
      2) any other person, including another person or an organization legally liable for the conduct of such person, but only:

         a) for liability arising out of the operation of the equipment; and
         b) if there is no other insurance covering the liability available to them;

      3) no person or organization is an "insured" for "property damage" to property owned by, rented to, in the charge of, or occupied by "you", or an employer of any person who is an "insured" under paragraph c.

   d. "your" "employees", for acts within the scope of their employment by "you" (this does not include "your" executive officers). None of these "employees" are "insureds" for:

      1) "bodily injury", "personal injury", and "advertising injury" to "you" or to a fellow "employee"; or
      2) "property damage" to property owned by, rented to, or loaned to "employees", or any of "your" partners or members and their spouses (if "you" are a joint venture or a partnership).

e.  any organization (other than a joint venture or a partnership) newly acquired or formed by "you", and in which "you" have a majority interest.

Such an organization is not an "insured":

1)  if there is other similar insurance available to it;
2)  after 90 days immediately following that acquisition or formation or the end of the policy period, whichever is earlier;
3)  for "bodily injury" or "property damage" that occurred prior to the acquisition or formation; or
4)  for "personal injury" or "advertising injury" arising out of an offense committed prior to the acquisition or formation.

No person or organization is an "insured" with respect to the conduct of a current or past partnership or joint venture that is not named on the "declarations" as an "insured".

13. "Leased worker" means a person whom "you" lease from a labor leasing firm under a contract or agreement to perform duties related to the conduct of "your" business. "Leased worker" does not include a "temporary worker".

14. "Limit" means the amount of coverage that applies.

15. "Loading or unloading" means the movement of property:

a.  starting with after it is removed from the point where it has been accepted for transit by "auto", aircraft, or watercraft;

b.  continuing while it is in or on such vehicle; and

c.  ending when it has been removed from the vehicle at its point of destination.

"Loading or unloading" includes movement by:

a.  a hand truck; or

b.  any mechanical device only when attached to the vehicle.

16. "Occurrence" means an accident and includes repeated exposure to similar conditions.

17. "Personal injury" means injury (other than "bodily injury", "property damage", or "advertising injury") arising out of one or more of the following offenses:

a.  oral or written publication of material:

1)  that slanders or libels a person or organization;
2)  that disparages a person's or an organization's goods, products, or services; or
3)  that violates a person's right of privacy;

b.  false arrest, detention, or imprisonment;

c.  malicious prosecution; or

d.  wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

18. "Products/completed work hazard" --

a.  "Products hazard" means "bodily injury" or "property damage" occurring away from premises "you" own or rent and arising out of "products" after physical possession of the "products" has been relinquished to others. The "bodily injury" or "property damage" must occur away from premises "you" own or rent unless "your" business includes

selling, handling, or distributing "your" "products" for consumption on premises owned by or rented to "you".

b. "Completed work hazard" means "bodily injury" or "property damage" occurring away from premises "you" own or rent and arising out of "your work". It does not include work that has not been completed, or that has not been abandoned.

"Your work" is deemed completed at the earliest of the following times:

1) when all work specified in "your" contract has been done;
2) when all "your work" to be done at a job site has been completed if "your" contract includes work at more than one site; or
3) when "your work" at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same job site.

Work which requires further service, maintenance, correction, repair, or replacement because of defect or deficiency, but which is otherwise complete, shall be deemed completed.

c. Neither of these hazards include "bodily injury" or "property damage" arising out of:

1) the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle, created by "loading or unloading"; or
2) the presence of tools, uninstalled equipment, or abandoned or unused materials.

19. "Products" means goods or products manufactured, sold, handled, distributed, or disposed of by "you", others trading under "your" name, or a person or organization whose business or assets "you" have acquired.

"Products" includes:

a. warranties or representations made at any time with respect to the fitness, quality, durability, or performance of "products";
b. containers (other than vehicles), materials, parts, or equipment furnished in connection with such "products"; and
c. providing or failure to provide warnings or instructions.

"Products" does not include:

a. vending machines or other property that is rented to or placed for the use of others, but not sold; or
b. real property.

20. "Property damage" means:

a. physical injury or destruction of tangible property; or
b. the loss of use of tangible property whether or not it is physically damaged. Loss of use is deemed to occur at the time of the "occurrence" that caused it.

21. "Temporary worker" means a person who is furnished to "you" as a temporary substitute for an "employee".

22. "Terms" are all provisions, limitations, exclusions, conditions, and definitions that apply to the Commercial Liability Coverage.

23. "Your work" means:

a. work or operations performed by "you" or on "your" behalf;
b. materials, parts, and equipment supplied for such work or operations;

c. written warranties or representations made at any time regarding quality, fitness, durability, or performance of any of the foregoing; and

d. providing or failing to provide warnings or instructions.

## PRINCIPAL COVERAGES

"We" provide insurance for the following coverages indicated by a specific "limit" or premium charge on the "declarations".

### COVERAGE L -- BODILY INJURY LIABILITY/ PROPERTY DAMAGE LIABILITY

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" to which this insurance applies. The "bodily injury" or "property damage" must be caused by an "occurrence" which takes place in the "coverage territory", and the "bodily injury" or "property damage" must occur during the policy period.

### COVERAGE M -- MEDICAL PAYMENTS

1. "We" pay the medical expenses defined below for "bodily injury" caused by an accident:

   a. on premises "you" own or rent;

   b. on ways adjacent or next to premises "you" own or rent; or

   c. arising out of "your" operations.

2. "We" pay such expenses regardless of fault but only if:

   a. they arise out of an accident that occurred in the "coverage territory" and during the policy period; and

b. they are incurred and reported within one year of the accident.

3. Medical expenses means the reasonable and necessary expenses for:

   a. medical, surgical, x-ray, and dental services, including prosthetic devices and eye glasses;

   b. ambulance, hospital, professional nursing, and funeral services; and

   c. first aid at the time of an accident.

### COVERAGE N -- PRODUCTS/COMPLETED WORK

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" arising out of the "products/completed work hazard" to which this insurance applies. The "bodily injury" or "property damage" must be caused by an "occurrence" which takes place in the "coverage territory", and the "bodily injury" or "property damage" must occur during the policy period.

### COVERAGE O -- FIRE LEGAL LIABILITY

"We" pay for "property damage" to buildings, or parts thereof, which "you" rent from another, or which are loaned to "you", if the "property damage" is caused by fire or explosion for which "you" are legally liable. Buildings include fixtures permanently attached thereto.

All of the exclusions otherwise applicable to "property damage" do not apply to this coverage. However, "we" do not cover:

1. liability arising under any contract or agreement to indemnify any person or organization for damage by fire to the premises;

2. liability arising out of the rendering or failure to render a professional service; except as covered under Incidental Medical Malpractice Injury Coverage; or

3.  liability arising out of "property damage":

   a.  which is expected by, directed by, or intended by the "insured"; or

   b.  that is the result of intentional and malicious acts of the "insured".

## COVERAGE P -- PERSONAL INJURY LIABILITY/ADVERTISING INJURY LIABILITY

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "personal injury" or "advertising injury" to which this insurance applies.

1.  "We" cover:

   a.  "personal injury" arising out of an offense committed in the course of "your" business, excluding advertising, publishing, broadcasting, or telecasting done by "you" or on "your" behalf; and

   b.  "advertising injury" arising out of an offense committed in the course of advertising "your" goods, products, or services.

2.  The "personal injury" or "advertising injury" offense must be committed:

   a.  within the "coverage territory"; and

   b.  during the policy period.

## SUPPLEMENTAL COVERAGES

Subject to all the "terms" of the Principal Coverages, "we" provide the following supplemental coverages. They do not increase the "limits" stated for the Principal Coverages.

### CONTRACTUAL LIABILITY

1.  "We" cover "bodily injury" or "property damage" liability which is assumed under the following contracts or agreements:

   a.  lease of premises;

   b.  easement or license agreement (this does not include an agreement in connection with any construction or demolition operation within 50 feet of a railroad);

   c.  promise to indemnify a municipality if required by an ordinance (this does not apply in connection with work done for the municipality);

   d.  sidetrack agreement;

   e.  elevator maintenance agreement; or

   f.  any part of any other contract or agreement relating to the conduct of "your" business (including an indemnification of a municipality in connection with work performed for a municipality) under which "you" assume tort liability to pay "damages" because of "bodily injury" or "property damage". Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

2.  This coverage does not apply to that part of any contract or agreement:

   a.  that indemnifies any person or organization for "bodily injury" or "property damage" arising out of operations within 50 feet of railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass, or crossing;

   b.  that indemnifies an architect, engineer, or surveyor for injury or damage arising out of:

      1)  preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or

      2)  giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

c.  under which the "insured", if an architect, engineer, or surveyor, assumes liability for injury or damage arising out of the "insured's" rendering or failing to render professional services, including those listed in 2.b.1) above, and supervisory, inspection, or engineering services; or

d.  that indemnifies any person or organization for damage by fire to premises rented or loaned to "you".

## INCIDENTAL MEDICAL MALPRACTICE INJURY

1.  "We" cover "bodily injury" arising out of the rendering or failure to render the following services:

    a.  medical, surgical, dental, x-ray, or nursing services or treatment, or the furnishing of food or beverages in connection therewith;

    b.  the furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances.

2.  This coverage does not apply to:

    a.  expenses incurred by an "insured" for first aid to others at the time of an accident;

    b.  an "insured" or an "employee" engaged in the business or occupation of providing any of the services described under 1.a. and 1.b. above; or

    c.  injury caused by an indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described in 1.a. and 1.b. above.

## MOBILE EQUIPMENT

"We" pay all sums for which an "insured" is legally liable for "bodily injury" or "property damage" resulting from mobile equipment, including attached equipment and machinery.

1.  This coverage applies only to land motor vehicles that meet one or more of the following criteria:

    a.  Those which are used only on premises owned by or rented to "you" (premises includes adjoining ways).

    b.  Those which are designed primarily for use off public roads.

    c.  Those which travel on crawler treads.

    d.  Those which are self-propelled and designed or used only to afford mobility to the following types of equipment, which must be a part of or be permanently attached to such vehicle:

        1)  power cranes, shovels, loaders, diggers, or drills;
        2)  concrete mixers (this does not include the mix-in-transit type); and
        3)  graders, scrapers, rollers, and other road construction or repair equipment.

    e.  Those which are not self-propelled, but are used primarily to afford mobility to the following types of equipment permanently attached thereto:

        1)  air compressors, pumps, and generators (this includes spraying, welding, and building cleaning equipment);
        2)  geophysical exploration, lighting, and well servicing equipment; and
        3)  cherry pickers and similar devices used to raise or lower workers.

2.  This coverage does not apply to self-propelled vehicles with the following types of permanently attached equipment:

    a.  equipment designed primarily for snow removal, street cleaning, road maintenance other than road construction, or resurfacing;

b. cherry pickers and similar devices used to raise or lower workers;

c. air compressors, pumps, and generators (this includes spraying, welding, and building cleaning equipment); or

d. geophysical exploration, lighting, and well servicing equipment.

"We" cover "bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraphs 2.b., 2.c., and 2.d. above.

"We" will provide any liability, uninsured motorists, no fault, or other coverages required by any motor vehicle insurance law. "We" will provide the required "limits" for such required coverage.

# DEFENSE COVERAGE

Payments under this coverage are in addition to the "limits" for the Commercial Liability Coverage.

1. "We" have the right and duty to defend a suit seeking "damages" which may be covered under the Commercial Liability Coverage. "We" may make investigations and settle claims or suits "we" decide are appropriate.

   Suit includes any alternative dispute resolution proceeding involving "bodily injury", "property damage", "personal injury", or "advertising injury" to which:

   a. "you" must submit; or

   b. "you" submit with "our" consent.

2. "We" do not have to provide defense after "we" have paid an amount equal to the "limit" as the result of:

   a. a judgment; or

b. a written settlement agreed to by "us".

3. If "we" defend a suit, "we" will pay:

   a. The costs taxed to the "insured".

   b. The expenses incurred by "us".

   c. The actual loss of earnings by the "insured" for the time spent away from work at "our" request. "We" pay up to $100 per day.

   d. The necessary expenses incurred by the "insured" at "our" request.

   e. Pre-judgment interest awarded against the "insured" on that part of the judgment "we" pay. If "we" offer to pay the "limit", "we" will not pay any pre-judgment interest based on that period of time after the offer.

   f. The interest which accrues beginning with entry of a judgment and ending when "we" tender, deposit in court, or pay up to "our" "limit".

   g. The cost of appeal bonds or bonds for the release of attachments up to "our" "limit". We are not required to apply for or furnish such bonds.

   h. The cost, up to $500, for bail bonds required of an "insured" because of an accident or traffic violation arising out of the use of a vehicle to which Coverage L applies. "We" are not required to apply for or furnish such bonds.

# EXCLUSIONS

"We" do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.

## EXCLUSIONS THAT APPLY TO BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY, AND/OR ADVERTISING INJURY

1.  "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" liability which is assumed by the "insured" under a contract or an agreement.

    This exclusion does not apply to:

    a.  liability that an "insured" would have had in the absence of the contract or agreement; or

    b.  "bodily injury" or "property damage" covered under Contractual Liability Coverage, provided that the "bodily injury" or "property damage" occurs after the effective date of the contract or agreement.

2.  "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" that arises out of the rendering or the failure to render a professional service, except as covered under Incidental Medical Malpractice Injury Coverage.

3.  "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" that arises out of the use of mobile equipment in, or in the practice or preparation for, racing, speed, pulling or pushing, demolition, or stunt activities or contests.

4.  "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" that arises out of transporting mobile equipment by an "auto" owned by, operated by, rented to, or loaned to any "insured".

5.  "We" do not pay for "bodily injury", "property damage", "personal injury", and "advertising injury" that arises out of the ownership, operation, occupancy, renting, loaning, supervision, maintenance, use, entrusting, "loading or unloading" of an "auto", aircraft,

watercraft, or mobile equipment owned by, operated by, rented to, or loaned to any "insured".

This exclusion does not apply to:

    a.  "bodily injury" or "property damage" that arises out of "autos" or mobile equipment covered under Mobile Equipment Coverage;

    b.  the parking of an "auto" on premises owned by, rented to, or controlled by "you" or on the ways immediately adjoining if the "auto" is not owned by or rented to "you" or the "insured";

    c.  liability assumed under a contract covered under Contractual Liability Coverage for the ownership, maintenance, or use of an aircraft or a watercraft;

    d.  watercraft, if it is on shore on premises owned by, rented to, or controlled by "you"; or

    e.  watercraft, if it is not owned by "you" and is:

        1)  less than 26 feet in length; and
        2)  not being used to carry persons or property for a charge.

6.  "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" for which any "insured" may be held liable by reason of:

    a.  causing or contributing to the intoxication of a person;

    b.  the furnishing of alcoholic beverages to a person under the influence of alcohol or under the legal drinking age; or

    c.  a law or regulation relating to the sale, gift, distribution, or use of alcoholic beverages.

This exclusion applies if "you" are in the business of manufacturing, distributing, selling, or serving alcoholic beverages.

7. "We" do not pay for "bodily injury", "property damage", "personal injury", or "advertising injury" that arises out of war. War includes undeclared war, civil war, insurrection, rebellion, or revolution, or an act or a condition of war.

8. "We" do not pay for "bodily injury" or "property damage":

   a. which is expected by, directed by, or intended by the "insured"; or

   b. that is the result of intentional and malicious acts of the "insured".

   This exclusion does not apply to "bodily injury" that arises out of the use of reasonable force to protect people or property.

9. "We" do not pay for "bodily injury" or "property damage" included within the "products/completed work hazard" except as covered under Coverage N.

10. "We" do not pay for:

    a. "bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:

       1) at or from any premises, site, or location which is, or was at any time, owned by, occupied by, rented to, or loaned to any "insured", unless the "bodily injury" or "property damage" arises from the heat, smoke, or fumes of a fire which becomes uncontrollable or breaks out from where it was intended to be located;

       2) at or from any premises, site, or location which is or was at any time used by or for any "insured" or others, for the handling, storage, disposal, processing, or treatment of waste;

       3) which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any "insured" or any person or organization for whom any "insured" may be legally responsible; or

       4) at or from any premises, site, or location where any "insured" or any contractor or subcontractor, directly or indirectly under "your" control, is working:

          a) if the pollutants are brought on or to the premises, site, or location in connection with such work by such "insured", unless the "bodily injury" or "property damage" arises from the heat, smoke, or fumes of a fire which becomes uncontrollable or breaks out from where it was intended to be located; or

          b) if the work is to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants.

    b. any loss, cost, or expense arising out of any:

       1) request, demand, or order that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants; or

       2) claim or suit by or on behalf of any governmental authority relating to testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of pollutants.

Pollutants means:

a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be disposed of as well as recycled, reclaimed, or reconditioned.

b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

11. "We" do not pay for:

a. "bodily injury" or "personal injury" to an "employee" of the "insured" if it occurs in the course of employment by the "insured"; or

b. consequential injury to a spouse, child, parent, brother, or sister of such injured "employee".

This exclusion applies where the "insured" is liable either as an employer or in any other capacity; or there is an obligation to fully or partially reimburse a third party for "damages" arising out of paragraph 11.a. or 11.b. above.

This exclusion does not apply to liability assumed by the "insured" under a contract covered under Contractual Liability Coverage.

12. "We" do not pay for "bodily injury" or "personal injury" if benefits are provided or are required to be provided by the "insured" under a workers' compensation, disability benefits, occupational disease, unemployment compensation, or like law.

13. "We" do not pay for "bodily injury" or "personal injury" that arises out of any:

a. refusal to employ;

b. termination of employment;

c. coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, sexual misconduct, or other employment-related practices, policies, acts, or omissions; or

d. consequential "bodily injury" or "personal injury" as a result of 13.a., 13.b., and 13.c. above.

This exclusion applies where the "insured" is liable either as an employer or in any other capacity; or there is an obligation to fully or partially reimburse a third party for "damages" arising out of paragraph 13.a., 13.b., 13.c., or 13.d. above.

## ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO PERSONAL INJURY AND/OR ADVERTISING INJURY

1. "We" do not pay for "personal injury" or "advertising injury" arising out of willful violation of an ordinance, statute, or regulation by an "insured" or with the "insured's" consent.

2. "We" do not pay for "personal injury" or "advertising injury" arising out of:

a. oral or written publication of material done by or at the direction of an "insured" who knew it was false; or

b. oral or written publication of the same or similar material by or on behalf of an "insured" that took place prior to the policy.

3. "We" do not pay for "advertising injury" arising out of breach of contract, other than misappropriation of advertising ideas under an implied contract.

4. "We" do not pay for "advertising injury" arising out of the failure of goods, products, or services to conform with advertised quality or performance.

5. "We" do not pay for "advertising injury" arising from an offense committed by an "insured" whose business is advertising, broadcasting, publishing, or telecasting.

6. "We" do not pay for "advertising injury" arising out of wrong descriptions of the price of an "insured's" goods, products, or services.

7. "We" do not pay for:

a. "personal injury" or "advertising injury" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants at any time; or

b. any loss, cost, or expense arising out of any:

1) request, demand, or order that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants; or

2) claim or suit by or on behalf of any governmental authority relating to testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of pollutants.

Pollutants means:

a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be disposed of as well as recycled, reclaimed, or reconditioned.

b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

## ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO PROPERTY DAMAGE

1. "We" do not pay for "property damage" to property owned by, occupied by, or rented to "you", except as covered under Coverage O.

2. "We" do not pay for "property damage" to premises "you" sell, give away, or abandon, if the "property damage" arises out of any part of those premises. This exclusion does not apply if the premises are "your work" and were not occupied, rented, or held for rental by "you".

3. "We" do not pay for "property damage" to property used by or loaned to "you". This exclusion does not apply with respect to liability assumed under a sidetrack agreement.

4. "We" do not pay for "property damage" to either business or non-business personal property in the care, custody, or control of the "insured". This exclusion does not apply with respect to liability assumed under a sidetrack agreement.

5. "We" do not pay for "property damage" to that specific part of real property on which work is being performed by:

a. "you"; or

b. a contractor or subcontractor working directly or indirectly on "your" behalf,

if the "property damage" arises out of such work. This exclusion does not apply with respect to liability assumed under a sidetrack agreement.

6. "We" do not pay for "property damage" to that specific part of any property that must be restored, repaired, or replaced because of faults in "your work". This exclusion does not apply to:

a. "property damage" covered under the "products/completed work hazard" or

b.  liability assumed under a sidetrack agreement.

7.  "We" do not pay for "property damage" to "products" if the damage arises out of the "products" or their parts.

8.  "We" do not pay for "property damage" to "your work" if the "property damage" arises out of "your work" and is included in the "products/completed work hazard". This exclusion does not apply if damage to the work or the part of the work out of which the damage arises is performed by a subcontractor on "your" behalf.

9.  "We" do not pay for "property damage" to property that has not been physically injured or destroyed, or to "impaired property", that arises out of:

a.  a delay or failure to perform a contract by "you" or one acting on "your" behalf; or

b.  a defect, deficiency, inadequacy, or unsafe condition in "your work" or "products".

This exclusion does not apply to the loss of use of other property resulting from sudden and accidental physical injury to or destruction of "your work" or "products" after having been put to its intended use.

10.  "We" do not pay for any loss or expense incurred by "you" or anyone else arising out of the loss of use, disposal, withdrawal, recall, inspection, repair, replacement, adjustment, or removal of (including any expenses involved in the withdrawal or recall) of "your work", "products", or "impaired property". This applies when the loss of use, disposal, withdrawal, recall, inspection, repair, replacement, adjustment, or removal was because of a known or suspected defect, deficiency, or unsafe condition.

## ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO MEDICAL PAYMENTS

These exclusions apply in addition to the other exclusions that apply to "bodily injury".

1.  "We" do not pay for medical expenses for "bodily injury" to an "insured".

2.  "We" do not pay for medical expenses for "bodily injury" to a person hired by or on behalf of any "insured" to do work for:

a.  an "insured"; or

b.  a tenant of an "insured".

3.  "We" do not pay for medical expenses for "bodily injury" to a person injured on that part of the premises owned by or rented to "you" that the person normally occupies.

4.  "We" do not pay for medical expenses for "bodily injury" to a person injured while taking part in athletic activities.

5.  "We" do not pay for medical expenses for "bodily injury" included in the "products/completed work hazard".

6.  "We" do not pay for medical expenses for "bodily injury" to "your" members if "you" are a club.

7.  "We" do not pay for medical expenses for "bodily injury" to a guest of a hotel, motel, or tourist court owned or operated by "you" or on "your" behalf.

8.  "We" do not pay for medical expenses for "bodily injury" to a person if benefits are provided or required to be provided under any workers' compensation, nonoccupational disability, occupational disease, or like law.

9.  "We" do not pay for medical expenses for "bodily injury" to a:

AAIS
BP-200  Ed 1.0
Page 38 of 43

a. student or camper enrolled in a program of any facility owned or operated by "you" or on "your" behalf; or

b. patient or inmate being treated or detained in a facility owned or operated by "you" or on "your" behalf.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice --**

a. In the case of an "occurrence" or if an "insured" becomes aware of anything that indicates that there might be a claim under the Commercial Liability Coverage, "you" must arrange for prompt notice to be given to "us" or "our" agent. Notice to "our" agent is notice to "us".

b. The notice to "us" must state:

1) the "insured's" name;
2) the policy number;
3) the time, the place, and the circumstances of the "occurrence", or the situation that indicates that there might be a claim; and
4) the names and addresses of all known and potential claimants and witnesses.

2. **Cooperation --** All "insureds" involved with an "occurrence" or an offense must cooperate with "us" in performing all acts required by the Commercial Liability Coverage.

3. **Volunteer Payments --** An "insured" must not make payments or assume obligations or other costs except at the "insured's" own cost. This does not apply to first aid to others at the time of "bodily injury".

4. **Other Duties --**

a. If a claim is made or suit is brought, the "insured" must:

1) promptly send to "us" copies of all legal papers, demands, and notices; and

2) at "our" request, assist in:

a) a settlement;
b) the conduct of suits. This includes the attendance at trials or hearings;
c) the enforcing of rights against all parties who may be liable to an "insured" for the injury or damage;
d) the securing of and giving of evidence; and
e) obtaining the attendance of all witnesses.



b. In the case of a medical payments loss:

1) the injured person (or one acting on such person's behalf) must:

a) give "us" written proof of claim (under oath if requested) as soon as practicable; and
b) give "us" permission to get copies of the medical records;

2) the injured person must submit to medical exams by doctors chosen by "us" when and as often as "we" may reasonably require.

## HOW MUCH WE PAY

1. The "limits", shown on the "declarations" and subject to the following conditions, are the most "we" pay regardless of the number of:

a. "insureds" under the Commercial Liability Coverage;

b. persons or organizations who sustain injury or damage; or

c. claims made or suits brought.

The payment of a claim under Coverage M does not mean that "we" admit "we" are liable under other coverages.

2. The General Aggregate Limit is the most "we" will pay during a policy period for the sum of:

a. all "damages" under Coverage L, except "damages" due to "bodily injury" or "property damage" included under Coverage N;

b. all medical expenses under Coverage M; and

c. all "damages" under Coverage P.

3. The Products/Completed Work Hazard Aggregate Limit is the most "we" will pay during a policy period for "damages" due to "bodily injury" or "property damage" included under Coverage N.

4. The Each Occurrence Limit, subject to the General Aggregate Limit and the Products/Completed Work Hazard Aggregate Limit, is the most "we" will pay for the total of:

a. "damages" under Coverages L, N, O, and P; and

b. medical expenses under Coverage M.

due to all "bodily injury" and "property damage" arising out of a single "occurrence" or due to all "personal injury" and "advertising injury" sustained by one person or organization.

5. Subject to the Each Occurrence Limit, "our" "limit" for "property damage" covered under Coverage O is $50,000 for each "occurrence" unless otherwise shown on the "declarations".

6. Subject to the General Aggregate Limit and the Each Occurrence Limit, the Coverage M Limit is the most that "we" will pay under Coverage M for all medical expenses because of "bodily injury" sustained by any one person.

7. The General Aggregate Limit and the Products/Completed Work Hazard Aggregate Limit apply separately to each consecutive 12-month period beginning with the inception date of the Commercial Liability Coverage shown on the "declarations". They also apply separately to any remaining policy period of less than 12 months, unless the Commercial Liability Coverage has been extended after it was written. In that case, the additional period will be considered part of the last preceding period for the purpose of determining "limits".

## CONDITIONS

1. **Bankruptcy** -- Bankruptcy or insolvency of an "insured" does not relieve "us" of "our" obligations under Commercial Liability Coverage.

2. **Insurance Under More Than One Policy** -- (Applies to all coverages except Coverage M -- Medical Payments.)

a. Insurance under this Commercial Liability Coverage is primary except as provided under paragraph 2.c. below, or unless otherwise stated. The amount of "our" liability is not reduced because of other insurance which applies to the loss on other than a primary basis.

b.  If the other insurance is also primary, "we" will share in the loss as follows:

1)  If the other insurance provides for contribution by equal shares, "we" will pay equal amounts with other insurers until:

a)  the lowest applicable "limit" under any one policy is reached; or

b)  the full amount of the loss is paid.

If part of the loss remains unpaid, "we" will pay an equal share with the other insurers until the full amount of the loss is paid, or until "we" have paid "our" "limit" in full.

2)  If the other insurance does not provide for contribution by equal shares, "we" will pay, up to "our" "limit", no more than that proportion of the loss to which the applicable "limit" under this policy for such loss bears to the total applicable "limit" for all insurance against the loss.

c.  Insurance under this Commercial Liability Coverage is excess over any other insurance:

1)  if the other insurance, whether primary, excess, contingent, or on any other basis, provides:

a)  fire, extended coverage, builders' risk, installation risk, or similar coverage for "your work"; or

b)  fire insurance for premises rented to "you"; or

2)  if the other insurance applies to any loss arising out of the maintenance or use of aircraft, "autos", or watercraft which may be covered by this policy.

d.  When this insurance is excess over any other insurance:

1)  "we" will have no duty to defend any claim or suit that any other insurer has a duty to defend. If no other insurer defends, "we" will do so. However, "we" will be entitled to the "insured's" rights against all those other insurers.

2)  "we" will pay "our" share of the amount of loss, if any, that exceeds the sum of:

a)  the total amount that all such other insurance would pay for the loss in the absence of this insurance; and

b)  the total of all deductibles and self-insured amounts required by such other insurance.

"We" will share the remaining loss with any other insurance that is not described in this excess insurance provision and was not bought specifically to apply in excess of the "limits" shown on the "declarations" of this Commercial Liability Coverage.

3.  **Motor Vehicle Financial Responsibility Certification** -- When Commercial Liability Coverage is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, the insurance provided for "bodily injury" liability or "property damage" liability will comply with the provisions of the law to the extent of the coverage and "limits" of insurance required by that law.

4.  **Premium** -- If the premium is shown on the "declarations" as a deposit premium, "we" will compute the final earned premium at the end of each audit period shown on the "declarations". If it is more than the deposit premium paid by "you", "we" will bill "you"

for the difference. If the final earned premium is less than the deposit premium paid by "you", "we" will return the difference to "you". "You" must maintain records of the information that is necessary for computing the premium. Copies of the records must be sent to "us" at the end of the audit period or when requested by "us".

5. **Separate Insureds** -- Coverage provided under the Commercial Liability Coverage applies separately to each "insured" against whom claim is made or suit is brought. This does not affect the "limits" stated under How Much We Pay.

6. **Subrogation** -- If "we" pay under the Commercial Liability Coverage, "we" may require from an "insured" an assignment of any right of recovery. "We" are not liable under the Commercial Liability Coverage if any "insured" has impaired "our" right to recover. An "insured" may waive its right to recover, in writing, before an "occurrence" takes place.

7. **Suit Against Us** -- No suit may be brought against "us" unless:

   a. all the "terms" of the Commercial Liability Coverage have been complied with; and

   b. the amount of the "insured's" liability has been determined by:

      1) a final judgment against an "insured" as a result of a trial; or
      2) a written agreement by the "insured", the claimant, and "us".

No person has a right under the Commercial Liability Coverage to join "us" or implead "us" in actions that are brought to determine an "insured's" liability.

# NUCLEAR ENERGY LIABILITY EXCLUSION

This insurance does not apply:

1. under any liability coverage, to "bodily injury" or "property damage":

   a. with respect to which an "insured" under the policy is also an "insured" under a Nuclear Energy Liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an "insured" under any such policy but for its termination upon exhaustion of its "limit" of liability; or

   b. resulting from the "hazardous properties" of "nuclear material" and with respect to which:

      1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereto; or
      2) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

2. under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

3.  under any liability coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

    a.  the "nuclear material":

        1)  is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured"; or

        2)  has been discharged or dispersed therefrom;

    b.  the "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, stored, processed, transported, or disposed of by or on behalf of an "insured"; or

    c.  the "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (c.) applies only to "property damage" to such "nuclear facility" and any property thereat.

## DEFINITIONS

The following definitions apply to the Nuclear Energy Liability Exclusion:

1.  "Hazardous Properties" -- These include radioactive, toxic, or explosive properties.

2.  "Nuclear Material" -- This means "source material", "special nuclear material", or "by-product material".

3.  "Source Material", "Special Nuclear Material", "By-product Material" -- These have the meanings given them in the Atomic Energy Act of 1954, or in any law amendatory thereof.

4.  "Spent Fuel" -- This means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

5.  "Waste" -- This means any "waste" material:

    a.  containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    b.  resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

6.  "Nuclear Facility" -- This means:

    a.  any "nuclear reactor".

    b.  any equipment or device designed or used for:

        1)  separating the isotopes of uranium or plutonium;

        2)  processing or utilizing "spent fuel"; or

        3)  handling, processing, or packaging "waste".

    c.  any equipment or device used for the processing, fabricating, or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium-233 or any combination thereof, or more than 250 grams of uranium-235.

    d.  any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such sites, and all premises used for such operations.

7.  "Nuclear Reactor" -- This means any apparatus designed or used:

   a.  to sustain nuclear fission in a self-supporting chain reaction; or

   b.  to contain a critical mass of fissionable material.

8.  "Property Damage" -- This includes all forms of radioactive contamination of property.

BP-200  Ed 1.0
Copyright MCMXCIV
American Association of Insurance Services

**AAIS**
**BP-432  Ed 2.0**
**Page 1 of 4**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# AMENDATORY ENDORSEMENT
## MASSACHUSETTS

1. Under the Common Policy Conditions, the Cancellation condition is deleted and replaced by:

   **Cancellation** -- "You" may cancel this policy at any time by returning it to "us". "You" may also cancel it by advance notice in writing to "your" agent or "us" giving the date upon which "you" wish it cancelled.

   "We" may cancel this policy for any reason during the first 60 days it is in effect.

   "We" cannot cancel this policy after it has been in effect for 60 days, unless after the effective date:

   a.  "you" have not paid the premium;

   b.  "you" or any other "insured" are convicted of any act which increases the chance of a loss covered under the policy;

   c.  "we" discover a fraudulent or material misrepresentation "you" or any other "insured" made in the application for the policy;

   d.  "we" discover a willful or reckless act or omission by "you" or any other "insured" which increases the chance of a loss covered under the policy;

   e.  there have been physical changes to the property covered under the policy which make that property uninsurable; or

   f.  the Commissioner of Insurance determines that continuation of the policy would violate the law.

   "We" will give "you" notice at least five days before the stated effective date of cancellation unless the reason for cancellation is for nonpayment of premium.

   If "we" cancel for nonpayment of premium, "we" will give "you" notice at least ten days before the effective date of cancellation.

   To cancel the rights of any mortgagee shown in the "declarations", "we" must also send notice to the mortgagee at least 20 days before the effective date of cancellation. This supersedes the notice of cancellation requirement contained in the Mortgage Provisions.

   "We" may cancel this policy by written notice delivered or mailed to "you" at the address shown on the "declarations". United States Postal Service certificate of mailing showing "your" name and address will be considered sufficient notice.

   The notice of cancellation will state "our" reason for such cancellation.

   If the stated reason is nonpayment of premium, "you" may continue the coverage and avoid the effect of cancellation by payment at any time prior to the effective date of cancellation.

   Refunds of any premium will be sent to "you" as soon as possible. "Your" return premium, if any, will be calculated on a pro rata basis.

   The following provisions amend the Property Coverages:

2. Under Perils Covered, the following is added:

   "We" insure against all loss (not otherwise excluded) to covered property caused by fire or lightning.

3. Under What Must Be Done In Case Of Loss, the Proof of Loss provision is deleted and replaced by:

AAIS
BP 0620 01 99
Page 1 of 1

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# LOSS OF INCOME COVERAGE 72-HOUR WAITING PERIOD
## PROPERTY COVERAGES

## DEFINITIONS

The Definition of "Restoration period" is deleted and replaced by the following:

8. "Restoration period":

   a. This means the period of time it should reasonably take to resume "your" normal business activities at the described premises starting:

      1) for Earnings, 72 hours after the time of loss caused by a covered peril; or
      2) for Extra Expense, immediately after the time of loss caused by a covered peril, and

      ending on the date the property should be rebuilt, repaired, or replaced. This is not limited by the expiration date of the policy.

   b. "Restoration period" does not include any increase in time due to the enforcement of any ordinance, law, or decree that regulates or requires:

      1) the construction, use, repair, or demolition of any property;
      2) the testing, evaluating, observing, or recording the existence, level, or effects of "pollutants"; or
      3) the clean up, removal, containment, treatment, detoxification, or neutralization of "pollutants".

## COVERAGE C – LOSS OF INCOME

Under Supplemental Loss of Income Coverages, Interruption by Civil Authority is deleted and replaced by the following:

2. **Interruption by Civil Authority** – "We" extend "your" coverage to include loss while access to the described premises is specifically denied by an order of civil authority. This order must be a result of damage to property other than at the described premises and caused by a covered peril.

   This extension of coverage:

   a. for Earnings, starts 72 hours after the time the order is issued and will apply for a period of up to three consecutive weeks after the order is issued; and

   b. for Extra Expense, starts immediately after the order is issued, and will apply for:

      1) a period of up to three consecutive weeks after the order is issued; or
      2) until "your" Earnings coverage ends,

      whichever is later

   This does not increase any "limit" for Coverage C -- Loss of Income shown on the "declarations".

BP 0620 01 99
Copyright, American Association of Insurance Services, 1998

**AAIS**
**GL-895  Ed 2.0**
**Page 1 of 1**

This endorsement changes the Commercial
Liability Coverages provided by this policy
-- PLEASE READ THIS CAREFULLY --

# EMPLOYEE REDEFINED

The Commercial Liability Coverage is amended as follows:

## DEFINITIONS

The definition of "employee" is replaced by the following:

"Employee" does not include a "leased worker" or a "temporary worker".

}

GL-895  Ed 2.0

Copyright MCMXCV, American Association of Insurance Services

}

The Patrons Group
BP 56 22 03 99
Page 1 of 1

**This endorsement changes
the policy
PLEASE READ THIS CAREFULLY**

# CALENDAR DATE OR TIME FAILURE EXCLUSION

Coverage is amended as follows:

**PROPERTY COVERAGES**

1. The Calendar Date or Time Failure exclusion shown below is added under Additional Exclusions:

   **Calendar Date or Time Failure --** "We" do not pay for loss or damage resulting from the failure of any electronic data processing equipment, computer program, software media, or data to correctly recognize interpret, or process any encoded, abbreviated, or encrypted date or time included, but not limited to the transition to the Year 2000.

2. If this policy includes:

   a. endorsement BP-320, Accounts Receivable Coverage;

   b. endorsement BP-322, Computer Coverage;

   c. endorsement BP-327, Spoilage Coverage; and/or

   d. endorsement BP 328, Valuable Papers and Record Coverage,

   the Calendar Date or Time Failure exclusion shown above is added to each applicable endorsement under Perils Excluded, item 2.

3. If this policy includes endorsement BP 05 51, Businessowners Property Additional Coverage Endorsement, the Calendar Date or Time Failure exclusion shown above is added to the applicable endorsement under Perils Excluded, item 2 for: Accounts Receivable, Computers, Spoilage, and Valuable Papers and Records.

**COMMERCIAL LIABILITY COVERAGES**

The following exclusion is added:

"We" do not pay for "property damage", "personal injury", or "advertising injury" resulting from the failure of any electronic data processing equipment, computer program, software, media, or data to correctly recognize, interpret, or process the dates of August 22, 1999, September 9, 1999, December 31, 1999, or any encoded, abbreviated, or encrypted date or time related to the transition from the Year 1999 to the Year 2000 and beyond.

**BP 56 22 03 99**
Copyright, The Patrons Group, 1999. Contains material copyright AAIS, 1999 used with permission.

**This endorsement changes the policy
-- PLEASE READ THIS CAREFULLY --**

# EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS STANDARD POLICY

BUSINESSOWNERS SPECIAL POLICY

The following is added to ADDITIONAL COVERAGES.

**Equipment Breakdown**

(1)  "We" pay for loss caused by or resulting from an "Accident" to "covered equipment". As used in this Additional Coverage, an "Accident" means direct physical loss as follows:

    (a)  mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force;

    (b)  loss caused by arcing or by electrical currents other than lightning;

    (c)  explosion of steam boilers, steam pipes, steam turbines or steam engines that "you" own or lease or that are operated under "your" control;

    (d)  loss to steam boilers, steam pipes, steam turbines or steam engines caused by any condition or occurrence within such equipment; or

    (e)  loss to hot water boilers or water heaters caused by any condition or occurrence within such equipment.

If an initial "Accident" causes other "Accidents", all will be considered one "Accident". All "Accidents" that are the result of the same event will be considered one "Accident".

"Covered equipment" means covered property built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilization of energy.

(2)  The following coverages also apply to loss caused by or resulting from an "Accident" to "covered equipment". These coverages do not provide additional amounts of insurance.

    (a)  Expediting Expenses

        With respect to "your" damaged covered property, "we" pay, up to $25,000, the reasonable extra cost to:

        (i)  expedite permanent repairs or replacement; and

        (ii)  make temporary repairs.

    (b)  "Pollutants"

        "We" pay for the additional cost to repair or replace covered property because of contamination by a "pollutant". This includes the additional expenses to clean up or dispose of such property.

        Additional costs mean those beyond what would have been required had no "pollutant" been involved.

        The most "we" will pay for loss or damage under this coverage, including actual loss under Earnings, Extra Expense and Perishable Goods coverage, is $25,000.

    (c)  Perishable Goods

        (i)  "We" pay for "your" loss of "perishable goods" due to spoilage.

        (ii)  "We" also pay for "your" loss of "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

        (iii)  "We" also pay any necessary expenses "you" incur to reduce the amount of loss under this coverage. "We" pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

(iv)    If "you" are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment is determined on the basis of the sales price of the "perishable goods" at the time of the "Accident", less discounts and expenses "you" otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation of Property Losses condition.

(v)    Additional Definition. For the purpose of this coverage, "perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

The most "we" pay for loss or damage under this coverage is $25,000. However, if Spoilage endorsement BP-327 Ed. 1.0 applies and the limit is greater than $25,000, then the limit for Perishable Goods is increased to match the amount of the limit indicated in Spoilage endorsement BP-327 Ed. 1.0.

(d)    Computer Equipment

"We" pay for loss or damage caused by or resulting from an "Accident" to "computer equipment".

"Computer equipment" means covered property that is electronic computer or other data processing equipment, including "media" and peripherals used in conjunction with such equipment.

"Media" means all forms of electronic, magnetic and optical tapes and discs for use in any electronic computer or electronic data processing equipment.

The most "we" pay for loss or damage under this coverage, including loss under Earnings and Extra Expense coverages is $25,000 unless otherwise shown in the Declarations.

(e)    CFC Refrigerants

"We" pay for the additional cost to repair or replace covered property because of the use or presence of a refrigerant containing CFC (chlorinated fluorocarbon) substances. This means the additional expense to do the least expensive of the following:

(i)    Repair the damaged property and replace any lost CFC refrigerant;

(ii)    Repair the damaged property, retrofit the system to accept a non-CFC refrigerant and charge the system with a non-CFC refrigerant; or

(iii)    Replace the system with one using a non-CFC refrigerant.

Additional costs mean those beyond what would have been required had no CFC refrigerant been involved.

The most "we" pay for loss or damage under this coverage, including loss under Earnings, Extra Expense and Perishable Goods coverage, is $25,000.

(f)    Service Interruption

The insurance provided for Earnings, Extra Expense and Perishable Goods is extended to apply to loss caused by or resulting from an "Accident" to equipment that is owned by a utility, landlord, or other supplier with whom "you" have a contract to provide "you" with any of the following services: electrical power, communications, waste disposal, air conditioning, refrigeration, heating, gas, air, water or steam.

(3)    Exclusions

In the applicable Businessowners Policy, only as regards Equipment Breakdown Coverage, all the Property Not Covered; Additional Property Excluded and Limitations; Exclusions and Limitations; Perils Excluded, and; Additional Exclusions apply except:

(a)    In the Businessowners Special Policy, Additional Property Excluded and Limitations 1. Boilers, and; Additional Exclusions 6. Electrical Currents, 7. Explosion, and 9. Mechanical Breakdown.

(b)    In the Businessowners Standard Policy, Additional Exclusions 1. Boiler Explosion, 3. Electrical Currents, and 4. Mechanical Breakdown.

(c)    In the applicable Businessowners Policy, Perils Excluded 6.a. Water is modified by adding the following:

However, if electrical "covered equipment" requires drying out because of the above, "we" pay for the direct expenses of such drying out subject to the applicable limit of insurance and deductible for Buildings or Business Personal Property, whichever applies.

(d)    In the Businessowners Special Policy, the following Additional Exclusions are amended as follows:

    (i)    Animals – Additional Exclusion 1. is deleted and replaced with the following:

    Animals – "We" do not pay for loss caused by nesting or infestation, or discharge or release of waste products or secretions of animals, including birds, or insects. "We" do pay for any resulting loss caused by an "Accident".

    (ii)    Contamination or Deterioration – Additional Exclusion 3. is deleted and replaced with the following:

    Contamination or Deterioration – "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in property that causes it to damage or destroy itself. "We" do pay for any resulting loss caused by an "Accident."

    (iii)    Wear and Tear – Additional Exclusion 17. is deleted and replaced with the following:

    Wear and Tear – "We" do not pay for loss caused by wear and tear, marring, or scratching. "We" do pay for any resulting loss caused by an "Accident".

(e)    None of the following is "covered equipment":

    (i)    structure, foundation, cabinet, compartment or air supported structure or building;

    (ii)    insulating or refractory material;

    (iii)    sewer piping, underground vessels or piping, piping forming a part of a sprinkler system or water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

    (iv)    vehicle, dragline, excavation or construction equipment; or

    (v)    equipment manufactured by "you" for sale.

(f)    "We" do not pay under this endorsement for loss or damage caused by or resulting from:

    (i)    "your" failure to use all reasonable means to protect the "perishable goods" from damage following an "Accident";

    (ii)    any defect, virus, loss of data or other situation within "media". But if loss or damage from an "Accident" results, "we" pay for that resulting loss or damage; or

    (iii)    any of the following tests:

    a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or an insulation breakdown test of any type of electrical equipment.

(g)    With respect to Service Interruption coverage and Perishable Goods coverage, "we" also do not pay for loss or damage caused by or resulting from: fire; lightning; windstorm or hail; explosion (except for steam or centrifugal explosion); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing or collapse.

(4)    Conditions

(a)    Suspension

When any "covered equipment" is discovered to be in, or exposed to a dangerous situation or condition, any representative of ours may immediately suspend the insurance against loss from an "Accident" to that "covered equipment". "We" can do this by mailing or delivering a written notice of suspension to "your" address as shown in the Declarations, or at the address where the equipment is located. Once so suspended, "your" insurance can be reinstated only by written notice from "us". If "we" suspend "your" insurance, "you" will get a pro rata premium refund. But the suspension will be effective even if "we" have not yet offered or made a refund.

(b)    Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, "we" agree to perform such inspection on "your" behalf.

The most "we" will pay for loss or damage under this endorsement is the applicable limit of insurance shown in the Declarations. Coverage provided under this endorsement does not provide an additional amount of insurance.

THE PATRONS GROUP
PM 72 01 07 99
Page 1 of 4

**This endorsement changes the policy
– PLEASE READ THIS CAREFULLY –**

# EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS STANDARD POLICY

BUSINESSOWNERS SPECIAL POLICY

The following is added to ADDITIONAL COVERAGES.

**Equipment Breakdown**

(1)   "We" pay for loss caused by or resulting from an "Accident" to "covered equipment". As used in this Additional Coverage, an "Accident" means direct physical loss as follows:

(a)   mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force;

(b)   loss caused by arcing or by electrical currents other than lightning;

(c)   explosion of steam boilers, steam pipes, steam turbines or steam engines that "you" own or lease or that are operated under "your" control;

(d)   loss to steam boilers, steam pipes, steam turbines or steam engines caused by any condition or occurrence within such equipment; or

(e)   loss to hot water boilers or water heaters caused by any condition or occurrence within such equipment.

If an initial "Accident" causes other "Accidents", all will be considered one "Accident". All "Accidents" that are the result of the same event will be considered one "Accident".

"Covered equipment" means covered property built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilization of energy.

(2)   The following coverages also apply to loss caused by or resulting from an "Accident" to "covered equipment". These coverages do not provide additional amounts of insurance.

(a)   Expediting Expenses

With respect to "your" damaged covered property, "we" pay, up to $25,000, the reasonable extra cost to:

(i)   expedite permanent repairs or replacement; and

(ii)   make temporary repairs.

(b)   "Pollutants"

"We" pay for the additional cost to repair or replace covered property because of contamination by a "pollutant". This includes the additional expenses to clean up or dispose of such property.

Additional costs mean those beyond what would have been required had no "pollutant" been involved.

The most "we" will pay for loss or damage under this coverage, including actual loss under Earnings, Extra Expense and Perishable Goods coverage, is $25,000.

(c)   Perishable Goods

(i)   "We" pay for "your" loss of "perishable goods" due to spoilage.

(ii)   "We" also pay for "your" loss of "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

(iii)   "We" also pay any necessary expenses "you" incur to reduce the amount of loss under this coverage. "We" pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# KNOWN INJURY OR DAMAGE AMENDMENTS

The Commercial Liability Coverage is amended as follows:

1.  Under Definitions, the following definition is added:

    "Designated insured" means:

    a.  "you" and "your" spouse, but only with respect to the conduct of a business of which "you" are the sole owner, if "you" are shown on the "declarations" as an individual;

    b.  "you" and all "your" partners or members and their spouses, but only with respect to the conduct of "your" business, if "you" are shown on the "declarations" as a partnership or a joint venture;

    c.  "you" and all "your" members and managers, but only while acting within the scope of their duties, if "you" are shown on the "declarations" as a limited liability company; and

    d.  "you" and all "your" executive officers and directors, but only while acting within the scope of their duties, if "you" are shown on the "declarations" as an organization (other than a partnership, joint venture, or limited liability company). It also includes "your" stockholders, but only for their liability as such; or

    e.  any "employee" who is authorized to give or receive notice of an "occurrence" or a claim.

2.  Under Principal Coverages, Coverage L and, if applicable, Coverage N are amended by the addition of the following:

    This insurance applies only to:

    a.  "Bodily injury" or "property damage" which is not a continuation of, resumption of, or change in "bodily injury" or "property damage" that was known by a "designated insured" prior to the inception date of the policy period. If a "designated insured" knew, as stated under the Knowledge of Bodily Injury or Property Damage Condition, prior to the inception date of the policy period, that "bodily injury" or "property damage" had occurred, any continuation of, resumption of, or change in such "bodily injury" or "property damage" will be deemed to have been known by the "designated insured" prior to the inception date of the policy period.

    b.  "Bodily injury" or "property damage" that occurs during the policy period and which is not a continuation of, resumption of, or change in "bodily injury" or "property damage" which was known by a "designated insured", as stated under the Knowledge of Bodily Injury or Property Damage Condition, to have occurred prior to the inception date of this policy period, will include any continuation of, resumption of, or change in such "bodily injury" or "property damage" after the end of this policy period.

3.  Under Defense Coverage, the following is added:

    "We" have no duty to defend a suit or claim seeking "damages" because of "bodily injury" or "property damage" which was known by a "designated insured", as stated under the Knowledge of Bodily Injury or Property Damage Condition, prior to the inception date of the policy period.

AAIS

ML-106
Ed 1.0

# TENANT RELOCATION EXPENSE ENDORSEMENT

## MASSACHUSETTS

This endorsement is required by Massachusetts law.

This policy provides relocation expense benefits as follows:

1. **Relocation Expense** — When a **rented living quarters** in a building covered by this policy is made uninhabitable as a result of a loss by fire, this policy covers **relocation expense** incurred by the tenant or lawful occupant to relocate to other living quarters in the shortest possible time.

2. **Definitions**

   A. **Relocation Expense** means documented, reasonable and necessary:

   1) Costs of packing, insuring, storing and carting household goods;
   2) Costs of securing new utility services less refunds from discontinued services at the damaged premises;
   3) Costs of searching for other quarters;
   4) Costs of disconnecting and reconnecting household appliances;
   5) Additional living expenses while searching for or awaiting possession of other quarters or the restoration of existing quarters;

   commencing with the date of damage to the covered building and not limited by the expiration date of this policy.

   **Relocation expense** does not mean:

   1) Loss caused by the termination of a lease or other agreement;
   2) Security deposits or other payments made to the landlord or lessor of other quarters;
   3) Down payments, legal fees and closing costs incidental to the purchase of other quarters.

   B. **Rented Living Quarters** means a room, suite of rooms or apartment rented as a single residential unit by one or more persons.

   **Rented living quarters** does not mean one or more rooms occupied by one or more persons as roomers in a hotel, motel, public or private lodging or rooming house where the premises are occupied on a transient basis.

3. **Limit** — The amount of coverage for **relocation expense** under this policy is limited to not more than $750 for a **rented living quarters**.

4. **No Deductible** — The deductible provisions of this policy do not apply to the **relocation expense** benefits.

5. **Other Insurance**

   A. If at the time of loss, the tenant or lawful occupant has other insurance that covers **relocation expense**, **we** shall not be liable for any loss under this coverage until the liability of such other insurance has been exhausted.

   B. If **you** have other insurance that covers **relocation expense**, payment under this policy will be prorated with such insurance for the smaller of the incurred **relocation expense** or $750, all after application of the other insurance of the tenant or lawful occupant.

6. **Loss Settlement** — The claims of all persons occupying the **rented living quarters** will be settled with and payment made to the tenant or lawful occupant renting the quarters from the building owner or lessor.

7. **Policy Terms** — All other **terms** of this policy remain unchanged.

AAIS

Copyright MCMXCII, American Association of Insurance Services

AAIS
ML-223  Ed 3.0
Page 1 of 1

This endorsement changes the Liability Coverage
provided by this policy
-- PLEASE READ THIS CAREFULLY --

# LEAD LIABILITY EXCLUSION

1. The following additional exclusion applies to the liability coverage provided by this policy.

   "We" do not pay for "bodily injury" arising out of exposure to lead in residential premises owned by an "insured" and built prior to 1978.

2. The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in a single family owner-occupied residential premises. The exposure to lead that results in "bodily injury" must occur during the policy period.

3. The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in a premises newly acquired by an "insured" as a result of a bona fide transaction, if the "insured" has complied with the requirements of the Massachusetts Lead Law within 90 days after becoming the owner of such premises. The exposure to lead that results in "bodily injury" must occur during the policy period and on or after the date the "insured" took title to the premises.

4. The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in any dwelling unit or residential premises described in a Letter of Compliance or Letter of Interim Control, unless the "bodily injury" is the result of gross or willful negligence. The exposure to lead that results in "bodily injury" must occur during the policy period and on or after the date that the Letter of Compliance or Letter of Interim Control that applies to such dwelling unit or residential premises is effective.

   The Letter of Compliance or Letter of Interim Control must be signed, dated, and issued by a lead inspector authorized to do so under the Massachusetts Lead Law.

All other "terms" of the policy apply.

ML-223  Ed 3.0
Copyright MCMXCV
American Association of Insurance Services

**AAIS**
**BP-309  Ed 1.0**
**Page 1 of 1**

This endorsement changes the Commercial
Liability Coverage Provided by this policy
**-- PLEASE READ THIS CAREFULLY --**

# LIABILITY COVERAGE
# DESIGNATED PREMISES OR PROJECT

(The entries required to complete this endorsement
will be shown below or on the "declarations".)

**Premises:**

**Project:**

The Commercial Liability Coverage is amended
as follows:

## EXCLUSIONS

**EXCLUSIONS THAT APPLY TO BODILY
INJURY, PROPERTY DAMAGE, PERSONAL
INJURY, AND/OR ADVERTISING INJURY**

The following exclusions are added:

"We" do not pay for "bodily injury" or "property
damage" (or "personal injury" or "advertising
injury", if provided by the Commercial Liability
Coverage):

1.  that arises out of the ownership,
    maintenance, or use of the premises other
    than those described above;

2.  that arises out of operations that are
    necessary or incidental to the ownership,
    maintenance, or use of premises other than
    those described above; or

3.  that arises out of a project other than that
    described above.

**BP-309  Ed 1.0**
Copyright MCMXCV
American Association of Insurance Services

**This endorsement changes the policy
— PLEASE READ THIS CAREFULLY —**

# EQUIPMENT BREAKDOWN COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

   BUSINESSOWNERS STANDARD POLICY

   BUSINESSOWNERS SPECIAL POLICY

The following is added to ADDITIONAL COVERAGES.

**Equipment Breakdown**

(1)   "We" pay for loss caused by or resulting from an "Accident" to "covered equipment". As used in this Additional Coverage, an "Accident" means direct physical loss as follows:

   (a)   mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force;

   (b)   loss caused by arcing or by electrical currents other than lightning;

   (c)   explosion of steam boilers, steam pipes, steam turbines or steam engines that "you" own or lease or that are operated under "your" control;

   (d)   loss to steam boilers, steam pipes, steam turbines or steam engines caused by any condition or occurrence within such equipment; or

   (e)   loss to hot water boilers or water heaters caused by any condition or occurrence within such equipment.

   If an initial "Accident" causes other "Accidents", all will be considered one "Accident". All "Accidents" that are the result of the same event will be considered one "Accident".

   "Covered equipment" means covered property built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilization of energy.

(2)   The following coverages also apply to loss caused by or resulting from an "Accident" to "covered equipment". These coverages do not provide additional amounts of insurance.

   (a)   **Expediting Expenses**

      With respect to "your" damaged covered property, "we" pay, up to $25,000, the reasonable extra cost to:

      (i)    expedite permanent repairs or replacement; and

      (ii)   make temporary repairs.

   (b)   **"Pollutants"**

      "We" pay for the additional cost to repair or replace covered property because of contamination by a "pollutant". This includes the additional expenses to clean up or dispose of such property.

      Additional costs mean those beyond what would have been required had no "pollutant" been involved.

      The most "we" will pay for loss or damage under this coverage, including actual loss under Earnings, Extra Expense and Perishable Goods coverage, is $25,000.

   (c)   **Perishable Goods**

      (i)    "We" pay for "your" loss of "perishable goods" due to spoilage.

      (ii)   "We" also pay for "your" loss of "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

      (iii)  "We" also pay any necessary expenses "you" incur to reduce the amount of loss under this coverage. "We" pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

AAIS
BP 0663 12 99
Page 1 of 2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# KNOWN INJURY OR DAMAGE AMENDMENTS

The Commercial Liability Coverage is amended as follows:

1. Under Definitions, the following definition is added:

   "Designated insured" means:

   a. "you" and "your" spouse, but only with respect to the conduct of a business of which "you" are the sole owner, if "you" are shown on the "declarations" as an individual;

   b. "you" and all "your" partners or members and their spouses, but only with respect to the conduct of "your" business, if "you" are shown on the "declarations" as a partnership or a joint venture;

   c. "you" and all "your" members and managers, but only while acting within the scope of their duties, if "you" are shown on the "declarations" as a limited liability company; and

   d. "you" and all "your" executive officers and directors, but only while acting within the scope of their duties, if "you" are shown on the "declarations" as an organization (other than a partnership, joint venture, or limited liability company). It also includes "your" stockholders, but only for their liability as such; or

   e. any "employee" who is authorized to give or receive notice of an "occurrence" or a claim.

2. Under Principal Coverages, Coverage L and, if applicable, Coverage N are amended by the addition of the following:

   This insurance applies only to:

   a. "Bodily injury" or "property damage" which is not a continuation of, resumption of, or change in "bodily injury" or "property damage" that was known by a "designated insured" prior to the inception date of the policy period. If a "designated insured" knew, as stated under the Knowledge of Bodily Injury or Property Damage Condition, prior to the inception date of the policy period, that "bodily injury" or "property damage" had occurred, any continuation of, resumption of, or change in such "bodily injury" or "property damage" will be deemed to have been known by the "designated insured" prior to the inception date of the policy period.

   b. "Bodily injury" or "property damage" that occurs during the policy period and which is not a continuation of, resumption of, or change in "bodily injury" or "property damage" which was known by a "designated insured", as stated under the Knowledge of Bodily Injury or Property Damage Condition, to have occurred prior to the inception date of this policy period, will include any continuation of, resumption of, or change in such "bodily injury" or "property damage" after the end of this policy period.

3. Under Defense Coverage, the following is added:

   "We" have no duty to defend a suit or claim seeking "damages" because of "bodily injury" or "property damage" which was known by a "designated insured", as stated under the Knowledge of Bodily Injury or Property Damage Condition, prior to the inception date of the policy period.

AAIS

ML-106
Ed 1.0

# TENANT RELOCATION EXPENSE ENDORSEMENT

## MASSACHUSETTS

This endorsement is required by Massachusetts law.

This policy provides relocation expense benefits as follows:

1. **Relocation Expense** — When a **rented living quarters** in a building covered by this policy is made uninhabitable as a result of a loss by fire, this policy covers **relocation expense** incurred by the tenant or lawful occupant to relocate to other living quarters in the shortest possible time.

2. **Definitions**

   A. **Relocation Expense** means documented, reasonable and necessary:

      1) Costs of packing, insuring, storing and carting household goods;
      2) Costs of securing new utility services less refunds from discontinued services at the damaged premises;
      3) Costs of searching for other quarters;
      4) Costs of disconnecting and reconnecting household appliances;
      5) Additional living expenses while searching for or awaiting possession of other quarters or the restoration of existing quarters;

      commencing with the date of damage to the covered building and not limited by the expiration date of this policy.

      **Relocation expense** does not mean:

      1) Loss caused by the termination of a lease or other agreement;
      2) Security deposits or other payments made to the landlord or lessor of other quarters;
      3) Down payments, legal fees and closing costs incidental to the purchase of other quarters.

   B. **Rented Living Quarters** means a room, suite of rooms or apartment rented as a single residential unit by one or more persons.

      **Rented living quarters** does not mean one or more rooms occupied by one or more persons as roomers in a hotel, motel, public or private lodging or rooming house where the premises are occupied on a transient basis.

3. **Limit** — The amount of coverage for **relocation expense** under this policy is limited to not more than $750 for a **rented living quarters**.

4. **No Deductible** — The deductible provisions of this policy do not apply to the **relocation expense** benefits.

5. **Other Insurance**

   A. If at the time of loss, the tenant or lawful occupant has other insurance that covers **relocation expense, we** shall not be liable for any loss under this coverage until the liability of such other insurance has been exhausted.

   B. If **you** have other insurance that covers **relocation expense**, payment under this policy will be prorated with such insurance for the smaller of the incurred **relocation expense** or $750, all after application of the other insurance of the tenant or lawful occupant.

6. **Loss Settlement** — The claims of all persons occupying the **rented living quarters** will be settled with and payment made to the tenant or lawful occupant renting the quarters from the building owner or lessor.

7. **Policy Terms** — All other **terms** of this policy remain unchanged.

ML-106 Ed 1.0

AAIS

Copyright MCMXCII, American Association of Insurance Services

**AAIS**
**ML-223  Ed 3.0**
**Page 1 of 1**

This endorsement changes the Liability Coverage
provided by this policy
**-- PLEASE READ THIS CAREFULLY --**

# LEAD LIABILITY EXCLUSION

1.  The following additional exclusion applies to the liability coverage provided by this policy.

    "We" do not pay for "bodily injury" arising out of exposure to lead in residential premises owned by an "insured" and built prior to 1978.

2.  The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in a single family owner-occupied residential premises. The exposure to lead that results in "bodily injury" must occur during the policy period.

3.  The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in a premises newly acquired by an "insured" as a result of a bona fide transaction, if the "insured" has complied with the requirements of the Massachusetts Lead Law within 90 days after becoming the owner of such premises. The exposure to lead that results in "bodily injury" must occur during the policy period and on or after the date the "insured" took title to the premises.

4.  The exclusion under item 1. of this endorsement does not apply to "bodily injury" arising out of exposure to lead in any dwelling unit or residential premises described in a Letter of Compliance or Letter of Interim Control, unless the "bodily injury" is the result of gross or willful negligence. The exposure to lead that results in "bodily injury" must occur during the policy period and on or after the date that the Letter of Compliance or Letter of Interim Control that applies to such dwelling unit or residential premises is effective.

    The Letter of Compliance or Letter of Interim Control must be signed, dated, and issued by a lead inspector authorized to do so under the Massachusetts Lead Law.

All other "terms" of the policy apply.

**ML-223  Ed 3.0**
Copyright MCMXCV
American Association of Insurance Services

AAIS
BP-309  Ed 1.0
Page 1 of 1

This endorsement changes the Commercial
Liability Coverage Provided by this policy
-- PLEASE READ THIS CAREFULLY --

# LIABILITY COVERAGE
## DESIGNATED PREMISES OR PROJECT

(The entries required to complete this endorsement
will be shown below or on the "declarations".)

**Premises:**

**Project:**

The Commercial Liability Coverage is amended
as follows:

## EXCLUSIONS

**EXCLUSIONS THAT APPLY TO BODILY
INJURY, PROPERTY DAMAGE, PERSONAL
INJURY, AND/OR ADVERTISING INJURY**

The following exclusions are added:

"We" do not pay for "bodily injury" or "property
damage" (or "personal injury" or "advertising
injury", if provided by the Commercial Liability
Coverage):

1.  that arises out of the ownership,
    maintenance, or use of the premises other
    than those described above;

2.  that arises out of operations that are
    necessary or incidental to the ownership,
    maintenance, or use of premises other than
    those described above; or

3.  that arises out of a project other than that
    described above.

**BP-309  Ed 1.0**
Copyright MCMXCV
American Association of Insurance Services

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT

# LEGAL

**BUSINESSOWNERS POLICY DECLARATIONS**

Policy Number: BOP9008400        Renewal Certificate #: New

**BILLING TYPE: Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 273 Belgrade Realty Trust | Guard Insurance Agency |
| Evangelia Bakis | 279 Mt. Auburn Street |
| PO Box 203 | Watertown, MA 02172 |
| West Roxbury, MA 02132 | |
| | Agency Number: 6110 |

Policy Period:   from 11/12/01    to 11/12/02           12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## DESCRIBED PREMISES:

| Premise # | Building # | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 273 Belgrade Avenue, Roslindale, MA | The Cooperative Bank  ISAOA ATIMA<br>40 Belgrade Avenue<br>Roslindale, MA 02131 |

**BUSINESS DESCRIPTION: 3 UNIT APARTMENT BUILDING**

☐ Individual    ☐ Joint Venture    ☐ Partnership    ☐ Corporation    ☒ Other

### LIMITS OF INSURANCE FOR PROPERTY:

| | Premise # 1        Building # 1 | Premise #        Building # |
|---|---|---|
| **BUILDINGS**<br>☐ Actual Cash Value  ☒ Replacement Value<br>Automatic Increase     % | $        250,000 | $ |
| PERSONAL PROPERTY | $ | $ |

### OPTIONAL COVERAGES / applicable only if "x" is shown below:

**LIMITS OF INSURANCE**

| | |
|---|---|
| ☐ Outdoor Signs | $                        per occurrence |
| ☐ Exterior Grade Floor Glass | Included in Property Limit |
| ☐ Other (specify)        Specify: | Included in Property Limit |
| ☐ Money & Securities Limit  $        Inside Premises  $ | Outside Premises |
| ☐ Employee Dishonesty | $                        per occurrence |
| ☒ Mechanical Breakdown | Included in Property Limit |

**DEDUCTIBLE: $ 1,000**

### LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| | | |
|---|---|---|
| LIABILITY AND MEDICAL EXPENSES | $  1,000,000  Per Occurrence  $    2,000,000  Aggregate |
| MEDICAL EXPENSES | $      5,000  Per Person |
| FIRE LEGAL LIABILITY | $     50,000  Any one fire or explosion |
| | $ |

| FORMS APPLICABLE: | ANNUAL PREMIUM        $ 1,331 |
|---|---|
| BP-200 Ed 1.0  BP-432 Ed 2.0  BP-0620 Ed 01 99<br>GL-895 Ed 2.0  BP 56 22 03 99<br>PM 72 01 07 99  BP 06 63 12 99  ML-106 Ed 1.0  ML-223 Ed 3.0  BP-309 Ed 1.0<br>Authorized Signature: _____ | $350 Minimum Earned Premium Regardless of Term<br><br>Date: _____ |

bop 7/96                                                                                 kaq 12/10/01-8400

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT



## BUSINESSOWNERS POLICY DECLARATIONS

**Policy Number:** BOP9008359    **Renewal Certificate #:** New

**BILLING TYPE: Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 297 Belgrade Realty Trust<br>Evangelia Bakis<br>PO Box 203<br>West Roxbury, MA 02132 | Guard Insurance Agency<br>279 Mt. Auburn Street<br>Watertown, MA 02172<br><br>**LEGAL**<br><br>Agency Number: 6110 |

Policy Period:    from 11/12/01    to 11/12/02    12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### DESCRIBED PREMISES:

| Premise # | Building # | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 297 Belgrade Avenue, Roslindale, MA | The Cooperative Bank  ISAOA ATIMA<br>40 Belgrade Avenue<br>Roslindale, MA 02131 |

**BUSINESS DESCRIPTION: 6 UNIT APARTMENT BUILDING**

☐ Individual    ☐ Joint Venture    ☐ Partnership    ☐ Corporation    ☒ Other

### LIMITS OF INSURANCE FOR PROPERTY:

| | | Premise # 1 | Building # 1 | Premise # | Building # |
|---|---|---|---|---|---|
| **BUILDINGS**<br>☐ Actual Cash Value  ☒ Replacement Value<br>Automatic Increase      % | | $  360,000 | | $ | |
| PERSONAL PROPERTY | | $ | | $ | |

### OPTIONAL COVERAGES / applicable only if "x" is shown below:

**LIMITS OF INSURANCE**

☐ Outdoor Signs    $                    per occurrence
☐ Exterior Grade Floor Glass    Included in Property Limit
☐ Other (specify)    Specify:    Included in Property Limit
☐ Money & Securities Limit    $    Inside Premises    $    Outside Premises
☐ Employee Dishonesty    $    per occurrence
☒ Mechanical Breakdown    Included in Property Limit

**DEDUCTIBLE: $ 1,000**

### LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| | | |
|---|---|---|
| LIABILITY AND MEDICAL EXPENSES | $ 1,000,000 | Per Occurrence  $  2,000,000  Aggregate |
| MEDICAL EXPENSES | $ 5,000 | Per Person |
| FIRE LEGAL LIABILITY | $ 50,000 | Any one fire or explosion |
| | $ | |

**FORMS APPLICABLE:**

**ANNUAL PREMIUM**    $ 1,891

BP-200 Ed 1.0  BP-432 Ed 2.0  BP-0620 Ed 01 99
GL-895 Ed 2.0  BP 56 22 03 99
PM 72 01 07 99  BP 06 63 12 99  ML-106 Ed 1.0  ML-223 Ed 3.0  BP-309 Ed 1.0

$350 Minimum Earned Premium Regardless of Term

Authorized Signature: _____    Date: _____

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT

# LEGAL



## BUSINESSOWNERS POLICY DECLARATIONS

**Policy Number:** BOP9008401      **Renewal Certificate #:** New

**BILLING TYPE: Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 296 Belgrade Realty Trust<br>Evangelia Bakis<br>PO Box 203<br>West Roxbury, MA 02132 | Guard Insurance Agency<br>279 Mt. Auburn Street<br>Watertown, MA 02172<br><br>**Agency Number: 6110** |

**Policy Period:** from 11/12/01 to 11/12/02      12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## DESCRIBED PREMISES:

| Premise # | Building # | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 296 Belgrade Avenue, Roslindale, MA | The Cooperative Bank   ISAOA ATIMA<br>40 Belgrade Avenue<br>Roslindale, MA 02131 |

**BUSINESS DESCRIPTION:** 3 UNIT APARTMENT BUILDING

☐ Individual    ☐ Joint Venture    ☐ Partnership    ☐ Corporation    ☒ Other

## LIMITS OF INSURANCE FOR PROPERTY:

| | Premise # 1 | Building # 1 | Premise # | Building # |
|---|---|---|---|---|
| **BUILDINGS**<br>☐ Actual Cash Value   ☒ Replacement Value<br>Automatic Increase   % | $    250,000 | | $ | |
| **PERSONAL PROPERTY** | $ | | $ | |

## OPTIONAL COVERAGES / applicable only if "x" is shown below:

### LIMITS OF INSURANCE

☐ Outdoor Signs      $           per occurrence
☐ Exterior Grade Floor Glass      Included in Property Limit
☐ Other (specify)    Specify:      Included in Property Limit
☐ Money & Securities Limit   $    Inside Premises   $    Outside Premises
☐ Employee Dishonesty      $         per occurrence
☒ Mechanical Breakdown      Included in Property Limit

**DEDUCTIBLE: $ 1,000**

## LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| | | |
|---|---|---|
| LIABILITY AND MEDICAL EXPENSES | $   1,000,000   Per Occurrence   $   2,000,000   Aggregate | |
| MEDICAL EXPENSES | $   5,000   Per Person | |
| FIRE LEGAL LIABILITY | $   50,000   Any one fire or explosion | |
| | $ | |

| FORMS APPLICABLE: | ANNUAL PREMIUM     $ 1,331 |
|---|---|
| BP-200 Ed 1.0   BP-432 Ed 2.0   BP-0620 Ed 01 99<br>GL-895 Ed 2.0   BP 56 22 03 99<br>PM 72 01 07 99   BP 06 63 12 99   ML-106 Ed 1.0   ML-223 Ed 3.0   BP-309 Ed 1.0<br>Authorized Signature: _____ | $350 Minimum Earned Premium Regardless of Term<br><br>Date: _____ |

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT



**BUSINESSOWNERS POLICY DECLARATIONS**          **LEGAL**

**Policy Number: BOP9008358**          Renewal Certificate #: New

**BILLING TYPE:  Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 301 Belgrade Realty Trust<br>Evangelia Bakis<br>PO Box 203<br>West Roxbury, MA  02132 | Guard Insurance Agency<br>279 Mt. Auburn Street<br>Watertown, MA 02172<br><br>Agency Number: 6110 |

Policy Period:   from 11/12/01  to 11/12/02          12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### DESCRIBED PREMISES:

| Premise # | Building #. | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 301 Belgrade Avenue, Roslindale, MA | The Cooperative Bank  ISAOA ATIMA<br>40 Belgrade Avenue<br>Roslindale, MA 02131 |

**BUSINESS DESCRIPTION:  6 UNIT APARTMENT BUILDING**

☐ Individual      ☐ Joint Venture      ☐ Partnership      ☐ Corporation      ☒ Other

### LIMITS OF INSURANCE FOR PROPERTY:

| | Premise # 1        Building # 1 | Premise #        Building # |
|---|---|---|
| **BUILDINGS**<br>☐ Actual Cash Value   ☒ Replacement Value<br>Automatic Increase          %<br>PERSONAL PROPERTY | $        360,000<br><br>$ | $<br><br>$ |

### OPTIONAL COVERAGES / applicable only if "x" is shown below:          LIMITS OF INSURANCE

☐ Outdoor Signs          $                              per occurrence
☐ Exterior Grade Floor Glass          Included in Property Limit
☐ Other (specify)      Specify:          Included in Property Limit
☐ Money & Securities Limit      $      Inside Premises    $      Outside Premises
☐ Employee Dishonesty          $                              per occurrence
☒ Mechanical Breakdown          Included in Property Limit

**DEDUCTIBLE: $  1,000**

### LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| | | | | |
|---|---|---|---|---|
| LIABILITY AND MEDICAL EXPENSES | $ | 1,000,000 | Per Occurrence   $   2,000,000   Aggregate | |
| MEDICAL EXPENSES | $ | 5,000 | Per Person | |
| FIRE LEGAL LIABILITY | $ | 50,000 | Any one fire or explosion | |
| | $ | | | |

| FORMS APPLICABLE: | ANNUAL PREMIUM          $  1,891 |
|---|---|
| BP-200 Ed 1.0  BP-432 Ed 2.0  BP-0620 Ed 01 99<br>GL-895 Ed 2.0  BP 56 22 03 99<br>PM 72 01 07 99  BP 06 63 12 99  ML-106 Ed 1.0  ML-223 Ed 3.0  BP-309 Ed 1.0<br>Authorized Signature: | $350 Minimum Earned Premium Regardless of Term<br><br>Date: |

# PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT
## GLASTONBURY, CONNECTICUT

**LEGAL**

### BUSINESSOWNERS POLICY DECLARATIONS

Policy Number: **BOP9008358**         Renewal Certificate #: New

**BILLING TYPE: Direct**

| NAMED INSURED & MAILING ADDRESS: | AGENCY: |
|---|---|
| The 301 Belgrade Realty Trust <br> Evangelia Bakis <br> PO Box 203 <br> West Roxbury, MA 02132 | Guard Insurance Agency <br> 279 Mt. Auburn Street <br> Watertown, MA 02172 <br><br> Agency Number: 6110 |

Policy Period:    from 11/12/01    to 11/12/02         12:01 a.m. Standard Time

In return for your payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### DESCRIBED PREMISES:

| Premise # | Building #. | Location of Property Covered | Mortgagee, Name and Address |
|---|---|---|---|
| 1 | 1 | 301 Belgrade Avenue, Roslindale, MA | The Cooperative Bank  ISAOA ATIMA <br> 40 Belgrade Avenue <br> Roslindale, MA 02131 |

**BUSINESS DESCRIPTION:  6 UNIT APARTMENT BUILDING**

☐ Individual    ☐ Joint Venture    ☐ Partnership    ☐ Corporation    ☒ Other

### LIMITS OF INSURANCE FOR PROPERTY:

| | Premise # 1    Building # 1 | Premise #    Building # |
|---|---|---|
| **BUILDINGS** <br> ☐ Actual Cash Value  ☒ Replacement Value <br> Automatic Increase      % <br> PERSONAL PROPERTY | $         360,000 <br><br><br> $ | $ <br><br><br> $ |

| OPTIONAL COVERAGES / applicable only if "x" is shown below: | LIMITS OF INSURANCE |
|---|---|
| ☐ Outdoor Signs | $                          per occurrence |
| ☐ Exterior Grade Floor Glass | Included in Property Limit |
| ☐ Other (specify)          Specify: | Included in Property Limit |
| ☐ Money & Securities Limit    $        Inside Premises    $ | Outside Premises |
| ☐ Employee Dishonesty | $                          per occurrence |
| ☒ Mechanical Breakdown | Included in Property Limit |

**DEDUCTIBLE: $ 1,000**

### LIMITS OF INSURANCE FOR LIABILITY AND MEDICAL PAYMENTS

| LIABILITY AND MEDICAL EXPENSES | $ | 1,000,000 | Per Occurrence  $    2,000,000  Aggregate |
|---|---|---|---|
| MEDICAL EXPENSES | $ | 5,000 | Per Person |
| FIRE LEGAL LIABILITY | $ | 50,000 | Any one fire or explosion |
| | $ | | |

**FORMS APPLICABLE:**
BP-200 Ed 1.0  BP-432 Ed 2.0  BP-0620 Ed 01 99
GL-895 Ed 2.0  BP 56 22 03 99
PM 72 01 07 99  BP 06 63 12 99  ML-106 Ed 1.0  ML-223 Ed 3.0  BP-309 Ed 1.0

Authorized Signature: _____

| ANNUAL PREMIUM | $ 1,891 |
|---|---|

$350 Minimum Earned Premium Regardless of Term

Date: _____

bop 7/96                                    kaq 12/10/01-8358

# THE PATRONS GROUP

**Patrons Mutual Insurance Company of Connecticut**
**Litchfield Mutual Fire Insurance Company**
**Patrons Fire Insurance Company of Rhode Island**
**Provision State Insurance Company**

## FAX NUMBER 860-633-3942

DATE: 6/9/05

TO: Bill Burke

FROM: Ann Wilson

TOTAL NUMBER OF PAGES: 2

RE:   Bakis

Bill,

As per your request, the declarations page for BOP9008358 to follow.

Sincerely,
Ann Wilson
Sr. Casualty Claims Specialist
Ext. 3347

617457-5772

769 Hebron Avenue ◆ PO Box 6517 ◆ Glastonbury, Connecticut 06033-6517 ◆ (860) 633-4678 ◆ FAX (860) 633-3942

**hp officejet 7130**
**printer/fax/scanner/copier**

**Fax-History Report** for
 Burke & McMenimen
 6174575772
 Jun 09 2005 3:39pm

## Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jun 9 | 3:38pm | Received | 8606333942 | 0:29 | 2 | OK |

# EXHIBIT 3

Page 1

```
 1              COMMONWEALTH OF MASSACHUSETTS

 2    SUFFOLK, SS.          SUPERIOR COURT DEPARTMENT

 3                          OF THE TRIAL COURT

 4                          CIVIL ACTION NO. 02-4725E

 5    * * * * * * * * * * * * * * * * * * * * * * * * * *

 6    SUZANNE KELLY,                              *

 7              Plaintiff,                        *

 8    vs.                                         *

 9    NICHOLAS BAKIS, a Minor,                    *

10    EVANGELINA BAKIS, ALSO KNOWN AS EVI         *

11    BAKIS AND EVANGELINA SIMEONIDOU,            *

12    Individually and as Trustee OF THE 296      *

13    BELGRADE AVENUE TRUST, D AND S REALTY       *

14    * * * * * * * * * * * * * * * * * * * * * * * * * *

15    (Caption continued on next page)

16

17              DEPOSITION OF:  PETER BAKIS

18              GARGIULO/RUDNICK, LLP

19              66 Long Wharf

20              Boston, Massachusetts

21      July 22, 2003        10:05 a.m.

22

23              Sonya Medeiros

24              Court Reporter
```

PETER BAKIS
July 22, 2003

**Page 54**

1    MR. GILL: If you know, answer.
2    THE WITNESS: No, I don't know.
3    Q.    (By Ms. Corrigan) And when
4  Nicholas left the cleaners that afternoon, did
5  anybody ride in the car with him?
6    A.    Can you make a little more
7  specifically questions because I don't
8  understand exactly your question.
9    Q.    Okay. When Nicholas left the
10  cleaners that afternoon -- you said about 5 or 6
11  in the afternoon -- did anybody ride in the van
12  with him?
13    A.    From where?
14    Q.    From the cleaners to wherever he
15  was going.
16    A.    From the cleaners? No.
17    Q.    Where did he go when he left the
18  cleaners at 5 or 6 that afternoon?
19    A.    He's got a practice -- basket
20  practice -- at Hellenic College, Brookline.
21    Q.    When he left the cleaners in
22  Holbrook, did he go directly to basketball
23  practice in Brookline?
24    A.    I don't know.

**Page 55**

1    Q.    Was anybody else with him when he
2  drove from Holbrook to basketball practice?
3    A.    You ask me the same question
4  before. And I respond to you when he left the
5  cleaners, he left alone.
6    Q.    Okay. But did he pick anybody up
7  along the way to go to basketball practice?
8    A.    I don't know.
9    Q.    And what time was he at basketball
10  practice?
11    A.    My best recollection is a guy.
12  It's at church. They set up a time. My best
13  recollection, it start 6:00.
14    Q.    And how long was he there for
15  basketball practice?
16    A.    I still don't understand.
17    Q.    How long --
18    A.    Can I ask you for, please, little
19  loud?
20    Q.    Okay.
21    A.    I appreciate it.
22    Q.    How long --
23    A.    Louder.
24    Q.    How long was Nicholas at

**Page 56**

1  basketball practice?
2    A.    Usually takes two hours, usually.
3  It's not specific time.
4    Q.    Now, when Nicholas was at the
5  cleaners, what was he doing there?
6    A.    He's helping at the counter.
7    Q.    And did he often work at the
8  cleaners?
9    A.    What do you mean often?
10    Q.    Usually, did he usually work at
11  the cleaners in Holbrook?
12    A.    Saturdays, yes.
13    Q.    I'm sorry?
14    A.    Saturdays, yes. When he's got
15  free time.
16    Q.    How often did he work at the
17  cleaners?
18    A.    He's go every Saturday.
19    Q.    Every Saturday. Okay.
20    A.    The most of Saturdays. Not every
21  Saturday. Most.
22    Q.    Beginning when? How many years
23  before that had he been working Saturdays at the
24  cleaners?

**Page 57**

1    A.    About four, five years, four
2  years.
3    Q.    And did he work there at any other
4  time during the week?
5    A.    No.
6    Q.    Now, after Nicholas was finished
7  with basketball practice, what did he do then?
8    A.    Going to Tewksbury. He went to
9  Tewksbury.
10    Q.    And what time did he leave for
11  Tewksbury?
12    A.    I wasn't with him.
13    Q.    Do you know what time he left
14  approximately?
15    A.    Yes. He told me.
16    Q.    What time did he leave for
17  Tewksbury?
18    A.    Around 8:30.
19    Q.    And what car did he drive to
20  Tewksbury?
21    A.    The same car he drove to the
22  practice.
23    Q.    And what car was that?
24    A.    The dodge van. The white van.

15 (Pages 54 to 57)

PETER BAKIS
July 22, 2003

Page 118

1 board and member of the church, both people.
2     Q.    Did you have a conversation with
3 Nicholas while he was at the church?
4     A.    Can you repeat little louder,
5 please, your question?
6     Q.    During the time that you were at
7 the church, did you have a conversation with
8 your son Nicholas?
9         MR. GILL:  You go ahead.  If you
10 understand the question, answer it.
11        THE WITNESS:  Yes.
12     Q.    (By Ms. Corrigan)  And what did
13 you say to your son during the course of that
14 conversation?
15     A.    Generally?
16     Q.    Generally.
17     A.    As a father and son, generally, I
18 said how are you doing, how's she doing, how's
19 the practice.  He said it was good, thanks.  He
20 introduced the girls to us.
21     Q.    Had you met the girls before?
22     A.    Excuse me?
23     Q.    Had you met the girls before?
24     A.    Little louder, please.

Page 119

1     Q.    Had you met the girls before?
2     A.    No.
3     Q.    And what time was this when you
4 had a conversation with Nicholas?
5     A.    After 10:30.
6     Q.    What did he say to you during the
7 course of that conversation?
8     A.    He introduced the girls, the girl
9 and the other girl was with.  I think it was her
10 cousin.  And we discuss -- I ask him how's the
11 practice going today, how's everything,
12 everything is all right, you drive carefully.
13 Yes, dad, it's perfect.
14     Q.    And what were the names of the
15 girls that you were introduced to?
16     A.    I know one's Nicholas's
17 girlfriend.  The name is -- repeat the question,
18 please.
19     Q.    What were the names of the girls
20 that you were introduced to, the names of the
21 girls that Nicholas introduced to you that
22 evening?
23     A.    Her name is -- Nicholas girlfriend
24 name is Amy Diaz.

Page 120

1     Q.    And what was the name of the other
2 girl that you were introduced to?
3     A.    I don't remember.
4     Q.    How long did Nicholas stay at the
5 dance?
6     A.    Excuse me?
7     Q.    How long did Nicholas stay at the
8 dance after that?
9     A.    Approximately about a half an
10 hour.
11     Q.    And what did he do then?
12     A.    He has to take the girls back to
13 the house.
14     Q.    And did you have a conversation
15 with him about taking the girls back to their
16 house?
17     A.    Yes.
18     Q.    And what did you say?
19     A.    He said to me dad, I have to
20 leave.  I say why.  He said I have to take back
21 the girls to the house.
22     Q.    And what did you say?
23     A.    He ask me if I can use the
24 Mercedes.  I said yes.

Page 121

1     Q.    How did Nicholas get to the dance?
2     A.    With the white van.
3     Q.    So why didn't he take the white
4 van to drive the girls home?
5         MR. GILL:  Objection.  You can
6 answer, if you know.
7         THE WITNESS:  Can you repeat the
8 question, please?
9     Q.    (By Ms. Corrigan)  Why didn't
10 Nicholas take the white van to take the girls
11 home that evening?
12        MR. GILL:  Objection.  You can
13 answer.
14        THE WITNESS:  Well, I think with
15 the Mercedes, it's little more better
16 ride.  Because the white van's a big car.
17 I'm not blame him to ask me.
18     Q.    (By Ms. Corrigan)  I'm just
19 asking.  What time did he leave the church that
20 evening?
21     A.    Around 11:00.
22     Q.    And do you know how long it took
23 to drive from the church to Tewksbury?
24        MR. GILL:  You're asking as a

31 (Pages 118 to 121)

PETER BAKIS
July 22, 2003

Page 66

1    you have something to say, then you can
2    say it at another time. This is not your
3    time. Okay? Do not ask me questions.
4        MR. GILL: I want to make sure
5    you got it clear.
6        MS. CORRIGAN: I was trying --
7    look, you know. I think we've got it on
8    the record. Thank you very much.
9        MR. GILL: Let's not do it again,
10    then. We will not be answering it next
11    time.
12    Q.    (By Ms. Corrigan) When you
13    arrived at your home after being at the office
14    on that Saturday evening on February 2nd, you
15    said you arrived at your house at about 8:30; is
16    that right?
17    A.    Approximately.
18    Q.    Okay. And what did you do at that
19    point in time?
20    A.    My best recollection, I have
21    dinner. I stay on the television for short
22    time, watch the Greek news. I took a shower.
23    My best recollection is that.
24    Q.    And what time is the Greek news on

Page 67

1    in the evening?
2    A.    It's variance. Different
3    programs. I don't remember. Sometimes it's
4    three different programs -- three different
5    stations. Each one has different times.
6    Q.    Okay. What programs or program
7    did you watch that evening?
8    A.    I don't remember. Whatever my
9    wife's aunt programs on, I watch.
10    Q.    Now, after you had dinner, watched
11    TV and took a shower, then what did you do?
12    A.    We drove to the church. I drove
13    to the church.
14    Q.    And who was in the car?
15    A.    Me and my wife.
16    Q.    And what car did you drive to the
17    church?
18    A.    Mercedes 1978 -- '87 -- '88.
19    Q.    I'm sorry. '88?
20    A.    '88. Yes.
21    Q.    What was the model number of that
22    Mercedes?
23    A.    I'm not too good on models. I do
24    know 300.

Page 68

1    Q.    What kind of car was it?
2    A.    Mercedes.
3    Q.    Right. But was it a sedan?
4    Station wagon?
5    A.    Four doors.
6    Q.    Four doors. So was it a sedan?
7    A.    If you call sedan.
8    Q.    A car that has four doors and two
9    passenger seats and trunk in the back.
10    A.    Seats front and back.
11    Q.    And who owned that car?
12    A.    Evangelina Bakis.
13    Q.    And how long had Evangelina owned
14    that car?
15    A.    I don't remember.
16    Q.    Approximately, how long had you
17    owned that car prior to February 2, 2002?
18        MR. GILL: He just said that he
19    didn't own it. He said that his wife had
20    owned it.
21    Q.    (By Ms. Corrigan) I'm sorry.
22    Approximately, how long did your wife own that
23    car prior to February 2, 2002?
24    A.    It's more than four years.

Page 69

1    Q.    And did you buy the car for her?
2    A.    Yes.
3    Q.    And where did you buy it?
4    A.    Service Financial.
5    Q.    And where is that?
6    A.    What do you mean where's that?
7    Q.    Where is that located, Service
8    Financial?
9    A.    Little more specifically, please,
10    that question.
11    Q.    Where did you buy the Mercedes?
12    A.    From Service Financial.
13    Q.    Okay. And where are they located?
14    A.    In Newton.
15        MR. GILL: I think if you speak
16    up, you'll have an easier time. You're
17    not speaking very loudly.
18    Q.    (By Ms. Corrigan) Now, prior to
19    February 2, 2002, and during the time that your
20    wife owned the car -- the Mercedes -- had it
21    been in any accidents?
22    A.    My best recollection, yes.
23    Q.    Okay. And what accidents had it
24    been in?

18 (Pages 66 to 69)

PETER BAKIS
July 22, 2003

Page 282

1        I, SONYA MEDEIROS, a Notary Public
2  in and for the Commonwealth of Massachusetts, do
3  hereby certify that PETER BAKIS came before me
4  on the 22nd day of July, 2003, at the law
5  offices of GARGIULO/RUDNICK, LLP, 66 Long Wharf,
6  Boston, Massachusetts, and was by me duly sworn
7  to testify to the truth and nothing but the
8  truth as to his knowledge touching and
9  concerning the matters in controversy in this
10  cause; that he was thereupon examined upon his
11  oath and said examination reduced to writing by
12  me; and that the statement is a true record of
13  the testimony given by the witness, to the best
14  of my knowledge and ability.
15       I further certify that I am not a
16  relative or employee of counsel/attorney for any
17  of the parties, nor a relative or employee of
18  such parties, nor am I financially interested in
19  the outcome of the action.
20       WITNESS MY HAND this 30th day of
21  July 2003.
22
23  Sonya Medeiros     My Commission expires:
24  Notary Public      March 31, 2006

Page 283

1  Today's date:   July 30, 2003
2  To:       Robert T. Gill, Esq.
3  Copied to:   Patricia Noyes-Corrigan, Esq.
4  From:     Sonya Medeiros
5  Deposition of:  Peter Bakis
6  Taken:     July 22, 2003
7  Action:    KELLY
8          VS.
9          BAKIS
10
11
12     Enclosed is a copy of Mr. Bakis'
13  deposition. Pursuant to the Rules of Civil
14  Procedure, Mr. Bakis has thirty days to sign the
15  deposition from today's date.
16     Please have Mr. Bakis sign the enclosed
17  signature page. If there are any errors, please
18  have him mark the page, line and error on the
19  enclosed correction sheet. He should not mark
20  the transcript itself. This addendum should be
21  forwarded to all interested parties.
22     Thank you for your cooperation in this
23  matter.
24

Page 284

1       COMMONWEALTH OF MASSACHUSETTS
2  SUFFOLK, SS.     SUPERIOR COURT DEPARTMENT
3       OF THE TRIAL COURT
4       CIVIL ACTION NO. 02-4725E
5  *****************************************
6  SUZANNE KELLY,        *
7      Plaintiff,       *
8  vs.         *
9  NICHOLAS BAKIS, a Minor,    *
10  EVANGELINA BAKIS, ALSO KNOWN AS EVI  *
11  BAKIS AND EVANGELINA SIMEONIDOU,  *
12  Individually and as Trustee OF THE 296 *
13  BELGRADE AVENUE TRUST, D AND S REALTY *
14  ****************************************
15  (Caption continued on next page)
16     I, PETER BAKIS, do hereby certify, under
17  the pains and penalties of perjury, that the
18  foregoing testimony is true and accurate, to the
19  best of my knowledge and belief.
20     WITNESS MY HAND, this   day of
21     , 2003.
22
23       PETER BAKIS
24  SM

Page 285

1  (Caption continued)
2
3  *****************************************
4  TRUST, TABLETOP TRUST AND MACEDONIA  *
5  REALTY TRUST And PETER BAKIS, ALSO KNOWN *
6  AS PANAGIOTIS BAKIS, Individually, and, *
7  as Parents and Next Friends of NICHOLAS *
8  BAKIS, a Minor,       *
9      Defendants.      *
10  ****************************************
11
12
13
14
15
16
17
18
19
20
21
22
23
24

72 (Pages 282 to 285)

# EXHIBIT 4

```
                                         Volume:  1
                                         Pages:  117
                                         Exhibits:  0
```

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                      SUPERIOR COURT DEPARTMENT
                                  OF THE TRIAL COURT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                  \*
SUZANNE KELLY,                    \*
                                  \*
        Plaintiff,                \*
V.                                \*   CIVIL ACTION NO.:
                                  \*     02-4725E
NICHOLAS BAKIS, A MINOR,          \*
EVANGELINA BAKIS, ALSO KNOWN      \*
AS EVI BAKIS AND EVANGELINA       \*
SIMEONIDOU, INDIVIDUALLY AND      \*
AS TRUSTEE OF THE 296 BELGRADE    \*
AVENUE TRUST, D AND S REALTY      \*
TRUST, TABLETOP TRUST, AND        \*
MACEDONIA REALTY TRUST, AND       \*
PETER BAKIS, ALSO KNOWN AS        \*
PANAGIOTIS BAKIS, INDIVIDUALLY,   \*
AND AS PARENTS AND NEXT FRIENDS   \*
OF NICHOLAS BAKIS, A MINOR,       \*
                                  \*
        Defendants.               \*
                                  \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        **DEPOSITION OF EVANGELIA BAKIS**, A DEFENDANT called
by and on behalf of the Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of Civil Procedure,
before Patrice C. Lucero, a Certified Verbatim Reporter and
Notary Public in and for the Commonwealth of Massachusetts,
at the law offices of Gargiulo/Rudnick, LLP, 66 Long Wharf,
Fourth Floor, Boston, Massachusetts, on Wednesday,
June 25, 2003, to be commenced at 10 a.m.


                        \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

                        **DOHERTY COURT REPORTING**
                           **130 GRANGER STREET**
                           **QUINCY, MA 02170**
                            **(781) 834-1388**

34

1   A   Not specifically.  But I always when I wash I do ironing

2       too.  I took a shower.  This was in the daytime.  You

3       have lunch.  The usual things you do every day.  And

4       then in the afternoon -- the nighttime, we went to the

5       church function.

6   Q   Where was the church?

7   A   The church is in Roslindale Square.  St. Nectarios

8       Church.

9   Q   Could you please spell that.

10  A   S-t-N-e-c-t-a-r-i-o-s.  St. Nectarios.

11  Q   What time did you go to the church that evening?

12              MR. GILL:  Keep drinking your water.  I think

13      it will help you.

14              THE WITNESS:  Thank you.

15  A   You want the exact time?

16  Q   Approximately.  Unless you remember the exact time.

17  A   No.  I know it was after ten because the dance usually

18      starts at nine.  All the dances start around nine.

19  Q   After -- I'm sorry -- 10 p.m. or a.m.?

20  A   P.m.

21  Q   P.m.

22  A   Yeah.  They didn't have in the morning dances.

23              [Witness vomiting.]

24              MR. GILL:  Let's take a break for a minute.

**DOHERTY COURT REPORTING  (781) 834-1388**

61

1    Q    Well, I'm assuming you didn't see him after that because

2         you said that you didn't see him until he came home just

3         before ten.

4    A    Yes.

5    Q    So what do you know about where your son was after

6         basketball practice that evening?

7              MR. GILL:  Objection.  You can answer.

8    A    But see, what I know from what he told me.  It's not

9         that I physically know.  It's not something like -- I

10        don't know how to say it.

11             MR. GILL:  Well, if you know what he did, say.

12        If you don't know what he did, say.  Because they can

13        always ask him, too, you know.

14   A    Well, he told me that he went to pick up his girlfriend.

15   Q    That would be Amy Diaz?

16   A    Yes.

17   Q    And that would be up in Tewksbury?

18   A    Yes.

19   Q    I just want to be clear that when your son told you that

20        when he left basketball practice he went from there to

21        Amy Diaz's house in Tewksbury to pick her up for the

22        dance.

23   A    Yes.

24   Q    Did he make any other stops along the way between

**DOHERTY COURT REPORTING  (781) 834-1388**

68

1  A   He took the keys from my husband, and he went to give a

2      ride to the girls.

3  Q   What car did he drive?

4           MR. GILL:  Keep drinking your water.

5           THE WITNESS:  Could I ask you what time it is.

6           MR. PALMER:  12:45.

7           MR. GILL:  Do you need to take a break?

8           THE WITNESS:  I'm going to take my medication.

9           MR. GILL:  You know what, why don't we just

10     break for lunch.

11          MS. NOYES-CORRIGAN:  That would be fine.

12          MR. GILL:  Why don't we get the water and then

13     break for lunch, yeah, and then she can take her

14     medicine.

15          [Off the record.]

16 Q   I believe when we were last discussing the events of the

17     evening of February 2nd, my question to you was:  What

18     car did your son take to Tewksbury that evening?  And

19     this would be when he was driving the girlfriend and her

20     friend back home.

21 A   He took the Mercedes.

22 Q   Who usually drove the Mercedes?

23 A   My husband.

24 Q   Who owns the car?

**DOHERTY COURT REPORTING  (781) 834-1388**

69

| | | |
|---|---|---|
| 1 | A | I did at the time. |
| 2 | Q | Who was responsible for cleaning the car? |
| 3 | A | Usually my husband and the boys. |
| 4 | Q | What arrangement did you have with the boys for cleaning |
| 5 | | the car? |
| 6 | A | What do you mean arrangement? |
| 7 | Q | Well, did you have a set schedule as to when they were |
| 8 | | supposed to clean the car? |
| 9 | A | Not set schedule, but we usually clean all of our cars |
| 10 | | once a week. |
| 11 | Q | Prior to February 2nd, when was the last time that |
| 12 | | Mercedes had been cleaned? |
| 13 | A | I don't remember the exact day, but we usually clean the |
| 14 | | cars Fridays or Saturdays, by the end of the week so |
| 15 | | it's ready for church, for our activities. |
| 16 | Q | Had you had that car cleaned on Friday, February 1st? |
| 17 | A | I didn't say we had it February -- it was either Friday |
| 18 | | or Saturday, but I don't remember.  My husband would |
| 19 | | know about it because he's the one and sometimes the |
| 20 | | boys.  But it was the wintertime, so usually my husband |
| 21 | | does. |
| 22 | Q | Did he usually clean the car himself or take it to a |
| 23 | | carwash? |
| 24 | A | It depends.  Sometimes he takes it to Washington Street |

**DOHERTY COURT REPORTING  (781) 834-1388**

LASER BOND FORM A ⊕ PENGAD • 1-800-631-6989 • www.pengad.com

EVANGELIA BAKIS - VOLUME III
July 17, 2003

---

Page 158

1   Exhibit 20?
2         MR. GILL: Objection. She
3   testified she can't identify that picture.
4         THE WITNESS: Say again, please.
5         Q.    (By Ms. Corrigan) Can you
6   identify what's on the hood of that car in
7   Exhibit No. 20?
8         MR. GILL: Objection.
9         Q.    (By Ms. Corrigan) What does it
10  look like to you?
11        A.    This is the front of the car?
12        Q.    Tell me what those marks look like
13  to you?
14        A.    It says 0, 1, 2, 3.
15        Q.    The marks on the car, what does it
16  look like to you?
17        MR. GILL: She told you. It says
18  0, 1, 2, 3, and she's right.
19        Q.    (By Ms. Corrigan) You don't see
20  any marks on the car right above the numbers
21  right there, what does that look like to you?
22        MR. GILL: Objection.
23        THE WITNESS: I don't know. Can't
24  tell.

---

Page 159

1         Q.    (By Ms. Corrigan) On Exhibit
2   No. 28 can you identify what's on the hood of
3   the car above the numbers?
4         MR. GILL: Objection.
5         Q.    (By Ms. Corrigan) What does that
6   look like to you?
7         MR. GILL: There is no evidence
8   whatever that's the hood of a car, and
9   this witness has said she doesn't know
10  what it is.
11        Q.    (By Ms. Corrigan) What does it
12  look like to you, Mrs. Bakis?
13        A.    That's 1, 2, 3, 4.
14        Q.    Right above the numbers what does
15  that look like to you?
16        MR. GILL: She is looking above
17  the numbers.
18        THE WITNESS: Looks like lines,
19  dashes.
20        Q.    (By Ms. Corrigan) You don't see
21  the hair right above the numbers on that?
22        MR. GILL: She's telling you right
23  above the numbers. There is little lines
24  going up and down.

---

Page 160

1         THE WITNESS: There are no hairs.
2   Where are the hairs?
3         Q.    (By Ms. Corrigan) Right above the
4   ruler here?
5         A.    Those are hairs?
6         MR. GILL: Okay. There is no
7   question to you.
8         THE WITNESS: Those are like
9   branches from a tree.
10        Q.    (By Ms. Corrigan) I'm going to
11  ask you to look at Exhibits 37 through 46. Can
12  you identify those pictures for me?
13        MR. GILL: Can we just ask, can
14  she recognize that as her car, is that
15  what you really mean to ask her? I mean,
16  she can answer with one answer.
17        MS. CORRIGAN: You'll have your
18  opportunity to ask questions. Right now
19  I'm asking questions so I really
20  appreciate if you hold off, okay.
21        Q.    (By Ms. Corrigan) Is that your
22  car, Mrs. Bakis, the inside of your car?
23        A.    I cannot recognize it.
24        MR. GILL: Only trying to help.

---

Page 161

1         Q.    (By Ms. Corrigan) Mrs. Bakis,
2   what color are the seats in your Mercedes?
3         A.    I don't remember.
4         Q.    How long have you owned the car?
5         A.    My husband give it to me as a
6   gift, but I drove it maybe once or twice.
7         Q.    How often did you ride in the car?
8         A.    Only on Sundays but not every
9   Sunday.
10        Q.    You don't remember what color the
11  seats are in your Mercedes; is that what you are
12  telling me?
13        A.    Either dark grayish or dark blue.
14        Q.    Do those look like the seats in
15  your car?
16        A.    This looks like blue. See, it's a
17  different color here and a different color here.
18  The backseat have a different color than the
19  front seat. Looks like blue and this looks like
20  gray.
21        Q.    Is there broken glass in those
22  pictures on the seats?
23        A.    Do you see broken glass?
24        Q.    No. You need to answer the

---

41 (Pages 158 to 161)

88

1  the transactions with the insurances.

2 Q Do you still own that car?

3 A My daughter has it, yes.

4 Q When you left the dance, how long did it take you to get

5  back to your house from the dance?

6 A I don't remember.

7 Q How long does it take to drive from the church to your

8  house?

9 A If you have all green lights, maybe five minutes.  If

10  you have red lights in between, it depends if you have

11  one red light or four red lights.  Between, let's say,

12  five and ten minutes, between that.

13 Q When you arrived home after leaving the dance at about

14  two o'clock in the morning on the night now of

15  February 3rd, was Nikolas home?

16 A When we arrived?

17 Q Yes.

18 A No, he wasn't.

19 Q What did you do then?

20 A When we arrived home, I went up in his room to see if he

21  was there.  Actually, I didn't go right away.  First

22  when we arrived home, I went into the ladies room, and

23  then I went upstairs in his room, and when I saw he

24  wasn't there, I got scared.  I came down 'cause my

**DOHERTY COURT REPORTING  (781) 834-1388**

110

1   Q   Did you have a conversation with him; yes or no?

2   A   Before we went into the car or as soon as we arrived?

3   Q   As soon as you arrived, did you have a conversation with

4      your son or at any time while you were at the gas

5      station?

6   A   When we arrived there, I asked him, "Do you want me to

7      drive?"

8             He said, "No.  I'd like to drive."

9   Q   Was there any discussion between yourself and your

10     husband about who should drive the Mercedes home from

11     Tewksbury to your house at that time?

12           MR. GILL:  Just yes or no or you don't

13     remember.

14   A   I don't remember.

15   Q   Was anybody else present for any conversation that you

16     had with your husband about who was going to drive the

17     Mercedes home from Tewksbury to your house?

18   A   No.  My daughter was sitting in her car.

19   Q   And where is your son?

20   A   He was outside.  When we arrived, my husband and I got

21     out of the car, my daughter's car, and went close to the

22     pay phone, and we said, "What are you doing?"

23           He said, "I was just trying to call you."  He

24     didn't call.  He had the coins in his hand.  And he

**DOHERTY COURT REPORTING  (781) 834-1388**

59

1   A   By himself, no.

2   Q   Did he leave the house with anybody else in the morning?

3   A   No.  He left with my husband.

4   Q   And then how did he get to basketball practice that

5       evening?

6   A   I don't know.  I don't remember.

7   Q   Did he drive there?

8   A   But if I was in the house, I would see him.  But I don't

9       know.

10  Q   You don't know how he got to basketball practice.  Do

11      you know how he got home from basketball practice?

12  A   He either drove or --

13              MR. GILL:  No, no, no, no, no.  No, no, no.

14      If you know, say so, but don't guess.

15              THE WITNESS:  Yeah.  But I already said I

16      don't know.

17              MR. GILL:  Okay.  Then stop talking.  If you

18      don't know, you don't know.

19              THE WITNESS:  Okay.

20  Q   So you don't know how he got to basketball practice.

21  A   No.

22  Q   Do you know how he got home from basketball practice, or

23      did he come home from basketball practice?

24              MR. GILL:  So what are we asking?

**DOHERTY COURT REPORTING  (781) 834-1388**

60

1        MS. NOYES-CORRIGAN:  I'm sorry.

2   Q    Did your son come home to your house after basketball

3        practice that evening?

4        MR. GILL:  If you know.

5   A    I don't remember.  I might know, but I don't remember.

6        If I wasn't there, I wasn't able to see him.  If I went

7        to the supermarket and he came and got ready and went to

8        the girls, I wouldn't know about it.

9   Q    What were the usual times for basketball practice then?

10  A    It's between five -- sometimes they go 4:30.  See, they

11       have two teams, one girls team and the boys team, and

12       the girls team is before the boys.  Sometimes the boys

13       go and watch the girls while they practice, and then

14       they practice themselves.

15            So let's make more general.  Between, let's

16       say, 4:30 and 8.  But they don't exact start.  It's a

17       practice, not a game, so they can start anytime.  They

18       can start at 4:30.  They can start at five o'clock.  A

19       few girls can start by themselves before everybody is

20       there and then go on when everybody is...

21  Q    What did your son do after basketball practice that

22       evening?

23  A    That I saw him or that he called me or with my own eyes,

24       that I saw with my own eyes?

**DOHERTY COURT REPORTING  (781) 834-1388**

66

1    son Nikolas at any time prior to the evening of

2    February 2nd about any rules that he was to follow that

3    evening, for example, such as what time he was supposed

4    to be home, where he was allowed to go, with whom, and

5    when?

6  A    You mean in general?

7  Q    That day.  That evening, did you have a conversation

8    with him about any rules that he was to follow about his

9    activities for that day and that night?

10 A    He asked my husband if he can have his car keys to give

11    ride to the girls, and my husband said that can't

12    anybody else give them ride, can't anybody else pick

13    them up, because if you leave the dance, you won't be

14    able to be at the dance.  And Nikolas said, "No.  They

15    don't have any other way of going back."

16        And then both my husband and I reminded him,

17    don't forget you have to be back by 12 o'clock because

18    you cannot drive after 12 o'clock.  And Nikolas said,

19    "Oh, don't worry.  I will be back before 12 o'clock."

20 Q    When did you have that conversation with your son?

21 A    Excuse me?

22 Q    When did you have that --

23 A    When?

24 Q    When did you have that conversation with your son?

**DOHERTY COURT REPORTING  (781) 834-1388**

109

1              MS. NOYES-CORRIGAN:  Any of the roads.

2              MR. GILL:  I'm going to object to the

3       question.

4              THE WITNESS:  Excuse me?

5              MR. GILL:  I'm objecting to the question, but

6       if you understand the question, you can answer it.

7  A    The highway's always clear.  They plow them.

8  Q    Were the highways clear that night?

9  A    I assume they were.  I don't know.

10 Q    Who drove from your house to Tewksbury that evening when

11      you and your husband and your daughter went up; who

12      drove the BMW?

13 A    It was either my husband or my daughter.  I don't

14      remember.

15 Q    Did you drive the BMW?

16 A    No.

17 Q    So you didn't drive?

18 A    No.  I'm certain about --

19 Q    Is there a reason for that?

20 A    No.  But if my husband was there, why would I drive?

21 Q    I'm just asking.  So, when you met up with Nikolas in

22      the gas station, did you have a conversation with him at

23      that time?

24 A    In general or about what?

**DOHERTY COURT REPORTING  (781) 834-1388**

1    says, "Yeah.  I'm fine.  I c

2    all right, so.

3  Q    How long had your son had h

4    in time?

5  A    I don't remember exactly,

6    five months.  But I don't ___

7    I don't remember.

8  Q    Well, I think you testified earlier that he got his

9    license around 16½, somewhere around November of 2002.

10  A    Around.  Around.  Yeah.

11  Q    And this is February 2nd -- or February 3rd, actually, at

12    this point, 2001.

13  A    So it's more than five months.  Right?  November,

14    December.  No.

15  Q    November 2001 to February 3, 2002.

16          MR. GILL:  What's the question?

17  Q    How long had he had his license at that point in time.

18  A    I might be wrong.  Maybe he had it before November.  I'm

19    not sure.  I'll have to check.

20  Q    So you don't know?

21  A    I don't remember --

22  Q    You don't remember.

23  A    -- the month.  I remember the year, but I don't remember

24    the month.

**DOHERTY COURT REPORTING  (781) 834-1388**

LASER BOND FORM A  ⊕  PENGAD · 1-800-631-6989 · www.penpad.com

117

## CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH, ss.

       I, Patrice C. Lucero, a Certified Verbatim Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

       That Evangelia Bakis, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills, and ability, of the testimony given by the said witness.

       I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 9th day of July, 2003.

*Patrice C. Lucero*

Patrice C. Lucero
Notary Public

My Commission Expires April 25, 2008

Copies of this transcript, unless produced by or under the direct supervision of the court reporter, are not official copies.

**DOHERTY COURT REPORTING  (781) 834-1388**

Page 202

```
 1          COMMONWEALTH OF MASSACHUSETTS
 2              Department of the Trial Court
 3    Suffolk, ss.          Superior Court Division
 4
 5    ***********************************
 6    SUZANNE KELLY,              *
 7       Plaintiff              *
 8    vs.                       * No. 02-4725E
 9    NICHOLAS BAKIS, a Minor,   *
      EVANGELINA BAKIS, ALSO KNOWN  *
10    AS EVI Bakis AND EVANGELINA    *
      SIMEONIDOU, Individually and as  *
11    Trustee OF THE 296 Belgrade Avenue*
      TRUST, D AND S REALTY TRUST,  *
12    TABLETOP TRUST AND MACEDONIA   *
      REALTY TRUST and PETER BAKIS, ALSO*
13    KNOWN AS PANAGIOTIS BAKIS,     *
      Individually, and, as Parents and  *
14    Next Friends of NICHOLAS BAKIS,  *
      a Minor,                   *
15       Defendants             *
16    ***********************************
17
18
19
20
21
22
23
24
```

Page 203

```
 1        I, EVANGELIA BAKIS, do hereby certify,
 2    under the pains and penalties of perjury, that
 3    the foregoing testimony is true and accurate, to
 4    the best of my knowledge and belief.
 5        WITNESS MY HAND, this   day of      ,
 6    2003.
 7
 8
 9
         _____
10          EVANGELIA BAKIS
11    CSA
12
13
14
15
16
17
18
19
20
21
22
23
24
```

52 (Pages 202 to 203)

# EXHIBIT 5

# Massachusetts State Police
## Collision Reconstruction Report





10

7-18-02

### Page 1

| Collision # | EMO.02-04-W Roxbury |
|---|---|
| Recon # | 41·02 |
| Photo # | |
| Lab # | |

| | |
|---|---|
| Open | |
| Pending Court | |
| Closed | |

| Complainant: | SP Milton, H-7 | | Phone: | 617-698-5840 |
|---|---|---|---|---|
| Complainants Address: | 685 Hillside Drive Milton, MA 02186 | | | |
| Date Rec'd: | 02-03-02 | Time Rec'd: 0605 HRS | Type of Col: | PI |
| Primary Investigator: | Tpr. A. Balestra | Troop/Dept: | SP Milton, H-7 | |
| Reconstructionist Assigned: | Tpr. Edward M. O'Hara #2428 | Team | NE #2 | |

| Collision Occurred: | West Roxbury | Suffolk | Sunday | 02-03-02 | 0445 HRS |
|---|---|---|---|---|---|
| | City/Town | County | Day | Date | Time |

### Synopsis

1. On 02-03-02 at approximately 0610 HRS I was advised by Lieutenant Workman, HHQ that SP Milton, H-7 was requesting the assistance of the Collision Analysis and Reconstruction Section with the investigation of a serious pedestrian motor vehicle collision on West Roxbury Parkway in the West Roxbury Section of the City of Boston. Upon arrival at the scene at approximately 0700 HRS, I made observations, took measurements and collected evidence

2. Vehicle #1, a 1998 Mercedes 300E was travelling north on West Roxbury Parkway, between the VFW Parkway Rotary and Weld Street. Simultaneously, Pedestrian #1 was walking north on the east edge of the northbound travel lane of West Roxbury Parkway between the VFW Parkway Rotary and Weld Street.

3. Vehicle #1 struck Pedestrian #1 with its right front corner. Pedestrian #1 then struck the right side of the windshield of Vehicle #1. Pedestrian #1 was then thrown from Vehicle #1 and landed on the right shoulder of the roadway. Pedestrian #1 then slid to final rest on the right shoulder of the roadway. Pedestrian #1 sustained serious injuries as a result of this collision.

4. Vehicle #1 continued travelling north and the operator failed to stop and provide their identity to police. Pedestrian #1 was not located until approximately 0525 HRS. A large amount of debris from Vehicle #1 was recovered at the scene of this collision.

5. After an investigation, Vehicle #1 was located on 02-05-02 at approximately 2030 HRS on Belgrade Avenue in Roslindale, approximately 1 mile from the scene of this collision.

## Roadway

6. West Roxbury Parkway, in the area of this collision is a two-lane roadway, which runs generally north and south. There is one travel lane in the northbound direction and there is one travel lane in the southbound direction. Both travel lanes were measured to be approximately 19 feet in width. The opposite travel lanes are separated by two solid yellow centerlines. There are paved shoulders on both the north and south edges of the roadway. These shoulders are designated by solid white fog lines. Both shoulders were measured to be approximately 2 feet in width.

7. There is a sidewalk on the west edge of the roadway. The sidewalk is separated from the roadway by granite curbing. On the east edge of the roadway, there is a two-panel metal guardrail with wood posts. East of the guardrail is a grassy area with trees with a measured grade of approximately 10 percent. This grassy area separates West Roxbury Parkway from Park Lawn Street.

8. North of the area of this collision, Weld Street intersects West Roxbury Parkway. This intersection is a four-way intersection, which is regulated by traffic signals.

9. West Roxbury Parkway is a public way and is maintained by the Metropolitan District Commission. The roadway surface consists of asphalt and the roadway was dry at the time of this collision. The posted speed limit in the area of this collision is 35 MPH.

10. There was white salt residue located on the edges of the roadway. The sidewalk on the west edge of the roadway was ice covered. The grassy area between West Roxbury parkway and Park Lawn Street was snow covered, and the snow was covered with a layer of ice.

11. Atmospheric condition at the time of this collision, 0445 HRS, consisted of darkness with clear skies. The temperature was approximately 21 degrees Fahrenheit.

2

# Roadway Lighting

12. On 03-11-02 at approximately 1850 HRS, I returned to the scene of the collision and conducted testing of the lighting at the scene.

13. Lighting at the scene consists of overhead streetlights. There is a streetlight located on the west side of West Roxbury Parkway approximately 62 feet south of the area of impact. There is a street light on the east side of West Roxbury Parkway approximately 75 feet north of the area of impact. There are two streetlights located at the intersection of West Roxbury Parkway and Weld Street. One is located on the north east corner of the intersection and one is located on the northwest side of the intersection

## Lighting Measurements

14. Lighting measurements in foot-candles were taken on West Roxbury Parkway in the northbound travel lane. Measurements were taken every 25 feet, from the area of impact to 75 feet north and 75 feet south of this area. Three measurements were taken at each distance. A measurement was taken at the edge of the centerline, at the center of the northbound travel lane and at approximately 2 feet west of the fog line on the east side of the roadway.

| Distance From Area of Impact | Fog Line (Foot Candles) | Center of Lane (Foot Candles) | Centerline (Foot Candles) |
|---|---|---|---|
| 75' North of the area of impact | .43 | .73 | .43 |
| 50' North of the area of impact | .38 | .02 | .08 |
| 25' North of the area of impact | .03 | .03 | .03 |
| Area of Impact | .09 | .06 | .05 |
| 25' South of the area of impact | .96 | .33 | .32 |
| 50' South of the area of impact | .54 | .72 | 1.09 |
| 75' South of the area of impact | .46 | .56 | .98 |

15. The human eye is unable to discern color and contrast in lighting which is less than .40 foot-candles.

# Roadway Evidence

16. There was a scuff with striations consistent with a shoe located on the east side of the northbound travel lane approximately 2 feet west of the northbound fog line. I determined this to be the area of impact. I observed a brown walking right shoe in the southbound travel lane approximately 4 feet west of the centerline and approximately 22 feet northwest of the area of impact. I observed this shoe to have a scuff and a white substance on the bottom. There was a heel insert to a shoe located on the east shoulder approximately 20 feet north of the area of impact.

3

17. There was a large amount of motor vehicle debris scattered on the roadway and on the grassy area on the east side of the roadway. All the debris was observed to be north of the area of impact.

18. The majority of this MV debris was located in the northbound side of the roadway. The motor vehicle debris on the roadway appeared to be mostly small pieces of plastic bumper cover and trim. There were very small pieces of clear headlight glass and yellow corner light lens in the northbound travel lane. A whole piece of a component, which was gray plastic with louvers, similar to a vent, was recovered from the roadway. One triangular piece of a gray painted, non-plastic material was located among the debris in the northbound travel lane.

19. On the snow and ice covered grassy area on the east side of the roadway, I observed more pieces of motor vehicle debris. There were two pieces comprising the right front corner of a bumper cover to a motor vehicle, as well as numerous smaller pieces of motor vehicle debris. Most of the debris observed on the grassy area was either black plastic, gray plastic or gray painted plastic. A piece of yellow marker lens was located in the grassy area as well. There was a woman's winter knit glove located on the right side of the roadway.

20. The bumper corner pieces appeared to have been repaired with "bondo" type repair techniques. The debris, which was observed at the scene, appeared to be from a foreign vehicle manufacturer.

21. There was a tire mark located in the salt residue on the east edge of the northbound travel lane. This tire mark was observed to begin approximately 5 feet south of the area of impact. This tire mark curved right to the solid white fog line and then curved left and ended where the salt residue ended approximately 70 feet north of the area of impact. Tire Mark #1 was measured to be approximately 75 feet in length.

22. There was snow on top of the guardrail posts on the east edge of the roadway. The snow on a post located approximately 22 feet northeast of the area of impact, was disturbed. I observed there to be an area of disturbed snow and ice on the grassy area approximately 40 feet north east of the area of impact. Northeast of this area the snow was disturbed and had striations running southwest to northeast, consistent with something sliding across the ice. This area of disturbed snow was measured to be approximately 34 feet in length.

23. At the northeast end of this disturbance, there was another disturbed area of snow with what appeared to be bloodstains. I determined this to be the area of final rest for Pedestrian #1. I observed a blood trail leading from this area towards the southeast. Along this blood trail I observed there to be punctures in the snow consistent with the toe of a shoe. At the southeast end of this trail was another disturbed area of snow with bloodstains and medical debris. This was determined to be the area of controlled final rest of Pedestrian #1. The distance between the final rest position and the controlled final rest position was measured to be approximately 14 feet.

4

37. Mr. Bakis arrived at the Bellevue Street location with his attorney and they agreed to allow us to look in the garages and signed the consent to search form. Mr. Bakis unlocked the garage and opened the door.

38. Inside the garage, I observed a Gray Mercedes 2300 Sedan parked head inward. I observed that the windshield was shattered and caved in on the right side. The damage to the windshield was covered with a padded moving blanket. As I approached the front of the vehicle I observed what appeared to be hair on the right edge of the windshield trim area. I then observed the right front headlights and right front corner to be damaged. I observed the right front bumper corner to be missing and to be consistent with the pieces of bumper cover recovered at the scene of the collision. I observed a triangular piece of the top right corner of the panel, below the right front headlight to be broken away. This damage was consistent with the triangular piece recovered at the scene of this collision. There was a sheet of plywood leaning against the front of the vehicle covering the right front area of the vehicle.

39. Sgt. Harding, Crime Scene Services Section photographed the vehicle and the scene surrounding the vehicle. The vehicle was wrapped in a tarp and placed on a lined flat bed wrecker and towed to Interstate towing pending issuance of a search warrant. While on the tow truck I observed that the front tow hook cover was missing.

## Operator Data Vehicle #1

| | |
|---|---|
| Name: | Bakis, Nikolaos |
| Address: | 120 Anawan Avenue |
| | West Roxbury, MA 02132 |
| DOB: | 02-10-85 |
| License #: | S42242950 |

Injuries:   The operator of Vehicle #1 was not injured as a result of this collision.

Based on interviews conducted by Tpr. Balestra, Nikolaos Bakis was identified as the operator of Vehicle #1 at the time of this collision.

## Owner Data Vehicle #1

| | |
|---|---|
| Name: | Bakis, Evangelia |
| Address: | 120 Anawan Avenue |
| | West Roxbury, MA 02132 |

| | |
|---|---|
| DOB: | 03-25-54 |
| | |
| Yr/Make/Model: | 1988 Mercedes 300E |
| Reg/State/Type: | Massachusetts Passenger Registration #1978-PT |
| VIN: | WDBEA30DXJA593724 |

7

## Passenger Data Vehicle #1

The identity of any passengers in Vehicle #1 is unknown.

## Vehicle #1 Inspection

The following vehicle inspection was conducted at Interstate Towing, Canton on 02-06-02 at approximately 1820 HRS.

**Exterior**

The right front corner of the bumper cover was missing. The right front fog light lens was cracked at the top right corner. The wiper arm of the right front headlight was bent inward and was hanging. The right front headlight lens was broken. The right front headlight assembly was pushed in and shifted to the right. The right front corner light lens was broken. There was a triangular shaped piece broken away from the lower right corner of the panel below the right front headlight. The front tow hook cover was missing.

Paint samples, a portion of the front bumper cover and the right screw to the front license plate were taken and secured by CSSS section as evidence.

The right front corner of the hood was crumpled and bent down. The front corner edge of the right front quarter panel was bent inward. The hood was pushed back towards the windshield from induced damage.

There was cleansing and scrapes along the right front corner of the hood. There was cleansing and scrapes to the top of the right front quarter panel. There was fiber transfer to the top of the windshield. There was fiber transfer to the right edge of the windshield at its junction with the A-pillar.

The windshield was shattered on the right side with a strike at the lower right corner. The windshield glass was caved in creating a hole along the right edge. The right side mirror was broken from its mount and was hanging. The glass was still attached and was cracked. The windshield trim was missing from the lower right side.

There was contact damage to the left rear corner and the left rear corner of the bumper cover was missing. The left rear taillight lens was cracked. There was contact damage to the left rear quarter which starts behind the wheel well and goes to the left rear corner. There was induced damage to the left rear quarter. This damage appears to be old damage.

The center trim on the left front door was peeled back at B-pillar. This appears to be old damage.

During my inspection I observed that the pieces of bumper, the triangular piece of panel from under the right headlight and the tow hook door which was recovered at the scene of the collision, matched the missing pieces and sections of Vehicle #1.

8

## Interior

| | |
|---|---|
| Mileage: | 112,601 |
| Speedometer: | 0 |
| Ignition: | Off |
| Seatbelt Used: | Inconclusive |
| Airbag Equipped: | Yes |
| Deployment: | No |
| Radio: | Compact disc player on. When powered. Rap music was playing loudly. First lyrics heard were "Fuck the bitches...." CD player located in trunk. Disc playing is a "burned" CD with "Nick's Mix" written in marker on the CD. |
| Headlight Switch: | Off |
| Horn: | OK |
| Wipers: | Work slowly, and are entangled in damaged windshield. |
| Windows: | All are up and intact. |
| Inspection Sticker: | Massachusetts Inspection Sticker #3013624935. Issued: 12-14-2001 Expired: 12/2002. |
| Windshield: | Shattered on right side. Windshield is caved in on the right side along the right A-pillar. |
| Damage: | There was no interior damage observed. |
| Appearance: | There was a large amount of glass particles spread throughout the vehicle. The majority of this glass was located on the right front passengers floor and seat, and on the center console. The glass on the right front passenger's seat appeared to be in a "V" shape, pointing rearward at the front edge of the seat. There was a small amount of glass adhered to the right front seat back. There was glass particles on the rear seat. |

## Mechanical

| | |
|---|---|
| Engine: | 6-Cylinder |
| Transmission: | Automatic in Park position |
| Brakes: | Antilock power disk front and rear. No defects observed. |
| Steering: | No defects observed. |

## Vehicle Dimensions

The leading front edge of Vehicle #1 was observed to be the front bumper. The leading front edge was measured to be approximately 16 inches from the ground.

## Tire Inspection

| Location | Make | Type | Size | Tread | Pressure |
|----------|------|------|------|-------|----------|
| Left Front | Michelin | Rain Force | P195/65R15 | Good | Good |
| Right Front | Michelin | Rain Force | P195/65R15 | Good | Good |
| Left Rear | Michelin | Rain Force | P195/65R15 | Good | Good |
| Right Rear | Michelin | Rain Force | P195/65R15 | Good | Good |

## Lamp Inspection

The right front headlight lens was broken, the bulb was intact and no shock was observed. The right front fog light lens was cracked at the top right side. The bulb was intact and no shock was observed.

The right front marker/corner light lens was broken but the bulb was intact and I observed hot shock to the filament. This indicates that this filament was incandescent at the time it sustained a shock.

The left rear taillight lens is cracked open and the light is not functioning. All other lights were intact and functioning.

## Pedestrian #1 Data

Name:      Kelly, Suzanne

Address:     50-56 Broadlawn Park Unit 501
           Newton, MA 02467

DOB:      05-14-59

Height:      5 feet 5 inches

Clothing:      At the time of this collision, Pedestrian #1 was wearing a light brown, hooded winter coat with a "fur" collar. The hood was up on her head. She was wearing dark green sweatpants and brown shoes.

Injuries:      Pedestrian #1 sustained serious injuries as a result of this collision. These injuries included facial injuries and a broken right Tibia. The break in the right tibia of Pedestrian #1 was measured to be approximately 10 inches from the ground.

## Collision Analysis

40. Pedestrian #1 was walking north on West Roxbury Parkway, approaching the intersection with Weld Street in West Roxbury. Simultaneously, Vehicle #1 was travelling north on West Roxbury Parkway approaching Weld Street, south of Pedestrian #1. Vehicle #1 struck Pedestrian #1 from behind with its right front side and corner. The right front side of the bumper struck the right leg of Pedestrian #1.

10

41. Pedestrian #1 was thrown onto the hood of Vehicle #1 and into the windshield at the A-pillar. Pedestrian #1 was then thrown from Vehicle #1 to the northeast. Pedestrian #1 made contact with the top of a guardrail post on the east side of the roadway, approximately 22 feet northeast of the area of impact.

42. Pedestrian #1 landed on the ice-covered snow on the grassy area, on the east side of the roadway, approximately 40 feet northeast of the area of impact. Pedestrian #1 then slid on the ice, down the slope of the grassy area and came to final rest approximately 74 feet northeast of the area of impact. Pedestrian #1 the later came to a controlled final rest heading southwest, approximately 14 feet southwest of the original area final rest.

43. Vehicle #1 continued travelling north on West Roxbury Parkway.

## Witness Statements

44. There are no known witnesses to this collision.

## Subjective Sight Analysis

45. On 03-11-02 at approximately 1850 HRS, Tpr. Klane and I returned to the scene of this collision and conducted a subjective analysis of the possible point of perception by the operator of Vehicle #1 of Pedestrian #1 at the area of impact. This subjective analysis consisted of Tpr. Klane and myself driving north on West Roxbury Parkway toward a person wearing similar colored clothing to that being worn by Pedestrian #1 at the time of the collision. The clothing used in this analysis consisted of a light brown winter coat with a hood and black pants. The vehicle utilized was my cruiser. The front headlights were sprayed with a sand, salt and water mixture and allowed to dry to account for the extremely dirty headlights observed on Vehicle #1. The headlights were on low beam for this analysis.

46. The results of the subjective analysis revealed that the approximate point of possible perception was between 80 and 100 feet from the area of impact.

# Calculations

Calculate the Minimum speed of Vehicle #1 at impact with Pedestrian #1.

47. Pedestrian #1 came to final rest approximately 74 feet from the area of impact. Using the Searle Pedestrian Throw formula, with the Searle coefficient of friction value of .66 and a nominal departure angle of 30 degrees, the minimum velocity of Vehicle #1 was calculated to be approximately 47.12 fps or a minimum speed of approximately 32.14 MPH. This speed calculation result is supported by several other pedestrian throw formulas used in the collision reconstruction field, including the Borner, Rich and Barzeley formulas. These three formulas resulted in range of speeds between 28 and 35 MPH.

$$V = \frac{\sqrt{2 \times g \times f \times D}}{\text{Cos} \, \Theta + (f \times \text{Sin} \, \Theta)}$$

$f =$ The Acceleration/Drag Factor,
$V =$ The Velocity in FPS,
$2 =$ A Constant,
$g =$ Gravity, a Constant at 32.2 fps²,
$D =$ The Distance in Feet,
$\Theta =$ The Departure Angle in Degrees.

$$V = \frac{\sqrt{2 \times 32.2 \times 0.66 \times 74.00}}{0.866 + (0.66 \times 0.500)}$$

$$V = \frac{\sqrt{3145.29}}{0.866 + 0.330}$$

$$V = \frac{56.08}{1.196}$$

$$V = 47.12$$

$$S = \frac{V}{1.466}$$

$S =$ The Speed in MPH,
$V =$ The Velocity in FPS,
$1.466 =$ A Constant.

$$S = \frac{47.12}{1.466}$$

$$S = 32.14$$

12

**Calculate the total stopping distance for Vehicle #1 from the calculated minimum speed of 32 MPH.**

48. Using the calculated minimum speed for Vehicle #1 of approximately 32 MPH as a constant speed and using an average night perception-reaction time of 2 seconds, Vehicle #1 would travel approximately 93.82 feet between perception and reaction. The total stopping distance for Vehicle #1 would to be approximately 145.53 feet

$$D = \frac{S^2}{30 \times f}$$

$f$ = The Acceleration/Drag Factor.
$D$ = The Distance in Feet.
$S$ = The Speed in MPH.
30 = A Constant.

$$D = \frac{32.00^2}{30 \times 0.66}$$

$$D = 51.71$$

$D_{pr} = T_{pr} \times S \times 1.466$
$D_{pr} = 2.00 \times 32.00 \times 1.466$
$D_{pr} = 93.82$

$D_{pr}$ = The P & R Distance in Feet.
$T_{pr}$ = The P & R Time in Seconds.
$S$ = The Speed in MPH.
1.466 = A Constant.

$D_t = D_{pr} + D$
$D_t = 93.82 + 51.71$
$D_t = 145.53$

$D_t$ = The Total Stopping Dist in Feet.
$D_{pr}$ = The P & R Distance in Feet.
$D$ = The Distance in Feet.

Calculate the total stopping distance for Vehicle #1 from the speed limit of 35 MPH.

49. Using the posted speed limit of 35 MPH as a constant speed and using an average night reaction time of 2 seconds, Vehicle #1 would travel approximately 102.62 feet between perception and reaction. The total stopping distance for Vehicle #1 would be approximately 164.48 feet.

$$D = \frac{S^2}{30 \times f}$$

$f$ = The Acceleration/Drag Factor.
$D$ = The Distance in Feet.
$S$ = The Speed in MPH.
$30$ = A Constant.

$$D = \frac{35.00^2}{30 \times 0.66}$$

$$D = 61.86$$

$D_{pr} = T_{pr} \times S \times 1.466$
$D_{pr} = 2.00 \times 35.00 \times 1.466$
$D_{pr} = 102.62$

$D_{pr}$ = The P & R Distance in Feet.
$T_{pr}$ = The P & R Time in Seconds.
$S$ = The Speed in MPH.
$1.466$ = A Constant.

$D_t = D_{pr} + D$
$D_t = 102.62 + 61.86$
$D_t = 164.48$

$D_t$ = The Total Stopping Dist in Feet.
$D_{pr}$ = The P & R Distance in Feet.
$D$ = The Distance in Feet.

## Conclusions

50. Vehicle #1 was travelling north on West Roxbury Parkway approaching the intersection with Weld Street in West Roxbury. Pedestrian #1 was walking north on West Roxbury Parkway approaching Weld Street.

51. Vehicle #1 struck Pedestrian #1 with its right front corner. Pedestrian #1 struck the front windshield of Vehicle #1 and was then thrown from Vehicle #1.

52. The minimum speed at impact of Vehicle #1 was calculated to be approximately 32 MPH.

53. Pedestrian #1 was wearing dark clothing at the time of this collision. Pedestrian #1 was wearing the hood of her winter coat at the time of this collision. The temperature at the time of this collision was approximately 21 degrees Fahrenheit.

54. The right foot of Pedestrian #1 was approximately 2 feet into the travel lane.

55. The right front marker light was incandescent at the time of this collision. The front headlights of Vehicle #1 were extremely dirty from a coating of salt spray.

14

## Opinion

66. It is my opinion that there is not enough evidence to determine a complete and accurate cause of this collision.

67. It is my opinion that a significant factor in this collision is the position of Pedestrian #1 in the roadway.

68. It is my opinion that due to the dark conditions in the area of this collision and the dark clothing worn by Pedestrian #1, the operator of Vehicle #1 would have had little, if any, opportunity to see Pedestrian #1 and stop before striking her.

69. Evidence indicates that Vehicle #1 was sustaining a forward weight shift prior to striking Pedestrian #1. Based on this evidence it is my opinion that the operator of Vehicle #1 did observe Pedestrian #1 and began braking prior to striking her.

70. It is my opinion that excessive speed was not a factor in causing this collision.

71. It is my opinion that the operator of Vehicle #1 failed to stop after this collision, which caused serious personal injury to Pedestrian #1. It is my opinion that the operator and owner of Vehicle #1 engaged in an attempted cover up of this collision by failing to report the collision and concealing Vehicle #1.

Respectfully Submitted

Tpr. Edward M. O'Hara #2428
Massachusetts State Police
Collision Analysis & Reconstruction Section

16




# Massachusetts State Police
## Incident Report
### State Police Milton

**Incident #: 2002-0H7-0395**                            **Incident Report**
**Date:**     3/22/02
**Time:**     1135 hrs

**Location:**                                       **Involves 209A Abuse?**    **Yes**

**Driver: BAKIS , Nikolaos**                    **Summons: CST7200200659**
120 Arowan Street W, Roxbury, MA 02132                    Phone: 617-327-4847

| | | | | |
|---|---|---|---|---|
| SSN: 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 | D/O/B: 02/10/1985 | Age: 0 | Sex: | Race: |
| Height: _ft _in | Weight: ___ lbs | Hair: | Eyes: | Build: |
| Birthplace: | | Marital Status: | | Complexion: |
| Father: | | Mother: | | Spouse: |

**Offense(s):**
90-24-a 90-24-a    LEAVE SCENE OF PERSONAL INJURY

**Alias:**                           **Peculiarities:**

**Vehicle Information:**

| | | | |
|---|---|---|---|
| Operator State & #: 542242950 | Class: | Lic. Status: | Lic. Exp.: |
| Date of Susp/Revocation: | Reason: | | |

| | | | |
|---|---|---|---|
| | Veh Year: | | |
| VIN: | Veh Type: | Veh Color: | |
| Reg Issue: | Reg Exp: | Veh Color: | |
| Reg Issue: | Reg Exp: | Reg Rev/Susp: | Reason: |
| M/V Stolen? No | | Evidence Seized? No | Inventory Attached? No |

| Investigating Officer's Signature | State Police Milton<br>685 Hillside St.<br>Milton, MA 02186 | Reviewed By |
|---|---|---|
| | | |

1

| APPLICATION FOR COMPLAINT | ☐ ADULT  ☑ JUVENILE | NUMBER | | Trial Court of Massachusetts District Court Department |
|---|---|---|---|---|

☑ ARREST    ☒ HEARING    ☑ SUMMONS    ☒ WARRANT

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

**COURT DIVISION**

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 3/22/02 | 3/22/02 | |

**NAME OF COMPLAINANT**

State Police Milton

**OFFENSE(S)**

90-24-a 90-24-a    LEAVE SCENE OF PERSONAL INJURY

**ADDRESS AND ZIP CODE OF COMPLAINANT**

555 Hillside St.
Milton, MA, 02186

**NAME, ADDRESS AND ZIP CODE OF DEFENDANT**

BAKIS ,Nikolaos
120 Anawan Street W. Roxbury, MA 02132

| COURT USE ONLY | A hearing upon this complaint application will be held at the above court address on } | DATE OF HEARING    AT | TIME OF HEARING | COURT USE ONLY |
|---|---|---|---|---|

**CASE PARTICULARS - BE SPECIFIC**

| O | NAME OF VICTIM Owner of Property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OF PROPERTY Over or Under $250 | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|

**OTHER REMARKS:**

\* SEE ATTACHED NARRATIVE \*

**DEFENDANT IDENTIFICATION INFORMATION - Complete data below if known**

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 02/10/1985 | | 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 | | | _ft _in | __ lbs | | |

| OCCUPATION | EMPLOYER/SCHOOL | | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|---|

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|

**NO PROCESS TO ISSUE**
☒ At request of complainant
☒ Complainant failed to prosecute.
☒ Insufficient evidence having been presented.

**PROCESS TO ISSUE**
☒ Sufficient Evidence Presented
☒ Defendant Failed to Appear

**TYPE OF PROCESS**
☒ Warrant
☒ Summons Returnable_____

☒ Continued to_____

**COMMENTS**

# REPORT OF INVESTIGATION

On Sunday, February 3, 2002, at approximately 05:35 AM, Trooper Balestra responded to the West Roxbury Parkway, in vicinity of Weld Street, for a report of a seriously injured female found near the roadway. Upon arriving at the scene this officer observed a Boston Police cruiser in the eastbound travel lane of the roadway. Boston Police Officers Jason Gilmore and Robert Fields (617-343-4560), advised Trooper Balestra their department received a 911 telephone call at approximately 05:25 AM reporting someone had found a female lying on the snow covered grass area between Parklawn Street and the West Roxbury Parkway in West Roxbury. The victim's condition was extremely critical having suffered extensive multiple trauma.

During the initial investigation it became apparent the victim had been struck while on the eastside of the roadway by an unidentified motor vehicle which had fled the scene. The impact propelled the victim over the guardrail where she came to rest approximately 100 ft away from the point of impact onto the snow covered grass area. Estimates revealed the female victim had been lying in the snow-covered area for approximately one hour before she was found. The victim was identified as Suzanne M. Kelly, 05/14/69, of 50-56 Broadlawn Park, Newton, MA 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. EMS Health & Hospitals Unit P5N arrived on scene and transported Ms. Kelly to Brigham and Women Hospital in Boston. At this time Trooper Balestra requested the services of State Police Accident Reconstruction (CARS), and Crime Scene photo unit (CSS) at the scene. The roadway between VFW rotary and Weld Street was closed immediately, and the scene secured. Trooper John Herbert (Cr 1182) arrived at 06:10 AM and assisted at the scene while Trooper Balestra responded to the Brigham and Women Hospital to check on the status of Ms. Kelly and to secure her clothing into evidence. At approximately 07:15 AM State Police Accident Reconstructionist, Trooper Edward O'Hara (CARS) and Sergeant Michael Harding from CSS arrived on scene. Because of the life threatening injury to the victim Suffolk CPAC was summonsed. MDC Labor personnel arrived to assist in the road closure. At 07:30 AM Sergeant Davis Rae and Trooper Michael Briggs from SP Milton arrived on scene to assist. Trooper Balestra arrived back at the scene of the accident at 07:50 AM. Trooper Steven MacDonald from the Suffolk County DA's office arrived shortly thereafter.

At the scene investigating Troopers located in the roadway pieces of freshly broken motor vehicle parts which were identified as coming from the front of a gray/silver foreign made vehicle. These parts were located, collected, cataloged and secured as evidence. At approximately 09:00 AM a BOLO was issued through HHQ Communications for a gray foreign motor vehicle with front-end damage. At approximately 10:00 AM the roadway was re-opened and the scene was secured. Troopers Herbert, Balestra, Briggs and O'Hara arrived at SP Milton at approximately 10:30 AM and conducted a closer analysis of the evidence. Desk officer Trooper Franzella advised investigators that Debbie Kelly, sister of the victim, had been located and advised of the accident. Trooper Balestra secured the clothing into the evidence locker. The officers at this time attempted to tape pieces of the bumper together and in doing so were able to make a partial reconstruction of the bumper.

On the afternoon of February 3, 2002, Trooper Balestra arrived at #341 Weld Street in West Roxbury to interview resident Maryann Berry regarding this incident. Ms. Maryann Berry 617-696-8265 (W) (H) 617-327-5543, stated she heard a crash at approximately 04:40 AM. When her dog started barking she looked out the window but didn't see anything. At this point she went back to bed. When her dog kept on barking she thought the dog had to go outside to take care of business. Ms. Berry states she got up and took the dog out. While walking towards the West Roxbury Parkway, she states, her attention was caught by the movement of the victim waving her hand. It was at that moment Ms. Berry located the badly injured victim lying on the ground. Moments later an ambulance arrived and Ms. Berry directed them to where the victim KELLY was lying. Upon completion of his interview with Ms. Berry Trooper Balestra returned SP Milton to continue his investigation

On February 4, at approximately 08:00 AM, Troopers Balestra and O'Hara traveled to the town of Norwood arriving at Boch Toyota. Meeting with personnel at the dealership, an attempt to possibly identify the type and make of vehicle involved in this crime was conducted by comparing the parts recovered at the scene to vehicles on the lot property. The above officers talked to employee Mr._____. He advised

1

the Troopers the bumper was from a foreign made vehicle and allowed the investigators to look through their inventory of vehicles for a possible match. In this lot were approximately 150 cars of all makes and models. After some time investigators located a 1988 Mercedes-Benz having a front bumper that appeared to closely match the pieces held as evidence.

Upon referral, Troopers Balestra and O'Hara arrived at the Clair Motors Mercedes-Benz dealership in W. Roxbury. With the assistance from Clair employees it was determined the parts held in evidence were identified as possibly coming from a 1986 to 1990 Mercedes-Benz. They were referred to the Clair Motors Collision Center at 155 Rivermoor Street in W. Roxbury for a more definitive identification of the evidence.

Arriving at the Collision Center, Troopers met with several employees who informed them there were approximately 14,000 like vehicles in the Clair Motors database. Further analysis and research by the investigators and collision personnel narrowed down the identification of one of the found pieces at the scene. This was a plastic panel identified as a tow hook door, which came from the front right bumper area. The door could be found only on a Mercedes-Benz between the model years of 1986 to 1989, 260E and 300E series. The employees were certain the bumper and pieces belonged to a Mercedes-Benz. After much discussion and research through several Mercedes-Benz parts manuals, it was determined the suspect parts gathered as evidence had come from a 1986-1989 silver/gray Mercedes-Benz 260E or 300E series.

During this time State Police Crime Scene Services assigned case number 02-1102 to the victim's recovered clothing evidence and Trooper Balestra requested State Police Communications re-broadcast the suspect vehicle information (GBC).

On Tuesday February 5, 2002, Troopers Balestra and O'Hara continued their investigation by contacting the Massachusetts Registry of Motor Vehicles Registration Compliance Section. With the assistance of Trooper Willie Singletary (617-351-9177) of the Registry Registration Compliance Unit, a list of approximately thirty-three (33) possible vehicles located in the immediate Boston area was obtained. Specifically, the list identified registered vehicles of a gray/silver color, 1986-1989 Mercedes-Benz's, 260E and 300E series, with a listed address in close proximity to where this incident occurred. At approx.16:00 PM Troopers Balestra and Herbert, utilizing this information, initiated a diligent search for the suspect vehicle through the process of elimination.

On 02/05/02, at approximately 07:00 PM Trooper Balestra and Tpr Herbert arrived at #120 Anawan Avenue in West Roxbury to speak with Evangelia Bakis, the registered owner of a 1988 Mercedes-Benz, Series 300E, gray/silver in color, bearing Massachusetts registration 1978PT. Ms. Bakis was not present, however, conversation with Ms. Bakis' son, Nicholas Bakis revealed the vehicle was in the possession of his father Peter Bakis, who might possibly be located at his office on Belgrade Avenue in West Roxbury. The son was unable, or unwilling, to give the address of the office.

On 02/05/02, after further investigation, Troopers Balestra, Herbert, and O'Hara arrived at #297 Belgrade Avenue in West Roxbury, the alleged property of the father Peter Bakis, shortly before 8 PM. Located at the rear of the residence seated in a white motor vehicle, was Evangelia Bakis, the registered owner of the suspect motor vehicle. Troopers inquired to Ms Bakis where her gray Mercedes-Benz could be located. She replied she did not know where it was at that time adding her husband "could possibly have it in Boston". She was informed the Troopers were investigating a motor vehicle accident in which a vehicle fitting the description of the Mercedes-Benz registered to her may have been involved. During initial conversation Ms. Bakis stated she had been operating her gray Mercedes-Benz on West Roxbury Parkway, in the close proximity of this incident, at approximately 05:00 AM the morning of February 3, 2002. She added her vehicle had sustained damage as she neared Weld Street which she believed was caused by a rock striking her vehicle. She also stated there was additional damage to the front right of her vehicle. Troopers ceased further questioning of Ms. Bakis at that time. Peter Bakis, the husband of vehicle owner, Evangelia Bakis, arrived at the Belgrade Avenue location at 08:05 PM in the accompaniment of Attorney Stanley Charnoy. Upon the advice of Attorney Charnoy, Mr. Bakis led Troopers to the rear of the property and unlocked the garage doors where he stated he had parked the suspect vehicle.

2

With written permission from Attorney Charmoy (trustee of the trust owned property ) and Peter Bakis (the owner of the property), Trooper Balestra and Trooper O'Hara located inside the garage one 1988 Mercedes-Benz 300E series, gray in color, bearing Massachusetts registration 1978PT, VIN #WDBEA30DXJA593724. The following observations were made: The front right section of the windshield was covered with a large greenish/blue blanket under which the windshield was found to be broken with a large hole in the glass. The front right quadrant of the vehicle, specifically the bumper and headlamp area, had fresh damage which was consistent with the evidence recovered at the scene.

As a result of the information above Trooper Balestra established probable cause to believe certain evidence related to this incident would be found on, or within, the 1988 Mercedes-Benz 300 E bearing MA registration 1978PT. Therefore, the vehicle was impounded and transported to a secure location at that time.

On 02/06/02, Trooper Balestra applied for and was granted a search warrant through the West Roxbury District Court for the vehicle and any and all related evidence pertaining to this incident. Personnel from the State Police Crime Lab with the assistance of Trooper Wes Wanagle (CSS) collected forensic evidence associated with the gray Mercedes-Benz which at this time, investigators believe struck the victim. The suspect vehicle is identified as a 1988 Mercedes-Benz, registered in the name of Evangelia Bakis, bearing VIN # WDBEA30DXJA593724.

During the course of this investigation, Trooper Balestra was contacted via telephone by Attorney Richard Egbert on 02/08/02. Counsel informed Trooper Balestra he was representing Evangelia Bakis and would not allow his client to make any statement. During conversation Attorney Egbert advised Trooper Balestra he wished to meet with him and the District Attorney assigned to the case, Glenn Chouniha.

On Monday 02/11/02, Attorney Egbert, DA Chouniha, Sgt Poore, and Trooper Balestra met at SP Milton. During this meeting Attorney Egbert related he had discussed this incident with the BAKIS family. He revealed the identity of the operator of the suspect vehicle as the son, Nikolaos BAKIS, 02/10/85, MA license S42242950, also of 120 Anawan Avenue in Boston. Attorney Egbert stated the mother, Evangelia BAKIS was riding as a passenger in the vehicle at the time of this incident.

3